UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

_____

IN RE: GENERAL PRODUCTS CORPORATION,　　　Case No.: 16-_____
　　　　　　　　　　　　　　　　　　　　　　　　　Joint Administration Proposed
　　　　　　Debtor.　　　　　　　　　　　　　　　 (Chapter 11)
　　　　　　　　　　　　　　　　　　　　　　　　　Hon. _____
_____/

### DECLARATION OF ANDREW D. MASULLO
### IN SUPPORT OF FIRST DAY MOTIONS

I, Andrew D. Masullo, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the President and Chief Executive Officer of General Products Corporation ("GPC") and I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled GPC and General Products Mexico, LLC ("GPM;" and together with GPC "Debtors") to commence their Chapter 11 cases and in support of (i) the Debtors' Petitions for Relief Under Chapter 11 of the United States Code (the "Bankruptcy Code"), and (ii) the relief requested by the Debtors pursuant to various Motions filed contemporaneously with this Declaration (collectively, "the First Day Motions").

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of GPC's senior management, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. The Debtors have authorized me to submit this Declaration on their behalf.

3. I have been employed by GPC as President and Chief Executive Officer since August 14, 2012. As President and Chief Executive Officer of GPC, I am familiar with the day to day operations, businesses and financial affairs of the Debtors. The Debtors will continue to operate their businesses and manage their properties as Debtors and Debtors-In-Possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4. I have generally reviewed the First Day Motions and affirm that the facts set forth in those Motions are true and correct to the best of my knowledge.

## BACKGROUND

### Corporate Structure

5. GPC (a Delaware company) is headquartered in Livonia, Michigan.

6. GPM (a Michigan limited liability company) which is also headquartered in Livonia, Michigan, does not conduct any business operations. Its sole assets are a 2% ownership interest in GP Innovative Machining & Assembly de Mexico, S. de R.L. de C.V. ("Innovative") and SLP Resource Solutions, S. de R.L. de C.V. ("SLP") (together, the "Mexican Entities").

7. GPC is the sole member of GPM and owns 98% of each of the Mexican Entities.

8. Set forth below is a flow chart summarizing GPC's corporate structure.

General Products Corporation
Structure of Corporate Entities



## Business Operations

9. GPC is a full service supplier of highly engineered, complex and precision machine components and assemblies to the American automotive and heavy-duty truck markets. The company has approximately 175 employees located in its United States facilities. Additionally, Innovative leases approximately 38 employees from SLP and two unrelated Mexican companies for its manufacturing facility. SLP functions solely as the employer of 14 employees who are subcontracted to Innovative. Neither General Products Mexico, LLC or SLP have any manufacturing facilities. In 2015, GPC had gross sales of approximately $43.4 million.

10. The Debtors' headquarters and primary management offices are located at 14137 Farmington Road, Livonia, Michigan 48154. GPC also owns and operates manufacturing facilities at 1411 Wohlert Street, Angola, Indiana 46703 and 188 Earl Davis Drive, Russellville, Kentucky 42276. Innovative leases a manufacturing facility at Avenida EJE Dos #206 Lote 251 M1 Parque Industrial Logostik Villa Reyes, S.L.P., Mexico C.P. 79526.

11. Innovative generates revenues for GPC. These revenues are included in GPC's gross revenue figures.

## Business History

12. GPC was founded in 1922 in Jackson, Michigan and evolved its machining capabilities from low-margin, commodity type products to more precision, close-tolerance components used in chassis and engine systems. Prior to 2000, the company grew rapidly, establishing a relationship with Ford Motor Company and began to supply engine components to the heavy-duty truck industry. In 1986, GPC opened its Angola, Indiana facility. In 2004, GPC acquired its Russellville, Kentucky facility.

## Events Leading to Filing

13. In 2009, GPC started experiencing a decline in revenue due to a significant decline in auto and heavy truck sales. GPC emerged from the 2008-2010 recession with a working capital deficit and a high debt to equity ratio.

14. As GPC began to recover, one of GPC's largest customer programs was not renewed as a result of reengineering of materials used in the product.

15. During 2011 and 2012, GPC experienced a number of additional operational challenges related to tooling and commissioning new business. Despite continued capital investment, revenues failed to grow and the business never returned to profitability.

16. In 2012 and 2013, GPC implemented significant cost reductions and operational improvements under Andrew Masullo as its new President and Chief Executive Officer.

17. In spite of these changes, due to a declining demand for product from existing customers and as a result of the increased capital requirements needed to replace and grow its business, GPC has been faced with insufficient cash flow to continue paying secured debt and vendor obligations on a timely bases. As a result, it has been forced to seek a buyer or liquidate.

## Current Equity and Debt Structure

18. GPC's equity is held primarily by two entities. Norwest Mezzanine Partners ("NMP") owns just under 60% of GPC's equity and Protostar Equity Partners, LLC owns approximately 31%. Below is a complete list of GPC's shareholders with their ownership percentages:

| Shareholder | Percentage |
|---|---|
| William D. Best | 0.13 |
| Guy M. Cassidy | 0.72 |

| Shareholder | Percentage |
|---|---|
| Larry D. Clanton | 0.17 |
| Kevin Haines | 0.64 |
| Joseph Haviv | 1.82 |
| MidMark Capital II, L.P. | 5.69 |
| Norwest Mezzanine Partners (NMP) | 59.70 |
| Protostar Equity Partners, LP | 31.13 |

19. GPC estimates that, in the aggregate, it has approximately 1,500 creditors, including active and retired employees. GPC has senior secured debt in the amount of approximately $12.5 million and unsecured trade debt of approximately $4.8 million. In addition, GPC is obligated to NMP in the amount of $14.8 million on an unsecured basis. Further, GPC estimates that as of December 31, 2015 its union pension plan is underfunded in the amount of $3,970,421 and that it is obligated to fund health care for its retired non-union employees. Based on actuarial schedules, as of December 31, 2015, the healthcare obligation is estimated to be $1,008,446.

**Secured Debt**

20. GPC's secured debt is comprised of a revolving line of credit and three (3) term loans as evidenced by the loan and security documents between General Products and MB Financial Bank, f/k/a Cole Taylor Bank ("MB Bank").

21. As of May 31, 2016, the outstanding balance owed to MB Bank by GPC under the various loans were as follows:

    a.     $4,900,000.00 under the revolving credit facility; and

    b.     $7,559,000.00 under the term loans.

22. GPC's obligations to MB Bank are secured by a properly perfected first lien position on substantially all of GPC's personal property, as well as first priority mortgages on GPC's Angola, Indiana and Russellville, Kentucky facilities.

6

16-49267-tjt   Doc 15   Filed 06/27/16   Entered 06/27/16 18:37:31   Page 6 of 16

23. NMP, GPC's largest shareholder, has also deposited $2.75 million with MB Bank as additional security for GPC's obligations to MB Bank.

24. Further, as of May 31, 2016, GPC's five (5) primary customers have funded a total of $1,365,552 in last-out participations in the MB Bank debt.

25. Finally, General Products has a total of $2,800,000 in purchase money secured debt owing to 14 separate lenders.

### Stalking Horse Sale Agreement

26. As a result of the factors described above, in late 2015, GPC and its management team began evaluating a number of options to respond to their operational and liquidity issues. To this end, GPC engaged an outside professional to evaluate its business and to propose potential strategies, including but not limited to, the raising of additional capital, a sale of some or all assets, or a restructuring transaction.

27. The professional engaged to serve as a financial advisor to GPC was Ron Miller of Blue Water Partners, LLC ("Blue Water"). Among other activities performed in connection with its engagement, Blue Water evaluated GPC's business and financial performance to determine if there were alternative business models that could lead to improved financial strength. Blue Water's ultimate conclusion was that there was not a better model. The primary challenge was to reduce the size of the debt load burdening the company.

28. Notwithstanding its financial challenges, GPC strongly believes that the specialized products it provides to its customers and its niche in the auto and heavy duty truck industry means it can be a viable player in the industry going forward. In consultation with its advisors, GPC decided upon a Chapter 11 bankruptcy and sales process to effect a balance sheet restructuring that would provide the business with the best chance for greater success and prosperity.

29. Blue Water began a robust marketing effort on December 1, 2015.

30. Pursuant to Blue Water's efforts, more than 115 potential buyers were contacted. 53 of the potential buyers obtained access to Debtor's data after signing non-disclosure agreements. Question and answer sessions were held with 15 of these parties. 5 of the parties ultimately signed LOIs and from these a single buyer was chosen.

31. The buyer chosen has submitted an offer for a significant portion of Debtor's assets on a going concern basis through a sale conducted under Section 363 of the Bankruptcy Code.

32. The offer is memorialized by an Asset Purchase Agreement with Industrial Opportunity Partners ("IOP"), for the sale and purchase of specified GPC assets. This would allow IOP to continue operating and serving GPC's customers in the automotive and heavy-duty truck industry. As part of the purchase, IOP will assume a significant portion of GPC's supplier obligations. IOP is not an affiliate of GPC and neither it nor any of its owners are related to or hold claims against GPC.

33. Consequently, after reviewing the economic and financial landscape, GPC decided it was in its best interest, the interest of its employees and its creditors to seek the protection of Chapter 11 in order to provide an expeditious restructuring of its debt through one or more Section 363 sales of its business assets.

34. GPC believes it is critical to examine every possible option to maximize the value of its business. As a result and in order to insure a marketing process that generates the maximum value for its assets, Blue Water will continue to assist in the marketing and sale of the company after the bankruptcy filing.

35. Accordingly, on June 27, 2016, (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**FIRST DAY MOTIONS**

36. To minimize the adverse effects of the commencement of their Chapter 11 Cases on their business and employees, the Debtors or GPC filed several First Day Motions including those listed below.

- Debtors' First Day Motion for an Order Directing Joint Administration of their Chapter 11 Cases (the "John Administration Motion").

- GPC's Emergency First Day Motion for Interim Order Authorizing Debtors to: (A) Use Cash Collateral Pending a Final Hearing, (B) Incur Post-Petition Debt Pending a Final Hearing, and (C) Grant Adequate Protection and Provide Security and Other Relief to MB Financial Bank, N.A. (the "Borrowing Motion")

- GPC's First Day Motion for Entry of an Order (A) Authorizing, But Not Directing, the Debtor to Pay Prepetition Claims of Lienholders and Toolmakers, and (B) Authorizing and Directing Financial Institutions to Receive, Process, Honor and Pay All Checks Issued and Electronic Payment Requests Related To Such Lienholders, and Toolmakers (the "Lienholders Motion")

- GPC's First Day Motion for Order Under 11 U.S.C. §§ 363, 1107 and 1108 Authorizing the Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, and Maintenance of Existing Cash Management Systems (the "Cash Management Motion")

- GPC's Motion for Entry of an Order Authorizing Debtors to Pay Prepetition Premiums Necessary to Maintain Insurance Coverage (the "Insurance Programs Motion").

- GPC's First Day Motion for Entry of an Order (A) Deeming Utilities Adequately Assured Of Future Performance And (B) Establishing Procedure for Determining Adequate Assurance Pursuant to § 366 of the Bankruptcy Code (the "Utilities Motion")

- GPC's First Day Motion for Ex Parte Order Approving Payment of Employee Obligations, Including (A) Payment of Pre-Petition Wages,

Salaries and Other Compensation, (B) Payment of Employee Benefits and Reimbursable Employee Expenses, and (C) Authorizing and Directing Banks to Honor Pre-Petition Payroll Checks and Other Employee Obligations (the "Employee Wages Motion")

- GPC's First Day Motion for Entry of an Order (A) Authorizing, But Not Requiring, General Products Corporation to Remit and Pay Sales and Use Taxes and (B) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing (the "Trust Fund Taxes Motion")

- GPC's First Day Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "Case Management Motion")

37. I have reviewed the First Day Motions and believe the facts set forth therein are true and correct to the best of my knowledge although in some instances I have relied upon information provided by GPC's senior management team with respect to certain prepetition dollar amounts listed in the First Day Motions. I believe that the relief requested in each of the First Day Motions is necessary, appropriate and is in the best interest of the Debtors' estates, creditors and other parties in interest.

A. **Joint Administration Motion.**

38. GPC owns 100% of the membership interests in GPM. GPM has no operations or employees.

39. Except for its guarantee of a portion of GPC's debts, GPM has no debt.

40. The two Mexican entities described in this Declaration are owned jointly by GPC and GPM with GPM owning a minority interest in both entities. GPM has no other assets.

41. Neither of the Debtors is obligated to the other on any debts and there have been no transfers between these Debtors within one year prior to the petition date. GPC

10

16-49267-tjt    Doc 15    Filed 06/27/16    Entered 06/27/16 18:37:31    Page 10 of 16

and GPM are co-obligors for the debts owed to MB Financial, GPC's primary secured creditor. Neither of the Debtors are publicly traded entities.

42. The Debtors request the court to authorize the joint administration of their Chapter 11 cases under the case number assigned to GPC. Granting this relief will help ensure the economical administration of the Debtors' cases by, among other things, avoiding the fees and costs resulting from the administration of each case separately and the burden of having to file multiple and duplicative documents in each case.

**B.     Borrowing Motion**

43. Through the Borrowing Motion, GPC seeks court approval to use cash in which the secured lender MB Financial Bank, N.A. ("MB") may assert a lien and enter into certain post-petition loans and grant adequate protection as described pursuant to a specified budget as described in the Borrowing Motion.

44. GPC has an immediate need for the use of cash collateral and to borrow additional funds and will suffer irreparable harm if it is not allowed to use cash collateral and borrow the necessary funds for among other things continuing its regular business operations in an orderly manner, maintaining business relationships with vendors, suppliers and customers, providing for the payment of employees, and satisfying other working capital and operational needs - - all of which are vital to preserving and maintaining GPC's going concern value and ultimately effectuating a successful reorganization for the benefit of all creditors and parties in interest. GPC intends to use cash collateral and post-petition loan proceeds consistent with a proposed budget. An interim budget is attached to the Borrowing Motion.

45. The budget covers the expenses necessary to meet the normal operations of GPC's business and to properly administer the Debtors' bankruptcy estates. The budget will

be amended prior to the final hearing on the motion to cover the additional necessary expenses through the end of the agreed upon budget period.

46. As may be set forth in more detail in the Borrowing Motion, I believe MB will not be prejudiced by GPC's use of cash collateral and post-petition loans but will be adequately protected. Utilizing cash collateral and post-petition loans will help to maintain GPC's business operations, to continue to replenish its accounts receivable and inventory stocks, and thereby preserve and enhance the value of MB's collateral. In a forced shutdown or liquidation of GPC's business the value of MB's collateral would decline dramatically.

C. **Lienholder's Motion**

47. As noted in the Lienholder's Motion, certain creditors of GPC maintain possession of certain of GPC's materials or products in the ordinary course of business. These creditors have claims against GPC for storage, transportation, manufacturing and repairing tool and die molds and other equipment and processing parts which are necessary for GPC's product programs.

48. As also noted in the motion GPC routinely contracts with independent tool and die shops for the production or repair of specialized tools, dies, and moldings necessary for GPC's various production processes. At any given time a number of toolmakers will be in the process of producing or repairing tools that GPC will need to continue existing lines of business or to launch new production programs. In the Lienholder Motion, GPC asks the court to (a) authorize but not direct it to pay certain prepetition claims of lienholders and toolmakers and (b) authorize and direct its financial institutions to receive, process on or/and pay all checks issued and electronic payment requests made relating to these payments.

49. If GPC is not authorized to make these payments as necessary, GPC will likely incur undue delay or be wholly unable to obtain possession of various goods and tools

which are necessary to GPC's continued operations, the maintenance of its facilities and plants, and the completion of GPC's goods and tools. If this were to occur, GPC would be required to significantly delay or discontinue production which would in turn cause irreparable damage to its business and the going concern value of its assets.

**D.     Cash Management Motion**

50.     As noted in the Cash Management Motion, GPC utilizes in the ordinary course of business a centralized cash management system (the "Cash Management System") commonly used by comparably sized companies to collect, transfer, concentrate, and disperse funds.

51.     In the Cash Management Motion, GPC asks the court to (a) authorize it to maintain its existing bank accounts, checks, and business forms without being required to close such accounts and forms and reopen new ones, (b) to authorize GPC to continue using its centralized Cash Management System, and (c) authorize GPC's bank to accept and rely upon GPC's notices and instructions as to which prepetition checks can be honored pursuant to any orders entered by this Court.

52.     GPC's Cash Management System, or a similar variation of it, has been employed by GPC for some time and constitutes an essential business practice. It allows GPC to control and monitor its corporate funds, to ensure cash availability and to reduce administrative expenses by facilitating the movement of funds. The closure and reopening of such accounts and systems would be very costly to GPC, significantly disruptive to its operations and potentially damaging to its business relations with customers, vendors and employees.

**E.     Insurance Programs Motion**

53.     Through the Insurance Programs Motion, GPC seeks, to the extent necessary, authority to pay those prepetition insurance premiums and related expenses, if any,

necessary to maintain its insurance coverages in current effect and, in its discretion, to revise, supplement or change insurance coverage as needed.

54. The insurance policies set forth in the Insurance Program Motion are necessary to preserve GPC's business, and assets and in many cases are required by various regulations, laws and contracts that govern GPC's business activity.

55. If GPC is not authorized to make payments on its insurance policies, GPC's ability to maintain its current level of insurance without a significant cost increase will be severely hampered. This would in turn impact GPC's ability to continue its business operations.

F. Utilities Motion

56. GPC has relationships with at least 13 utility companies for the provision of telephone, electric, gas, water, sewer, waste management, internet, and similar utility services. Any interruption of utility service would severely disrupt and diminish GPC's chance for a successful reorganization. Accordingly GPC requests the court to enter an order (a) prohibiting the utility companies from altering or discontinuing utility services based upon the Chapter 11 filing and (b) establishing procedures as described in Utilities Motion for determining request for assurance of payment.

G. Employee Wages Motion

57. In the ordinary course of its business GPC incurs payroll obligation to its employees (the "Employees"). GPC employs approximately 175 individuals. The employees perform critical functions for GPC's day-to-day business operations. GPC's hourly employees are paid on a weekly basis one week in arrears. GPC's salaried employees are paid on a semi-monthly basis.

58. Through the Employee Wages Motion GPC seeks authority to pay certain prepetition obligations owing with respect to the employees but not yet paid as of the petition date. These include:

    a. Wages, salaries, holiday, and other similar forms of earned, compensation (the "Salaries and Wages").

    b. Deductions collected by GPC from employees' paychecks but not yet paid by GPC for the purposes of (i) income tax withholdings, (ii) employee contributions towards the 401(k) savings program, (iii) insurance premiums relating to certain health benefit plans and (iv) certain garnishments, child support, and other employee wage deduction orders (collectively, the "Prepetition Deductions").

    c. Reimbursement of expenses incurred by employees in connection with services rendered for the benefit of GPC including travel, meals, and lodging ("Expense Reimbursements").

    d. Monetary obligations owed by GPC with respect to certain employee benefit programs, including health, dental, 401(k) retirement plans, and life and disability insurance for their employees and other similar programs (collectively, the "Prepetition Benefits").

59. GPC's records indicate that the amount of Prepetition Compensation and Prepetition Benefits owing to or on account of any one particular employee will not exceed the sum of $12,850 allowable as a priority claim under sections 507(a)(4)(a)(5) of the Bankruptcy Code.

60. GPC requests the court to authorize the payments described in the Employee Wages Motion. Granting such relief will help ensure the uninterrupted delivery of the employee services to GPC as well as help create normality and aid in the debtors maintaining a "business as usual" atmosphere. Otherwise GPC faces the risk that its operations and customer relations may be jeopardized through reduced employee morale and possible attrition.

**H.**    **Trust Fund Taxes Motion**

61. GPC collects certain sales and use taxes, income withholding taxes, and other possible trust fund taxes (collectively, the "Trust Fund Taxes") from its customers or employees and ultimately remits them to the appropriate taxing authorities. As of the Petition Date, GPC estimates that the collected but unpaid prepetition Trust Fund Taxes aggregate approximately $500.00 for sales/use taxes and approximate $-0- for withholding taxes related to employee compensation.

62. GPC requests court approval to pay any prepetition Trust Fund Taxes that may be owing in order to avoid the disruption to the Chapter 11 case which would result from the nonpayment of such items, including the distractions that could result from liability for nonpayment imposed upon GPC's officers and directors.

## CONCLUSION

63. I believe the relief sought in the First Day Motions is necessary for GPC to effectuate a smooth transition into Chapter 11 Bankruptcy, to avoid irreparable harm to its business and estate and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

64. Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in their entirety, together with such further relief as the court may deem just and proper.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: _June 27_, 2016          _____
                                Andrew D Masullo