UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

**IN RE: GENERAL PRODUCTS CORPORATION,**
    *et al.,*[1]

                **Debtors.**

                        /

**Case No.: 16-49267**
**(Chapter 11)**
**Hon. Thomas J. Tucker**

## MOTION TO APPROVE (1) BIDDING PROCEDURES, A TERMINATION FEE, BID PROTECTIONS, FORM OF ASSET PURCHASE AGREEMENT AND OTHER MATTERS RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' OPERATING ASSETS; (2) SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' OPERATING ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 105(A), AND 363, AND (3) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES UNDER 11 U.S.C. § 365 IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS

Pursuant to §§ 105(a), 363, and 365 of Title 11, United States Code

(the "Bankruptcy Code") and Rules 2002, 6004, 9007, and 9014 of the Federal

Rules of Bankruptcy Procedure, (the "Bankruptcy Rules"), General Products

Corporation and General Products Mexico LLC (the "Debtors"), debtors and

debtors-in-possession in these Chapter 11 cases, hereby request that this Court

enter orders authorizing and approving (i) bidding procedures, a termination fee,

bid protections, form of asset purchase agreement, and various other matters

relating to the Debtors' intended sale of substantially all of their remaining

---

[1] General Products Corporation's case is jointly administered with the case of General Products
Mexico LLC, Case No. 16 _____.

operating assets; (ii) the sale of substantially all of the Debtors' operating assets free and clear of all liens, claims, and encumbrances to AAA-GP Holdings, LLC ("AAA-GP Holdings"), subject to higher and better bids; and (iii) the assumption and assignment of certain executory contracts and unexpired nonresidential real property leases in connection with the sale contemplated herein. In support of its Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.   On June 27, 2016 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2.   The Debtors continue to manage and operate their business as Debtors-In-Possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.   No trustee or examiner has been appointed in the Debtors' Chapter 11 cases and no committees have been appointed or designated.

4.   This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper for this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.   The statutory predicates for relief requested herein are 11 U.S.C. §§ 105(a), 363, and 365.

## Factual Background

### A.     Corporate Structure

6.     General Products Corporation ("GPC") is headquartered in Livonia, Michigan.

7.     General Products Mexico, LLC (a Michigan limited liability company) ("GPM"), which is also headquartered in Livonia, Michigan, does not conduct any business operations.  Its sole assets are a 2% ownership interest in GP Innovative Machining & Assembly de Mexico, S. de R.L. de C.V. ("Innovative") and SLP Resource Solutions, S. de R.L. de C.V. ("SLP") (together, the "Mexican Entities").

8.     GPC is the sole member of GPM and owns 98% of each of the Mexican Entities.

### B.     Business Operations

9.     GPC is a full service supplier of highly engineered, complex and precision machine components and assemblies to the American automotive and heavy-duty truck markets.  The company has approximately 175 employees located in its United States facilities.     Additionally, Innovative leases approximately 38 employees from SLP and two unrelated Mexican companies for its manufacturing facility.  SLP functions solely as the employer of 14 employees who are subcontracted to Innovative.     Neither GPM or SLP have any

manufacturing facilities. In 2015, GPC had gross sales of approximately $43.4 million.

10. GPC's headquarters and primary management offices are located at 14137 Farmington Road, Livonia, Michigan 48154. GPC also owns and operates manufacturing facilities at 1411 Wohlert Street, Angola, Indiana 46703 and 188 Earl Davis Drive, Russellville, Kentucky 42276. Innovative leases a manufacturing facility at Avenida EJE Dos #206 Lote 251 M1 Parque Industrial Logostik Villa Reyes, S.L.P., Mexico C.P. 79526.

11. Innovative generates revenues for GPC. These revenues are included in GPC's gross revenue figures.

C.  **Business History**

12. GPC was founded in 1922 in Jackson, Michigan and evolved its machining capabilities from low-margin, commodity type products to more precision, close-tolerance components used in chassis and engine systems. Prior to 2000, the company grew rapidly, establishing a relationship with Ford Motor Company and beginning to supply engine components to the heavy-duty truck industry. In 1986, GPC opened its Angola, Indiana facility. In 2004, GPC acquired its Russellville, Kentucky facility.

**D.     Events Leading to Filing**

13.     In 2009, GPC started experiencing a decline in revenue due to a significant decline in auto and heavy truck sales.  GPC emerged from the 2008-2010 recession with a working capital deficit and a high debt to equity ratio.

14.     As GPC began to recover, one of its largest customer programs was not renewed as a result of reengineering of materials used in the product.

15.     During 2011 and 2012, GPC experienced a number of additional operational challenges related to tooling and commissioning new business.  Despite continued capital investment, revenues failed to grow and the business never returned to profitability.

16.     In 2012 and 2013, GPC implemented significant cost reductions and operational improvements under Andrew Masullo as its new President and Chief Executive Officer.

17.     In spite of these changes, due to a declining demand for product from existing customers and as a result of the increased capital requirements needed to replace and grow its business, GPC has been faced with insufficient cash flow to continue paying secured debt and vendor obligations on a timely basis.  As a result, it has been forced to seek a buyer or liquidate.

## E. Current Equity and Debt Structure

18.     GPC's equity is held primarily by two entities. Norwest Mezzanine Partners ("NMP") owns just under 60% of GPC's equity and Protostar Equity Partners, LLC owns approximately 31%. Below is a complete list of GPC's shareholders with their ownership percentages:

| Shareholder | Percentage |
|---|---|
| William D. Best | 0.13 |
| Guy M. Cassidy | 0.72 |
| Larry D. Clanton | 0.17 |
| Kevin Haines | 0.64 |
| Joseph Haviv | 1.82 |
| MidMark Capital II, L.P. | 5.69 |
| Norwest Mezzanine Partners (NMP) | 59.70 |
| Protostar Equity Partners, L.P. | 31.13 |

19.     GPC estimates that, in the aggregate, it has approximately 1,500 creditors, including active and retired employees. GPC has senior secured debt in the amount of approximately $12.5 million and unsecured trade debt of approximately $4.8 million. In addition, GPC is obligated to NMP in the amount of $14.8 million on an unsecured basis. Further, GPC estimates that as of December 31, 2015 its union pension plan is underfunded in the amount of $3,970,421 and that it is obligated to fund health care for its retired non-union employees. Based on actuarial schedules, as of December 31, 2015, the healthcare obligation is estimated to be $1,008,446.

**F.    Secured Debt**

20.    GPC's secured debt is comprised of a revolving line of credit and three (3) term loans as evidenced by the loan and security documents between GPC and MB Financial Bank, f/k/a Cole Taylor Bank ("MB Bank").

21.    As of May 31, 2016, the outstanding balance owed to MB Bank by GPC under the various loans were as follows:

i.    $4,900,000.00 under the revolving credit facility; and

ii.    $7,559,000.00 under the term loans.

22.    GPC's obligations to MB Bank are secured by a properly perfected first lien position on substantially all of GPC's personal property, as well as first priority mortgages on GPC's Angola, Indiana and Russellville, Kentucky facilities.

23.    NMP, GPC's largest shareholder, has also deposited $2.75 million with MB Bank as additional security for GPC's obligations to MB Bank.

24.    Further, as of May 31, 2016, GPC's five (5) primary customers have funded a total of $1,365,552 in last out participations in the MB Bank debt.

25.    Finally, GPC has a total of $2,800,000 in purchase money secured debt owing to 14 separate lenders.

## G. Stalking Horse Sale Agreement

26. As a result of the factors described above, in late 2015, GPC and its management team began evaluating a number of options to respond to their operational and liquidity issues. To this end, GPC engaged an outside professional to evaluate its business and to propose potential strategies, including but not limited to the raising of additional capital, a sale of some or all assets, or a restructuring transaction.

27. The professionals engaged to serve as financial advisor to GPC were Blue Water Partners, LLC ("Blue Water"). Among other activities performed in connection with its engagement, Blue Water evaluated GPC's business and financial performance to determine if there were alternative business models that could lead to improved financial strength. Blue Water's ultimate conclusion was that there was not a better model. The primary challenge was to reduce the size of the debt load burdening the company.

28. Notwithstanding its financial challenges, GPC strongly believes that the specialized products it provides to its customers and its niche in the auto and heavy duty truck industry means it can be a viable player in the industry going forward. In consultation with its advisors, Debtors decided that a Chapter 11 bankruptcy and sales process would provide the business with the best chance for greater success and prosperity.

29.     Consequently, after reviewing the economic and financial landscape, the Debtors decided it was in their best interest, the interest of GPC's employees and Debtors' creditors to seek the protection of Chapter 11 in order to maximize the value of their assets by preserving going-concern value through one or more Section 363 sales of their business assets.

30.     Blue Water began a robust marketing effort on December 1, 2015.

31.     Pursuant to Blue Water's efforts, more than 115 potential buyers were contacted. 53 of the potential buyers obtained access to GPC's data after signing non-disclosure agreements. Question and answer sessions were held with 15 of these parties. 5 of the parties ultimately signed letters of intent and from these a single buyer was chosen to serve as the stalking-horse bidder.

32.     The buyer chosen has submitted an offer for a significant portion of the Debtors' assets on a going concern basis through a sale conducted under Section 363 of the Bankruptcy Code.

33.     The offer is memorialized by an Asset Purchase Agreement with AAA-GP Holdings for the sale and purchase of specified assets of the Debtors. This would allow AAA-GP Holdings to continue operating and serving GPC's customers in the automotive and heavy-duty truck industry. As part of the purchase, AAA-GP Holdings will assume a significant portion of the GPC's

9

supplier obligations. AAA-GP Holdings is not an affiliate of the Debtors and neither it nor any of its owners are related to or hold claims against the Debtors.

34. The Debtors believe it is critical to examine every possible option to maximize the value of their business. As a result and in order to insure a marketing process that generates the maximum value for their assets, Blue Water will continue to assist in the marketing and sale of the company after the bankruptcy filing.

35. Accordingly, on the Petition Date, the Debtors commenced their reorganization cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

**PROPOSED SALE OF DEBTOR'S ASSETS**

**H.      Overview of Proposed Sale Process**

36. As stated above, the Debtors have experienced significant financial difficulties. The Debtors have determined that it is not possible to operate their business profitably under the current market conditions in the industry. The Debtors have therefore determined, in the exercise of their business judgment, that the best mechanism for maximizing asset value for the benefit of this estates and their creditors is through an expeditious sale of certain equity interests, accounts receivable, deposits, advances, prepaid expenses and other prepaid items, inventories, equipment, real property, contracts and leases (the

"Assumed Contracts and Leases"), intangible assets and intellectual property, as well as certain related assets, all as more fully defined in the APA (collectively, the "Purchased Assets") to AAA-GP Holdings pursuant to that certain Asset Purchase Agreement dated June 26, 2016 (the "APA")[2], a copy of which is attached to this Motion as **Exhibit A**, subject to higher and better bids.

37.     The remaining assets of the Sellers, which include (a) all rights under the APA, the Escrow Agreement contemplated by the APA and any other agreement executed and delivered by any Seller pursuant hereto; (b) all minute books, organizational documents, stock registers and such other books and records of each Seller pertaining to ownership, organization or existence of such Seller; (c) all Tax Returns and records (including work papers) related thereto of each Seller; (d) all claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom; (e) each Seller's books and records not related to the Purchased Assets, the Transferred Employees or FCA LLC or that such Seller is required by law to retain in its possession (including confidential personnel and medical records of employees); (f) any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment not related to the Purchased Assets or Assumed Liabilities; (g) any

---

[2] Capitalized terms not otherwise defined in this Motion shall have the meaning given to such term in the APA.

claims and causes of action under Section 544 through 550 of the Bankruptcy Code; (h) any other claims or causes of action under any other provision of the Bankruptcy Code except any claims or causes of action relating to the Purchased Assets; (i) all Contracts (including all Real Property Leases) other than the Assigned Contracts, (j) all cash and cash equivalents (excluding pre-paids and deposits referenced in the definition of Purchased Assets), (k) all Employee Benefit Plans and insurance policies of Sellers, (l) all assets relating exclusively to the operations of the Debtors located at the Russellville, Kentucky facility (including the owned real property located in Russellville, Kentucky), other than those assets specifically identified on <u>Schedule 1.2(E)</u> to the APA, (m) the outstanding equity interests of any Person other than the Mexican Subsidiary Interests, (n) all Accounts Receivable and (o) all Inventory located at the Russellville, Kentucky facility or otherwise related to a specific customer other than FCA LLC (collectively with other remaining assets of the Debtors, the "Excluded Assets"), will remain part of the bankruptcy estates and in all likelihood be liquidated in accordance with the Bankruptcy Code and Rules and the further orders of the Court.

38.     Consequently, the Debtors request authority to sell to AAA-GP Holdings the Purchased Assets free and clear of liens, claims, and encumbrances. As a preliminary matter, the Debtors request the entry of an order (the "Sale

Procedures Order"), the form of which is attached to this Motion as **Exhibit B**, approving (a) the form of the APA and (b) certain bidding procedures (the "Bidding Procedures"), a copy of which is attached to this Motion as **Exhibit C**, for the auction of the Purchased Assets.

39.     The Debtors further request that they be authorized to provide certain bid protections ("Bid Protections") and to pay to AAA-GP Holdings a termination fee of $500,000 (the "Termination Fee"), which amount shall include all of AAA-GP Holdings' out-of-pocket expenses incurred by it in connection with the transactions contemplated by the APA, including, without limitation, legal fees incurred by it, in the event the APA is terminated for any of the reasons set forth in Sections 7.6(a)(i) or 7.6(a)(ii) of the APA.

40.     The Debtors also request that the Court approve the form of notice to all creditors of the sale (the "Notice of Sale") attached to this Motion as **Exhibit D**.

41.     Additionally, the Debtors request that this Court schedule a hearing on July 11, 2016, at 9:00 a.m. Eastern Time, or as soon thereafter as the Court is available (the "Sale Hearing"), to approve the sale of the Purchased Assets to the highest bidder pursuant to the Bidding Procedures.  The Debtors request that the Court enter an order at the Sale Hearing substantially in the form attached to this Motion as **Exhibit E** and incorporated herein by reference (the "Sale Order")

authorizing the Debtors to sell the Purchased Assets free and clear of all liens, claims, and encumbrances on substantially the same terms and conditions as are set forth in the APA.

## I.  The Asset Purchase Agreement

42.  The Debtors and AAA-GP Holdings have reached agreement regarding the terms of the sale of the Purchased Assets to AAA-GP Holdings.  The principal terms and conditions of the APA may be summarized as follows:

> GENERAL TERMS:  AAA-GP Holdings will purchase the Purchased Assets (as that term is defined in Section 1.2 of the APA) in accordance with the terms set forth in Section 2.1 of the APA.  AAA-GP Holdings is not acquiring the Excluded Assets, which Excluded Assets will remain a part of the bankruptcy estate and be subject to further disposition in accordance with the Bankruptcy Code and Rules and the further orders of the Court.

> PURCHASE PRICE:  AAA-GP Holdings will pay the Debtor $11,500,000.00 in cash, subject only to those adjustments set forth in Section 2.8 of the APA (together with the Assumed Liabilities (including the Assumed Cure Amounts), the "Purchase Price").

> ESCROW AMOUNT:  AAA-GP Holdings will, at the Closing, deposit $400,000 into escrow pursuant to Section 2.7 of the APA.

> REPRESENTATIONS AND WARRANTIES: Pursuant to the APA, the Debtor and AAA-GP Holdings will provide standard representations and warranties, including representations and warranties regarding the Debtor's title to the Purchased Assets.

CLOSING CONDITIONS: The Debtor and AAA-GP Holdings have agreed to certain conditions to the closing of the sale of the Purchased Assets, including entry by this Court of the Sale Order (the "Bankruptcy Court Approval").

TERMINATION FEE: Subject to Bankruptcy Court approval, the Debtor will be obligated to pay to AAA-GP Holdings the Termination Fee of $500,000 in the event the APA is terminated for any of the reasons set forth in Sections 7.6(a)(i) or 7.6(a)(2) of the APA.

## J. Proposed Bidding Procedures

43. In order to insure the highest and best offer for the Purchased Assets as a group, the Debtors have developed the Bidding Procedures as a means of allowing competitive bidding. As set forth more specifically in the Bidding Procedures, in order to participate in the sales process, each potential bidder (a "Potential Bidder") for the Purchased Assets must be determined to be a "Qualified Bidder". Only "Qualified Bidders" will be permitted to participate in the sales process.

44. To be deemed a Qualified Bidder, the Potential Bidder must deliver to (a) the Debtors, (b) MB Bank, (c) counsel for the Creditors' Committee (as that term is defined in the Bidding Procedures), if any, and (d) the United States Trustee no later than 4:00 p.m. Eastern Time on Friday, July 19, 2016, the following: (i) current audited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential

Bidder, or such other form of financial disclosure acceptable to the Debtors and demonstrating such Potential Bidder's ability to close a proposed transaction regarding the Purchased Assets; (ii) a preliminary (non-binding) proposal regarding the purchase price range of the bid and the financing of the transaction; and (iii) an executed Confidentiality and Non-Disclosure Agreement in form and substance reasonably acceptable to the Debtors, which such Confidentiality and Non-Disclosure Agreement shall be the same as the Confidentiality Agreement (as defined in the APA) in all material respects (collectively, the "Potential Bid Package").

45.     After reviewing any Potential Bid Packages, the Debtors, in consultation with MB Bank, the Customers (as that term is defined in the Bidding Procedures) and the Creditors' Committee, if any, will determine who is a "Qualified Bidder" for the Purchased Assets.  Under the Bidding Procedures, a Qualified Bidder is a Potential Bidder that delivers the Potential Bid Package to the Debtors, whose financial information demonstrates the financial capability to consummate a sale, and that the Debtors, in consultation with MB Bank, the Customers, and the Creditors' Committee, if any, determines is reasonably likely (based on availability of financing, experience, and other considerations) to submit a bona fide offer and to be able to consummate a sale if selected as the successful bidder.  AAA-GP Holdings is automatically deemed a Qualified Bidder based on

its willingness to act as stalking horse bidder in connection with the auction for the Purchased Assets and the Debtors' prior determination of AAA-GP Holdings' financial qualifications.

46.    The Bidding Procedures require Qualified Bidders to deliver a written copy of the Required Bid Documents to the Debtors and the Debtors' counsel not later than 4:00 p.m. Eastern Time on August 3, 2016 (the "Bid Deadline").   The Debtors' counsel shall then distribute copies of the bids to (i) counsel  for  MB  Bank,  (ii) the  United  States  Trustee,  (iii) counsel  to  the Customers, (iv) counsel to the Creditors' Committee, if appointed, and (v) counsel for AAA-GP Holdings; AAA-GP Holdings, having already submitted its bid for the Purchased Assets in the form of its entry into the APA, shall not be required to submit any additional bid, but may submit an additional bid in response to the bid of any other Qualified Bidder on or before the Bid Deadline.  To the extent AAA-GP Holdings submits an additional bid in response to the bid of any other Qualified Bidder, the Debtors shall share the terms of such additional bid of AAA-GP Holdings with the other Qualified Bidders.  The Debtors may extend the bid Deadline once or successively, but is not obligated to do so.  All initial bids by Qualified Bidders other than AAA-GP Holdings must also include the following documents (the "Required Bid Documents"):

- A letter stating that the Bidder's offer is irrevocable until thirty (30) days after the Sale Hearing, currently scheduled for August

8, 2016, and that the Bidder agrees to be bound by such offer if its bid is the Back Up Bid (as defined in the Bidding Procedures), until such thirty (30) day period has passed.

- An executed copy of an asset purchase agreement in a form substantially the same as the APA. Any changes to the APA must be (a) non-material, (b) made to and marked on such form of agreement, and (c) agreed to by the Debtors. The asset purchase agreement must set forth a cash bid at least $800,000 in excess of the Purchase Price, as defined in the APA, cannot contain any consideration other than cash and assumption of liabilities of the Debtors, and shall not be subject to any financing or other conditions not set forth in the APA.

- A good faith deposit (the "Deposit") in the form of a certified check (or other form acceptable to the Debtors in their sole discretion) payable to the order of the Debtors (or such other party as the Debtors may designate) in the amount of $500,000.

- Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to the Debtors.

- Written acknowledgment that the bid is not subject to due diligence review, board approval, obtaining financing, or the receipt of any non-governmental consents

47. After all Qualified Bids have been received, the Debtors intend to conduct an auction (the "Auction") with respect to the Purchased Assets if a Qualified Bid other than that of AAA-GP Holdings has been received. Subject to the Court's approval, the Auction shall take place August 5, 2016 at 10:00 a.m. at the offices of Miller Johnson, 45 Ottawa Ave., S.W., Suite 1100, Grand Rapids, Michigan 49503, or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids. Only AAA-GP Holdings

and any other Qualified Bidders who have submitted the Required Bid Documents in form and substance satisfactory to the Debtors by the Bid Deadline will be eligible to participate in the Auction. Based upon the terms of the Qualified Bids received, the level of interest expressed as to the Purchased Assets, and such other information as the Debtors determine is relevant, the Debtors, in consultation with MB Bank, the Customers, and the Creditors' Committee, if any, and if no Creditors' Committee exists, with the Office of the United States Trustee (the "UST"), will conduct the Auction in the manner it determines will result in the highest or otherwise best offer for the Purchased Assets. If there is not a timely Qualified Bidder other than AAA-GP Holdings, then AAA-GP Holdings shall be deemed the Successful Bidder.

48. Upon the Auction's conclusion, the Debtors, in consultation with their advisors, MB Bank, the Customers, and representatives of the Creditors' Committee, if any, and if no Creditors' Committee exists, with the UST, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest and otherwise best offer (the "Successful Bid"). At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

49.     If the Successful Bidder fails to consummate the transactions by the Closing Date, as defined in the APA, the Debtors shall (i) retain such bidder's earnest money deposit; and (ii) be free to consummate the proposed sale of the Purchased Assets with the next highest and best bidder (the "Back Up Bidder") at the final price bid by the Back Up Bidder at the Auction (the "Back Up Bid") (or, if that competing bidder is unable to consummate the purchase of the Purchased Assets at that price, the Debtors may consummate the transaction with the next highest and best competing bidder, and so forth) without the need for an additional hearing or order of the Court; provided, the Debtors must have the consent of MB Bank.

**K.     Assumption and Assignment of Executory Contracts; Cure Amounts**

50.     As part of the Sale, the Debtors seek to assume and assign the Assumed Contracts and Leases to the Successful Bidder pursuant to the terms of the APA, or such other purchase agreement submitted by the Successful Bidder. With respect to any other contracts and leases of the Debtors, the Debtors will file a motion to assume or reject such contracts and leases at the appropriate point in the Chapter 11 case. The assumption and assignment of the Assumed Contracts and Leases shall be effective upon the Closing of the Sale unless otherwise noticed by the Debtors prior to Closing.

51.     AAA-GP Holdings or any other Qualified Bidder shall have until July 22, 2016 to designate the Assumed Contracts and Leases that it intends for the Debtors to assume and assign to it pursuant to § 365 of the Bankruptcy Code; however, Qualified Bidders, including AAA-GP Holdings, shall be entitled to add or remove Assumed Contracts and Leases from the designated list through the Bid Deadline.  The Debtors shall pay all amounts necessary to cure any monetary defaults under the Assumed Contracts and Leases, as required by § 365 of the Bankruptcy Code.  A schedule of the Debtors' calculation of the amount that the Debtors believe must be paid to cure all defaults under each of their executory contracts and unexpired leases (the "Cure Amounts") will be filed and served upon all parties to the Debtors' executory contracts and unexpired leases no later than eight (8) days prior to the Sale Hearing (the "Cure Amount Deadline").

52.     The Debtors request that unless a party to an executory contract or unexpired lease files with this Court and serves upon counsel for the Debtors, Robert D. Wolford, Miller Johnson, 45 Ottawa Ave., S.W., Suite 1100, Grand Rapids, Michigan  49503, an objection to its scheduled Cure Amount on or before two (2) days prior to the Sale Hearing (the "Cure Objection Deadline"), such party to an executory contract or unexpired lease shall be forever barred from objecting to the Cure Amount, and from asserting any additional cure or other amounts with respect to its executory contract or unexpired lease, and the Debtors will be entitled

to rely solely upon the Cure Amounts. The Debtors further request that if an objection to a scheduled Cure Amount is filed by a party to an executory contract or unexpired lease, the Court will hear that objection at the Sale Hearing. The Debtors will cooperate with the parties to the Debtors' executory contracts and unexpired leases to attempt to reconcile any differences in a particular Cure Amount believed to exist prior to the Sale Hearing.

53. The Cure Amounts scheduled should be deemed to include any such actual or pecuniary losses from an existing default, if any, under the executory contract or unexpired lease. Consequently, the amounts necessary to pay the Cure Amounts as scheduled or determined by this Court will compensate or provide adequate assurance that the appropriate party will be compensated for any such actual or pecuniary loss.

## L.    Bid Protection and Termination Fee

54. To induce AAA-GP Holdings to act as a so-called "stalking horse" bidder and thereby set a floor price for the Purchased Assets, the Debtors have agreed to provide AAA-GP Holdings certain bid protections (the "Bid Protections"). The Bid Protections consist of a requirement that any alternative acquisition proposal be a cash bid of $800,000 in excess of the Purchase Price, with subsequent bidding in increments of $100,000. Any alternative bid must also be on no less favorable terms to the Debtors than those offered by AAA-GP

Holdings in the APA. Any Potential Bidder should consider the Bid Protections in making any proposal relating to the Purchased Assets.

55.     The Debtors have also agreed to pay to AAA-GP Holdings the Termination Fee of $500,000 in the event the APA is terminated for any of the reasons set forth in Sections 7.6(a)(i) or 7.6(a)(ii) of the APA. AAA-GP Holdings has expended, and likely will continue to expend, considerable time, money and attention in pursuit of this sale and have engaged in arm's length, good faith negotiations with the Debtors. The APA is a product of those negotiations and benefits the Debtors' estates by providing a floor price for the Purchased Assets and a form of agreement to be used in negotiations with Potential Bidders.

56.     The Debtors' obligation to pay the Termination Fee arises under Article VII of the APA. AAA-GP Holdings' right to receive payment of the Termination Fee shall be treated as a superpriority administrative expense claim under §§ 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, and to the rights of any successor trustee or any creditor, in the Chapter 11 case, or any subsequent proceedings under the Bankruptcy Code. The Debtors' Termination Fee obligation survives termination of the APA.

57.     The Termination Fee was a material inducement for, and a condition to, AAA-GP Holdings' entry into the APA.  The Debtors believe it is reasonable in light of the comparative size of the proposed transaction and the fact that AAA-GP Holdings' efforts and due diligence have established a floor price and increased the opportunity for the Debtors' estates to receive the highest and otherwise best price for the Purchased Assets.

**M.     Notice of Sale**

58.     Within one (1) business days after entry of the Sale Procedures Order, the Debtors will serve the Notice of Sale on all of its known creditors by first class United States mail, postage prepaid, and also serve the Notice of Sale and the Bidding Procedures by first class, United States mail, postage prepaid, upon (i) MB Bank and its counsel, and all other entities known to have asserted any lien, claim or encumbrance in or upon the Purchased Assets; (ii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested herein; (iii) counsel for any committee appointed in this case or (a) if no counsel is employed, the committee members or (b) until a committee of unsecured creditors is appointed, the twenty (20) largest unsecured creditors as disclosed on the Debtors' schedule filed pursuant to Bankruptcy Rule 1007(d); (iv) the United States Trustee, the United States Attorney's Office, and the Internal Revenue Service; (v) counsel for AAA-

GP Holdings; (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (vii) all parties known to the Debtors to have expressed an interest in acquiring the Purchased Assets and other potential purchasers.

## APPLICABLE LEGAL AUTHORITY

### N.      Sales Outside the Ordinary Course of Business

59.      Section 363 of the Bankruptcy Code provides that the Debtors, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." See 11 U.S.C. § 363(b). To approve the use, sale or lease of property outside the ordinary course of business, this Court need only determine that the Debtors' decision is supported by "some articulated business justification." *See, e.g. Stephens Ind., Inc. v. McClung,* 789 F.2d 386, 389-90 (6th Cir. 1986); *Fulton State Bank v. Schipper,* 933 F.2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F2d 1063, 1070 (2d Cir. 1983); *see also In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D.Del. 1991).

60.      Once the debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the

honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Company,* 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Resources. Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

61.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310, 315 (Bankr. D. Utah 1981). Accordingly, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. *See Stephens Ind., Inc.*, 789 F.2d at 389-90; Schipper, 933 F.2d at 515; *In re Lionel Corp.,* 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.,* 124 B.R. 169 at 179.

62.     While the holding of *Stephens Industries* merely requires articulation of a sound business justification for a sale outside the ordinary course of business, other courts have offered additional guidance by citing various factors that they consider in determining whether a sound business justification exists. These factors include: (i) whether a sound business reason exists for the proposed transaction; (ii) whether adequate consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. *See Abbotts Dairies of Pa., Inc.*, 788

F.2d 143; *Plabell Rubber Prods., Inc.*, 149 B.R. 475, 479 (Bankr. N.D. Ohio 1992)

(citing *In re Titusville Country Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991)).

63.     The Debtors have a sound business justification for selling the Purchased Assets at this time, namely that they will be unable in their current structure to operate profitably in the future due to market conditions in their industry and the lack of the financial resources and access to capital necessary to fund their remaining operations for a prolonged period.  Further, the status of the Debtors' cash or other liquid assets necessary to operate in business on a going concern basis has left the Debtors with a small window of opportunity to maximize the value of their assets through an orderly sale process involving competitive bidding.

64.     Additionally, the terms of the sale of the Purchased Assets that the Debtors have reached with AAA-GP Holdings were proposed and negotiated in good faith, the consideration proposed to be paid by AAA-GP Holdings is adequate and reasonable under the circumstances and the Debtor proposes to provide reasonable notice of the proposed sale under the Bidding Procedures.  For these reasons, the Debtors have determined, in the exercise of their business judgment, that the most viable option for maximizing the value of the estates is through a sale of the Purchased Assets in the manner and in the time frame set forth in the Bidding Procedures.  The Debtors' request for approval to sell the

Purchased Assets in accordance with the Bidding Procedures should be allowed accordingly.

## O.     Bid Protection and Termination Fee

65.     In order to induce AAA-GP Holdings to spend the time, energy, and resources necessary to submit an offer that the Debtors can use as a minimum or stalking horse bid at the auction, the Debtors request authority to offer AAA-GP Holdings the Bid Protections in the form of a minimum $800,000 bid in excess of the Purchase Price, and a minimum bid increment of $100,000 thereafter.   The Debtors believe that a compelling need exists to authorize the Bid Protections in order to induce AAA-GP Holdings to submit the first bid for the Purchased Assets within the time frame mandated by the Debtors' business circumstances. Moreover, the Debtors believe that the proposed Bid Protections will benefit the estates by providing an incentive to AAA-GP Holdings to expend the resources necessary to consummate the APA.   Finally, the Bid Protections will prevent the inefficiencies and delays of bidding in small increments that do not provide benefit to this bankruptcy estates.

66.     The Debtors have also agreed to provide AAA-GP Holdings with a Termination Fee under certain circumstances.   Termination or "break-up" fees, such as those included in the APA, are "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction."   *In re S.N.A.*

*Nut Company,* 186 B.R. at 101. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers.'" *Id.*; *see also In re 995 Fifth Ave. Associates, L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").

67.     In the bankruptcy context, the test for determining whether a proposed break-up fee should be approved is whether it is in the best interests of the estate. *Id.* at 140; *see also In re America West Airlines, Inc.,* 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Industries, Inc.,* 140 B.R. 191 (Bankr. N.D. Ohio 1992). In particular, there must be compelling circumstances "which clearly indicate that payment of the fee would be in the best interests of the estate." *S.N.A. Nut Company,* 186 B.R. at 105.

68.     The Debtors believe that the Termination Fee satisfies this standard. The primary circumstance compelling allowance of the Termination Fee is to entice offers for the Purchased Assets so that a transaction can be consummated as quickly as possible.

69.     The Debtors' ability to offer the Bid Protections and Termination Fee enables the Debtors to ensure the sale of the Purchased Assets to

contractually committed bidders at prices it believes to be fair, while providing the

Debtors with the potential of even greater benefit to their estates through higher

bids. The Bid Protections and Termination Fee should be approved accordingly.

**P.      Sales Free and Clear of Liens, Claims and Encumbrances**

70.      Under § 363(f) of the Bankruptcy Code, a debtor in possession

may sell property free and clear of any lien, claim, or encumbrance in such

property if, among other things:

> (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

71.      Because § 363(f) of the Bankruptcy Code is drafted in the

disjunctive, the Debtors' satisfaction of any one of its five requirements will be

sufficient to permit the sale of the Purchased Assets free and clear of all liens,

claims, and encumbrances. *See Mich. Empl. Sec. Comm'n v. Wolverine Radio Co.

(In re Wolverine Radio Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. Mich. 1991). The

Debtors believe that the primary entity holding a lien on the Purchased Assets is

MB Bank. MB Bank has supported the sale process, and the Debtors are reasonably confident that they will obtain any necessary consent on or before the Sale Hearing and will thereby satisfy the requirements of § 363(f)(2).

72. Moreover, all holders of interests, including MB Bank, can be compelled to accept a money satisfaction of their liens in legal or equitable proceedings in accordance with § 363(f)(5) of the Bankruptcy Code. Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to 11 U.S.C. § 1129(b)(2)(A).

73. Indeed, § 1129(b)(2)(A) of the Bankruptcy Code specifically allows a debtor-in-possession to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any claims and defenses the debtor may possess with respect thereto. The Debtors propose that any liens in the Purchased Assets attach to the net proceeds of the proposed sale.

## Q. Good Faith Purchaser Finding and Immediate Effectiveness of Sale Order

74. The Successful Bidder should be afforded all protections under 11 U.S.C. § 363(m) as a good faith purchaser. Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) and (c) of this section of a sale or lease of property does not

affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith…" 11 U.S.C. § 363(m).

75. As discussed above, prior to entering into the APA with AAA-GP Holdings, Blue Water had been engaged by GPC to market the Purchased Assets since 2015. During that period, Blue Water contacted over 115 prospective purchasers. Further, upon execution of the APA and the filing of this Chapter 11 case, Blue Water began remarketing the Purchased Assets to those parties already contacted, as well as other interested parties that could be identified.

76. The APA with AAA-GP Holdings constitutes an arms' length transaction that was negotiated between unrelated parties. Additionally, the Bidding Procedures have been designed to create a fair, open and level playing field to ensure that any party interested in acquiring the Purchased Assets by making a competing bid has every opportunity to do so.

77. Accordingly, the Debtors request that the party submitting the Successful Bid be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under § 363(m) of the Bankruptcy Code.

78. Further, because all parties have acted in good faith during this process and, once a Successful Bidder is identified, it is critical to the going-concern value of the Purchased Assets that the sale be closed expeditiously, the Debtors respectfully request that any Sale Order entered by the Court approving

the sale to the Successful Bidder be immediately effective and any stay arising under Bankruptcy Rule 6004(h) be waived.

**R.  Summary of Events**

79.  The following chart summarizes the proposed timeline for the sale process contemplated in the Sale Procedures Order and Sale Order:

| Event | Date | Action Required |
|---|---|---|
| Sale Procedures | 7/11/16 | Court enters Sale Procedures Order |
| Sale Notice Service Deadline | 7/12/16 | Deadline for Debtors to provide notice of sale |
| Potential Bid Package Deadline | 7/19/16 | Deadline to submit materials required to qualify as bidder |
| Assumed Contract Designation Date | 7/22/16 | Deadline for Potential Bidders to designate the Assumed Contracts and Leases for the Debtors to assume and assign |
| Cure Amount Deadline | 7/27/16 | Deadline for Debtors to file Cure Amount Schedule |
| Competing Bid Deadline | 8/3/16 | Deadline to submit Required Bid Documents/Deposit |
| Assumed Contract/ Leases and Cure Objection Deadline | 8/3/16 | Deadline for a party to executory contract to file objection to either Cure Amount or assumption of contract/lease |

| Event | Date | Action Required |
|---|---|---|
| Auction Date | 8/5/16 | Auction Sale held at offices of Debtors' counsel |
| Sale Hearing | 8/8/16 | Court Approves Sale |
| Closing Date | 8/15/16 | Sale Closes |

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter orders substantially in the forms annexed hereto: (i) approving the Bidding Procedures, a Termination Fee, Bid Protections, the form of the APA, and various other matters relating to the sale of the Purchased Assets; (ii) authorizing the Debtors' sale of the Purchased Assets free and clear of liens, claims and encumbrances to AAA-GP Holdings subject to higher and better bids; and (iii) for such other and further relief as the Court deems just and proper.

Miller Johnson
Proposed Attorneys for Debtors

Dated: June 28, 2016

By  /s/ Robert D. Wolford
John T. Piggins (P34495)
pigginsj@millerjohnson.com
Robert D. Wolford (P62595)
wolfordr@millerjohnson.com
Rachel L. Hillegonds (P67684)
hillegondsr@millerjohnson.com
Business Address:
45 Ottawa Avenue, S.W., Suite 1100
PO Box 306
Grand Rapids, Michigan  49501-0306
Telephone:  (616) 831-1700

34

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

**IN RE: GENERAL PRODUCTS CORPORATION,**
*et al.,*[1]

                     **Debtors.**       /

**Case No.: 16-49267**
**(Chapter 11)**
**Hon. Thomas J. Tucker**

## Exhibit List

| Exhibit | Description |
|---------|-------------|
| A | Asset Purchase Agreement |
| B | Sale Procedures Order |
| C | Bidding Procedures |
| D | Notice of Sale |
| E | Sale Order |

---

[1] General Products Corporation's case is jointly administered with the case of General Products Mexico LLC, Case No. 16 _____.

# Exhibit A

*Execution Version*

ASSET PURCHASE AGREEMENT

DATED JUNE 26, 2016

BY AND AMONG

GENERAL PRODUCTS CORPORATION,

GENERAL PRODUCTS MEXICO, LLC

AND

AAA-GPC HOLDINGS LLC

# ASSET PURCHASE AGREEMENT
## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ........................................................................................... 2
1.1 General ................................................................................................... 2
1.2 Definitions................................................................................................ 2

ARTICLE II PURCHASE AND SALE OF ASSETS ................................................ 12
2.1 Sale and Purchase of Purchased Assets ................................................ 12
2.2 Purchased Assets.................................................................................... 12
2.3 Excluded Assets ..................................................................................... 12
2.4 Assumed Liabilities ................................................................................ 13
2.5 Excluded Liabilities ................................................................................ 13
2.6 Consideration .......................................................................................... 14
2.7 Payment of Estimated Cash Purchase Price........................................... 14
2.8 Purchase Price Adjustment and Determination of Purchase Price .......... 14
2.9 Transfer Taxes ....................................................................................... 16
2.10 Allocation of Purchase Price................................................................... 16
2.11 Acknowledgement of Payments ............................................................. 17

ARTICLE III REPRESENTATIONS AND WARRANTIES OF US SELLER........................ 17
3.1 Organization and Good Standing............................................................ 17
3.2 No Conflicts ........................................................................................... 18
3.3 Execution and Delivery........................................................................... 18
3.4 Title to Purchased Assets ....................................................................... 18
3.5 Compliance with Laws ........................................................................... 18
3.6 Contracts ................................................................................................ 18
3.7 Equipment Listing; Condition of Purchased Assets ................................ 19
3.8 Inventory................................................................................................. 19
3.9 Subsidiaries............................................................................................ 19
3.10 Licenses and Permits.............................................................................. 19
3.11 Personnel Identification and Compensation ........................................... 20
3.12 Broker's or Consultant's Fees................................................................. 20
3.13 Consents ................................................................................................. 20
3.14 Financial Statements .............................................................................. 20
3.15 No Material Adverse Change or Subsequent Distributions...................... 21
3.16 Taxes...................................................................................................... 21

# ASSET PURCHASE AGREEMENT
## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 3.17 | Real Property | 22 |
| 3.18 | Intellectual Property | 24 |
| 3.19 | Litigation, etc | 24 |
| 3.20 | Employee Benefits; ERISA | 24 |
| 3.21 | Labor and Employment Matters | 26 |
| 3.22 | Environmental Matters | 26 |
| 3.23 | Intentionally Omitted | 27 |
| 3.24 | Customers and Suppliers | 27 |
| 3.25 | Product Liability | 27 |
| 3.26 | Sufficiency of Purchased Assets | 27 |
| 3.27 | No Other Representations or Warranties | 27 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 28 |
| 4.1 | Organization and Good Standing | 28 |
| 4.2 | Execution and Delivery | 28 |
| 4.3 | No Conflicts; Consents | 28 |
| 4.4 | Financing | 28 |
| 4.5 | Brokers and Finders | 28 |
| 4.6 | Litigation | 29 |
| 4.7 | No Inducement or Reliance; Independent Investigation | 29 |
| 4.8 | Purchaser's Investigation | 29 |
| 4.9 | No Other Representations or Warranties | 29 |
| ARTICLE V | COVENANTS AND AGREEMENTS | 29 |
| 5.1 | Conduct of Business of each Seller | 29 |
| 5.2 | Access to Information | 31 |
| 5.3 | Assignability of Certain Permits | 32 |
| 5.4 | Rejected Contracts | 32 |
| 5.5 | Further Agreements | 32 |
| 5.6 | Reasonable Efforts | 32 |
| 5.7 | Preservation of Records | 33 |
| 5.8 | Publicity | 33 |
| 5.9 | Notification of Certain Matters | 34 |
| 5.10 | Amendment | 34 |

ii

# ASSET PURCHASE AGREEMENT
## TABLE OF CONTENTS

Page

| 5.11 | Waiver | 34 |
| 5.12 | Pro Rations | 34 |
| 5.13 | Offer of Employment | 34 |
| 5.14 | Title Commitments; Surveys; Zoning Reports | 35 |
| ARTICLE VI CONDITIONS TO CLOSING | | 36 |
| 6.1 | Conditions Precedent to the Obligations of Purchaser and each Seller | 36 |
| 6.2 | Conditions Precedent to the Obligations of each Seller | 36 |
| 6.3 | Conditions Precedent to the Obligations of Purchaser | 37 |
| 6.4 | Deemed Consents and Cures | 39 |
| 6.5 | Frustration of Closing Conditions | 39 |
| 6.6 | Survival of Representations and Warranties | 39 |
| ARTICLE VII CLOSING AND TERMINATION | | 39 |
| 7.1 | Closing | 39 |
| 7.2 | Closing Deliveries by each Seller | 40 |
| 7.3 | Closing Deliveries by Purchaser | 41 |
| 7.4 | Termination of Agreement | 41 |
| 7.5 | Procedure Upon Termination | 43 |
| 7.6 | Effect of Termination | 43 |
| ARTICLE VIII BANKRUPTCY COURT MATTERS | | 44 |
| 8.1 | Competing Bid and Other Matters | 44 |
| 8.2 | Sale Order | 45 |
| ARTICLE IX GENERAL PROVISIONS | | 45 |
| 9.1 | Notices | 45 |
| 9.2 | Severability | 46 |
| 9.3 | Entire Agreement | 47 |
| 9.4 | Successors and Assigns | 47 |
| 9.5 | Counterparts | 47 |
| 9.6 | Recitals, Schedules and Annexes | 47 |
| 9.7 | Construction | 47 |
| 9.8 | Governing Law | 48 |
| 9.9 | Jurisdiction, Waiver of Jury Trial | 48 |
| 9.10 | Injunctive Relief | 49 |

iii

## ASSET PURCHASE AGREEMENT
## TABLE OF CONTENTS

9.11    Expenses ................................................................................................................. 49

9.12    Time of the Essence ............................................................................................... 49

9.13    Limitation on Damages .......................................................................................... 49

CHI:2996054.16

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of June 26, 2016 (the "Execution Date") among AAA-GPC Holdings LLC, a Delaware limited liability company ("Purchaser"), General Products Corporation, a Delaware corporation ("US Seller"), and General Products Mexico, LLC, a Michigan limited liability company ("Mexico Seller", and together with US Seller, "Sellers").

### R E C I T A L S

A.     WHEREAS, Sellers are engaged in the business of manufacturing, producing and supplying highly engineered precision-machined components and assemblies to the automotive and heavy-duty truck markets (the "Business").

B.     WHEREAS, each Seller desires to sell to Purchaser, and Purchaser desires to purchase from each Seller, the Purchased Assets (as defined below) owned thereby, for a purchase price consisting of cash and other consideration, on the terms and conditions set forth in this Agreement.

C.     WHEREAS, each Seller intends to commence a bankruptcy filing no later than June 27, 2016 (the "Petition Date") pursuant to which such Seller shall become a debtor and debtor in possession in such bankruptcy case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") to be filed in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court").

D.     WHEREAS, in connection with the Chapter 11 Case and subject to the terms and conditions contained herein and following the entry of the Sale Order (as defined herein) finding Purchaser as the winning bidder and subject to the terms and conditions thereof, each Seller shall sell, transfer and assign to Purchaser, and Purchaser shall purchase and acquire from each such Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets owned thereby, all as more specifically provided herein and in the Sale Order.

E.     WHEREAS, each term defined in this Agreement shall have the meaning ascribed to it in Article I.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1  General.  Each term defined in the introductory paragraph of this Agreement and in the Recitals shall have the meaning set forth below whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

1.2  Definitions.  As used herein, the following terms shall have the meanings ascribed to them in this Section 1.2:

"Accounts Receivable" means all present and future rights to payment for goods or services rendered whether or not earned by performance, including, without limitation, all accounts or notes receivable owned or held thereby.

"Action" shall mean any claim, action, suit, arbitration, hearing, inquiry, legal, administrative and other proceeding, complaint, charge or investigation by or before any Governmental Authority or arbitrator and any appeal from any of the foregoing.

"Affiliate" of any Person shall mean any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with the former Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the introductory paragraph hereto.

"Alternative Transaction" shall have the meaning set forth in Section 8.1(c).

"Assigned Contracts" means the Contracts assigned to Purchaser pursuant to the Bill of Sale and which are listed on Schedule 1.2(A); provided, such Schedule 1.2(A) may be amended following the date hereof in Purchaser's discretion to add or remove Contracts thereto or therefrom.

"Assumed Capital Lease Amount" means the outstanding balance, net of security deposits, payable under those capital lease agreements which are listed on Schedule 1.2(B), including any Assumed Cure Amounts with respect thereto, which amounts are set forth on Schedule 1.2(B) as of the date indicated thereon.

"Assumed Cure Amount" means the aggregate Cure Amounts (and payment terms) with respect to the Assigned Contracts, which amounts are set forth on Schedule 1.2(C) as of the date indicated thereon.

"Assumed Liabilities" as defined in Section 2.4.

"Assumed Permit" shall have the meaning set forth in Section 5.3.

2

"Auction" shall have the meaning set forth in the Bidding Procedures Order.

"Back-up Bidder" shall have the meaning set forth in Section 8.1(c).

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Benchmark Working Capital" shall have the meaning set forth in Section 2.8(a).

"Bidding Procedures Motion" means the Motion to be filed by Sellers on or before June 27, 2016 with the Bankruptcy Court seeking, among other things, the entry of the Bidding Procedures Order.

"Bidding Procedures Order" shall mean an Order of the Bankruptcy Court in form and substance satisfactory to US Seller and acceptable to Purchaser in its sole discretion that, among other things, (i) grants the Bidding Procedures Motion, (ii) approves the Termination Fee on the terms set forth in Section 7.6 and (iii) establishes a day by which bids for Alternative Transactions must be submitted by bidders and establishes procedures for the auction process.

"Bill of Sale" means the Bill of Sale and Assignment dated as of the Closing Date between Purchaser and each Seller in substantially the form as Exhibit A.

"Business" shall have the meaning set forth in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in Chicago, Illinois are authorized or required by Law to be closed.

"Chapter 11 Case" shall have the meaning set forth in the Recitals.

"Closing" and "Closing Date" have the respective meanings assigned to such terms in Section 7.1.

"Closing Balance Sheet" has the meaning set forth in Section 2.8(b).

"Closing Date Consideration" shall have the meaning set forth in Section 2.7.

"Competing Bid" has the meaning set forth in Section 8.1(a).

"Confidential Information" shall have the meaning set forth in Section 5.2(e).

"Consents" has the meaning set forth in Section 3.13.

"Contract" shall mean any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property.

"Cure Amounts" means any amounts due under any Assigned Contract including, without limitation, any amounts necessary to cure existing pre-petition and post-petition defaults

3

which are required to be cured or paid at Closing in order to assume the Assigned Contracts, if any.

"Deposit" shall have the meaning set forth in Section 2.7.

"Disputed Items Notice" shall have the meaning set forth in Section 2.8(c).

"Documents" shall mean all of each Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means each retirement, welfare, severance, incentive or bonus, deferred compensation, profit sharing, vacation or paid-time-off, equity purchase, equity option or equity incentive plan, program, agreement or arrangement, and any other material employee benefit plan, program or arrangement, other than statutorily-mandated plans or programs, that is maintained or contributed to by any Seller Entity.

"Encumbrance" shall mean any lien, interest, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

"Environmental Law" has the meaning set forth in Section 3.22.

"Environmental Permit" has the meaning set forth in Section 3.22

"Equipment" shall mean all installations, fixtures, improvements, betterments, additions, spare parts, stores, supplies, fuel and lubes, machinery, equipment, cranes, forklifts, platforms, vehicles, trucks, chassis, generators, containers, spare tires and parts, tools and tooling, appliances, furniture, office furniture, fixtures, office supplies and office equipment, computers, computer terminals and printers, computer software, telephone systems, telecopiers and photocopiers, and other tangible personal property of every kind and description.

"Escrow Agent" shall have the meaning set forth in Section 2.7.

"Escrow Agreement" shall have the meaning set forth in Section 2.7.

"Escrow Amount" shall have the meaning set forth in Section 2.7.

4

"Estimated Assumed Capital Lease Amount" shall have the meaning set forth in Section 2.8.

"Estimated Cash Purchase Price" has the meaning set forth in Section 2.8.

"Estimated Closing Balance Sheet" has the meaning set forth in Section 2.8.

"Estimated Transferred Employees Liabilities" has the meaning set forth in Section 2.8.

"Estimated Purchase Price Certificate" has the meaning set forth in Section 2.8.

"Estimated Working Capital" has the meaning set forth in Section 2.8.

"Excluded Assets" shall have the meaning set forth in Section 2.3.

"Excluded Employee" has the meaning set forth in Section 5.13(a).

"Excluded Liabilities" shall have the meaning set forth in Section 2.5.

"Execution Date" shall have the meaning set forth in the introductory paragraph hereto.

"FCA LLC" means FCA USA, LLC and any Affiliates thereof.

"Final Assumed Capital Lease Amount" shall have the meaning set forth in Section 2.8.

"Final Cash Purchase Price" shall have the meaning set forth in Section 2.8.

"Final Transferred Employees Liabilities" shall have the meaning set forth in Section 2.8.

"Final Working Capital" has the meaning set forth in Section 2.8.

"GAAP" means United States generally accepted accounting principles as in effect as of the date hereof, consistently applied.

"Governmental Authority" shall mean any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"Gross Cash Purchase Price" has the meaning set forth in Section 2.6 (as adjusted pursuant to Section 6.3).

"Hazardous Materials" has the meaning set forth in Section 3.22.

5

"Hazardous Materials Contamination" has the meaning set forth in Section 3.22.

"Indebtedness" (i) indebtedness for money borrowed (including any prepayment penalties, fees, premiums or expenses with respect thereto); (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments (including derivative financial instruments such as foreign currency contracts and interest rate swaps, letters of credit and performance or surety bonds), including the current portion of such indebtedness; (iii) all obligations under leases required to be capitalized in accordance with GAAP; (iv) the liquidation value of all redeemable preferred stock; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which a Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any Encumbrance on any property or asset of a Person (whether or not such obligation is assumed by such Person).

"Indiana Owned Property" means the Owned Real Property located at 1411 Wohlert St., Angola, Indiana.

"Inventories" All raw materials, packaging, service parts, supplies, work-in-process and finished goods and any and all other inventories.

"Intellectual Property" shall mean all intellectual property and proprietary rights of any kind, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including without limitation any registration and applications for any of the foregoing); (iv) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, and methodologies; (v) computer software, computer programs, and databases (whether in source code, object code or other form); and (vi) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

"Laws" shall mean all federal, state, local or foreign laws, statutes, common laws, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Authorities, or court of competent jurisdiction, or other requirement or rule of law.

"Leased Real Property" shall mean the parcels of land more fully described on Schedule 1.2(D) under the heading "Leased Real Property," together with all plants, buildings,

6

structures, installations, fixtures, fittings, improvements, betterments and additions situated thereon, all privileges and appurtenances thereto, all easements and rights-of-way used or useful in connection therewith, and all rights and privileges under the Real Property Leases related thereto.

"Leave Employee" has the meaning set forth in Section 5.13(a).

"Liability" means any debt, liability, commitment or obligation of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any contract or tort based on negligence or strict liability).

"Material Adverse Effect" shall mean any event, change, occurrence, fact, condition or effect that has or would reasonably be expected to have, individually or in the aggregate with any other event, change, occurrence, fact, condition or effect, a materially adverse effect on the assets and liabilities, business, financial condition or results of operations of the Business (excluding the operations located at the Russellville, Kentucky facility), the Purchased Assets or the Seller Entities taken as a whole; provided, however, that none of the following changes will constitute, or will be considered in determining whether there has occurred, and no event, circumstance, change, effect or condition resulting from or arising out of any of the following will constitute, a Material Adverse Effect:

(i)     changes after the date hereof in applicable Law or in GAAP or interpretations thereof;

(ii)     the announcement of the execution of this Agreement or the intended consummation of the transactions contemplated herein (including threatened or actual impact on any relationship with any customer (other than with respect to FCA LLC), vendor, supplier, distributor, landlord or employee of any Seller Entity (including the threatened or actual termination, suspension, modification or reduction of such relationships);

(iii)     any act or threat of terrorism or war, any armed hostilities or terrorist activities, any threat or escalation of armed hostilities or terrorist activities or any governmental or other response or reaction to any of the foregoing or any natural disasters or any national or international calamity affecting the United States or other geographical region in which any Seller Entity does business;

(iv)     the failure, in of itself, of any Seller Entity to meet any estimate of revenues, earnings or other financial projections, performance measures or operating statistics, provided that the underlying causes in failing to meet such estimate of revenues, earnings or other financial projections, performance measures or operating statistics may be taken into account in determining the occurrence of a Material Adverse Effect;

(v)     any condition or change in economic conditions generally affecting the economy or the industries in which any Seller Entity operates, which do not affect the Seller Entities disproportionately relative to other entities operating in such industries;

7

(vi)     any condition affecting financial, banking or securities markets generally (including any disruption thereof and any decline in the price of any security or market index) which do not affect the Seller Entities disproportionately relative to other entities operating in such industries; or

(vii)     the taking of any action specifically contemplated by this Agreement, including the completion of the transactions contemplated hereby.

"Material Contracts" has the meaning set forth in Section 3.6(a).

"Material Customer" has the meaning set forth in Section 3.24.

"Material Supplier" has the meaning set forth in Section 3.24

"Mexican Subsidiaries" means (i) GP Innovative Machining & Assembly de Mexico, S. de R.L. de C.V. and (ii) SLP Resource Solutions, S. de R.L. de C.V.

"Mexican Subsidiary Interests" means the outstanding equity interests of the Mexican Subsidiaries.

"Mexican Working Capital" means the aggregate unrestricted cash on hand, plus the deposit with respect to the Leased Real Property of the Mexican Subsidiaries, plus third-party Accounts Receivable and Inventory of the Mexican Subsidiaries, minus the aggregate accounts payable of the Mexican Subsidiaries calculated in accordance with GAAP.

"Mexico Seller" shall have the meaning set forth in the introductory paragraph hereto.

"Order" shall mean any decree, order, judgment, writ, award, injunction, stipulation or consent of or by any Governmental Authority.

"Ordinary Course of Business" shall mean the ordinary and usual course of normal day to day operations of the US Seller consistent with past practice.

"Outside Back-up Date" shall have the meaning set forth in Section 8.1.

"Owned Real Property" means the parcels of land more fully described on Schedule 3.17, under the heading "Owned Real Property", together with all privileges and appurtenances thereto and all plants, buildings, structures, installations, fixtures, fittings, improvements, betterments and additions situated thereon, and all easements and rights-of-way used or useful in connection therewith.

"Party" shall mean each Seller and/or Purchaser.

"Permits" has the meaning set forth in Section 3.10.

"Permitted Encumbrances" means: (a) Encumbrances for Taxes not yet due and payable; (b) Encumbrances arising by operation of Law in the Ordinary Course of Business that

8

are not yet due and payable, such as mechanics' Encumbrances, materialmen's Encumbrances, carriers' Encumbrances, warehousemen's Encumbrances and similar Encumbrances; (c) pledges or deposits under workers' compensation (or similar) Law, unemployment insurance or other types of insurance or compensation plans participation in which is mandatory in connection with the operation of the Purchased Assets; (d) pledges or deposits that secure the performance of tenders, statutory obligations, bonds, bids, leases, Contracts and similar obligations; (e) with respect to any Real Property Lease, Encumbrances arising pursuant to the terms of such Real Property Lease or arising under zoning, land use or other applicable Law that are not violated by the current use and operation thereof; (f) imperfections of title and other Encumbrances that do not materially detract from the value of the property subject thereto or materially impair the operations of any Seller Entity and (i) Encumbrances to be discharged at Closing under Section 363(f) of the Bankruptcy Code.

"Person" shall mean all natural persons, corporations, limited liability companies, business trusts, associations, companies, partnerships, joint ventures, Governmental Entities and any other entities.

"Prevailing Bidder" shall have the meaning set forth in Section 8.1.

"Purchase Price" shall have the meaning set forth in Section 2.6.

"Purchased Assets" shall mean the following assets, rights and properties owned by any Seller on the Closing Date, whether or not carried and reflected on the books of such Seller (excluding the Excluded Assets:

(a)     the Mexican Subsidiary Interests;

(b)     [Intentionally Omitted];

(c)     all deposits and advances, prepaid expenses and other prepaid items of such Seller and all rights of such Seller to receive discounts, refunds, rebates awards and the like;

(d)     all Inventories located at, or related to the operations of, the Indiana Owned Property (including Inventory in transit);

(e)     all Equipment located at the Indiana Owned Property including the Equipment listed on Schedule 3.7 relating to the Indiana Owned Property;

(f)     the Indiana Owned Property;

(g)     the Assigned Contracts;

(h)     the customer Contracts entered into by such Seller with FCA LLC after the date hereof in compliance with the terms and provisions of this Agreement;

(i)     the Intellectual Property including, without limitation, the trade names "General Products Corporation" and any similar names used by such Seller;

9

(j)     any Permits related to the operation of the Indiana Owned Property or ownership of any other Purchased Asset to the extent any of the same are transferable or assignable to Purchaser;

(k)     choses in action, claims and causes of action or rights of recovery or set-off of every kind and character, in each case only to the extent related to the other Purchased Assets or the Assumed Liabilities;

(l)     all of such Seller's files, papers, documents and records relating to the other Purchased Assets, the Transferred Employees or FCA LLC, and all other miscellaneous assets of such Seller relating to the other Purchased Assets, the Transferred Employees or FCA LLC wherever located, including, without limitation, the registry book of each Subsidiary thereof, credit, sales and accounting records, price sheets, catalogues and sales literature, books, processes, formulae, manufacturing data, advertising material, stationery, office supplies, forms, catalogues, manuals, correspondence, production records, employment records and any other information reduced to writing relating thereto;

(m)     goodwill related to the foregoing;

(n)     those assets located at the US Seller's facility in Russellville, Kentucky and Livonia, Michigan specifically identified in Schedule 1.2(E); and

(o) all pre-paids and deposits made in the Ordinary Course of Business with third parties to satisfy insurance or supplier/vendor requirements under any Assigned Contract.

"Purchaser" shall have the meaning set forth in the introductory paragraph.

"Real Property" means, collectively, the Indiana Owned Property and the Leased Real Property.

"Real Property Lease" shall mean all leases, licenses, easements and agreements for the leasing, use or occupancy of, or otherwise granting a right in or relating to, the Leased Real Property.

"Reference Balance Sheet" means the unaudited consolidated balance sheet of US Seller dated May 31, 2016.

"Regulatory Approvals" shall mean any consents, waivers, approvals, orders, Permits or authorizations of any Governmental Authority required in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereunder.

"Release" has the meaning set forth in Section 3.22.

"Representatives" shall have the meaning set forth in Section 5.2(a).

"Sale Hearing" shall have the meaning set forth in the Bidding Procedures Order.

10

"Sale Order" shall have the meaning set forth in Section 8.2.

"Seller" shall have the meaning set forth in the introductory paragraph hereto.

"Seller Entities" means, collectively, each Seller and each Subsidiary thereof.

"Seller Entities' Knowledge" means the actual knowledge of the executive officers of US Seller after reasonable inquiry of those employees who would reasonably be expected to have knowledge of a particular fact, circumstance or other matter.

"Subsidiary" means (i) a corporation more than 50% of the combined voting power of the outstanding stock of which is owned, directly or indirectly, by such Person or by one or more other Subsidiaries of such Person or by such Person and one or more Subsidiaries thereof, or (ii) any other Person (other than a corporation) in which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, has the power to direct the policies, management and affairs thereof.

"Survey" has the meaning set forth in Section 5.14.

"Tax" and "Taxes" shall mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Authority, and include any interest, penalties or additional amounts attributable to, or imposed upon, or with respect to, Taxes and include any Liability for the Taxes of any other Person as a transferee or successor, by law, contract or otherwise.

"Tax Return" shall mean any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Authority with respect to Taxes, including amendments thereto.

"Termination Fee" means an amount in cash equal to $500,000.

"Title Commitment" has the meaning set forth in Section 5.14(a)(i).

"Title Company" means First American Title Insurance Company.

"Title Policy" has the meaning set forth in Section 5.14(a)(i).

"Transferred Employee" has the meaning set forth in Section 5.13(a).

"Transferred Employee Liabilities" has the meaning set forth in Section 2.4(c).

"US Seller" has the meaning set forth in the introductory paragraph hereto.

"Working Capital" means an aggregate amount equal to the US Seller's (a) Inventory, minus (b) accounts payable, in each case only to the extent related to the vendors set forth on Schedule 2.4(b) and calculated in accordance with GAAP applied on a basis consistent with the Reference Balance Sheet (without change in the application of principles or the

11

selection of methods of calculation permitted by GAAP unless based solely upon changes in facts and circumstances or required by changes in GAAP). For clarity's sake, for purposes of calculating Working Capital, Accounts Receivable, cash, cash equivalents, Indebtedness, Tax payables and inter-company receivables shall be excluded from any such calculation.

"Zoning Report" has the meaning set forth in Section 5.14.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

2.1     Sale and Purchase of Purchased Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, Purchaser shall purchase, acquire and accept from each Seller, and each Seller shall sell, transfer, assign, convey and deliver to Purchaser, on the Closing Date all of such Seller's right, title and interest in, to and under, the Purchased Assets free and clear of all Encumbrances to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

2.2     Purchased Assets. Notwithstanding anything herein to the contrary, the Excluded Assets will be retained by each Seller and not sold, assigned, conveyed, transferred or delivered to Purchaser hereunder.

2.3     Excluded Assets. For purposes herein, "Excluded Assets" shall mean the following:  (a) all rights under this Agreement, the Escrow Agreement and any other agreement executed and delivered by any Seller pursuant hereto; (b) all minute books, organizational documents, stock registers and such other books and records of each Seller pertaining to ownership, organization or existence of such Seller; (c) all Tax Returns and records (including work papers) related thereto of each Seller; (d) all claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom; (e) each Seller's books and records not related to the Purchased Assets, the Transferred Employees or FCA LLC or that such Seller is required by law to retain in its possession (including confidential personnel and medical records of employees); (f) any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment not related to the Purchased Assets or Assumed Liabilities; (g) any claims and causes of action under Section 544 through 550 of the Bankruptcy Code; (h) any other claims or causes of action under any other provision of the Bankruptcy Code except any claims or causes of action relating to the Purchased Assets; (i) all Contracts (including all Real Property Leases) other than the Assigned Contracts, (j) all cash and cash equivalents (excluding pre-paids and deposits referenced in the definition of Purchased Assets), (k) all Employee Benefit Plans and insurance policies of Sellers, (l) all assets relating exclusively to the operations of the Business located at the Russellville, Kentucky facility (including the owned real property located in Russellville, Kentucky), other than those assets specifically identified on Schedule 1.2(E), (m) the outstanding equity interests of any Person other than the Mexican Subsidiary Interests, (n) all Accounts Receivable and (o) all Inventory located at the Russellville, Kentucky facility or otherwise related to a specific customer other than FCA LLC.

12

2.4     Assumed Liabilities.  Purchaser shall, at the Closing, assume, agree to perform, and, when due, pay and discharge, only the following Liabilities of US Seller (the "Assumed Liabilities"):

(a)     the Liabilities of US Seller under the Assigned Contracts arising after the Closing Date (excluding any Liabilities attributable to a breach or default by US Seller thereunder prior to Closing other than the Assumed Cure Amounts which Purchaser shall be obligated to pay as a condition to the assignment of such Assigned Contracts to Purchaser);

(b)     solely to the extent included on the Closing Balance Sheet and included in the calculation of Final Working Capital, all accounts payable of US Seller related exclusively to the vendors set forth on Schedule 2.4(b); and

(c)     accrued liabilities with respect to the Transferred Employees for accrued payroll and accrued vacation solely to the extent included on the Closing Balance Sheet (collectively, the "Transferred Employees Liabilities").

Purchaser shall indemnify and hold Sellers harmless for any claims filed by any Person against one or both of Sellers' bankruptcy estates with respect to any of the Assumed Liabilities as calculated in accordance with Section 2.8.

2.5     Excluded Liabilities.  Other than the Assumed Liabilities, Purchaser shall not assume or pay, and shall not be deemed to have assumed, and each Seller shall be solely responsible for, all Liabilities of such Seller (including all Indebtedness and Contracts reflecting Indebtedness) whether or not relating to the Purchased Assets or the Business (collectively, the "Excluded Liabilities").  Specifically, without limiting the foregoing, Purchaser shall not assume:

(i)     any action, suit or proceeding pending as of the Closing Date notwithstanding the disclosure thereof on the Reference Balance Sheet or in the Schedules hereto, or any subsequent claim, action, suit or proceeding arising out of or relating to such pending matters, any other similar event occurring on or prior to the Closing Date or resulting from the manner in which any Seller conducted the Business on or prior to the Closing Date;

(ii)     any Taxes;

(iii)     any obligation or liability arising from claims, proceedings or causes of action resulting from property damage or personal injuries (including death) caused by products, materials or services manufactured, invoiced, sold, performed or shipped by any Seller or the Business on or prior to the Closing Date;

(iv)     any obligation or liability arising from product warranty or product liability claims, with respect to products, materials or services manufactured, invoiced, sold, performed or shipped by any Seller or the Business on or prior to the Closing Date;

(v)     any obligation or liability related to any actual or alleged violation or liability arising under any Environmental Laws, including, without limitation, any Release or threatened Release of Hazardous Substance, occurring prior to or continuing as of the Closing Date, regardless of whether such obligations or liabilities relate to any Seller's ownership or

13

operation of the Purchased Assets, to any predecessor, owner, tenant, occupant or user of the Purchased Assets, or to any other party unrelated to the Purchased Assets, including, without limitation, any matters disclosed in Schedule 3.22;

(vi)     any current, subsequent or contingent claim, action, suit, proceeding, obligation, demand, Encumbrance, or Liability, including by reason of Sellers or the Mexican Subsidiaries being a member of the controlled group of any other Person within the meaning of Section 414 of the Code or 4001(b)(1) of ERISA, relating to any "pension plan" within the meaning of Section 3(2) of ERISA that is subject to Title IV of ERISA or any multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA;

(vii)     any obligation or liability of any Seller arising from the transactions contemplated by this Agreement; or

(viii)     any obligation or liability arising from or related to the Excluded Assets (including all Indebtedness and Contracts reflecting Indebtedness) or the operation of the Business prior to the Closing.

2.6     Consideration.  The aggregate consideration to be paid for the Purchased Assets (the "Purchase Price") shall be (subject to adjustment pursuant to Section 2.8 and Section 6.3):

(a)     Eleven Million Five Hundred Thousand Dollars ($11,500,000) (the "Gross Cash Purchase Price"); plus

(b)     the Assumed Liabilities (including the Assumed Cure Amounts).

2.7     Payment of Estimated Cash Purchase Price.  Within two (2) Business Days of the date hereof, Purchaser shall pay to US Seller a deposit (the "Deposit") in an amount equal to $100,000 and which shall be released in accordance with Section 7.6 hereof.  At the Closing, Purchaser shall pay (i) to US Seller by wire transfer of immediately available United States funds into an account to be designated by US Seller or its designee, an amount equal to (A) the Estimated Cash Purchase Price, minus (B) the Deposit, minus (C) $400,000 (the "Escrow Amount") and (ii) to an escrow agent (the "Escrow Agent") mutually acceptable to Purchaser and US Seller an amount equal to the Escrow Amount to be held by the Escrow Agent pursuant to the terms and conditions of the escrow agreement substantially in the form attached as Exhibit C (the "Escrow Agreement") (collectively, the "Closing Date Consideration").

2.8     Purchase Price Adjustment and Determination of Purchase Price.

(a)     At least five (5) Business Days prior to the Closing, US Seller shall furnish to Purchaser: (i) an unaudited and estimated balance sheet of the US Seller (i.e., the balance sheet at the end of the accounting period immediately preceding the Closing Date and adjusted to reflect the operations of the Business following such date through the date thereof), prepared in accordance with GAAP using the same methods, principles, practices and policies used in the preparation of the Reference Balance Sheet (the "Estimated Closing Balance Sheet"), and (ii) a certificate (the "Estimated Purchase Price Certificate") setting forth US Seller's estimated calculation of (A) the Working Capital as of the Closing Date (the "Estimated Working Capital"), (B) the difference between the Estimated Working Capital and $2,000,000

14

(the "Benchmark Working Capital"), (C) the estimated Assumed Capital Lease Amount (with third-party supporting documentation related thereto) (the "Estimated Assumed Capital Lease Amount"), (D) the estimated Transferred Employees Liabilities (the "Estimated Transferred Employees Liabilities") and (E) a calculation of Mexican Working Capital. Such calculation shall be prepared in good faith based upon the Estimated Closing Balance Sheet and shall include an itemization of the components of Working Capital as at the date of such Estimated Closing Balance Sheet. The Estimated Closing Balance Sheet and the Estimated Purchase Price Certificate shall each be in form and substance reasonably satisfactory to Purchaser. In the event Purchaser notifies US Seller of any disagreement with the calculations set forth in the Estimated Purchase Price Certificate, the parties shall work in good faith to resolve any such disagreements before proceeding to Closing. At Closing, the Gross Cash Purchase Price shall be (1) decreased or increased to the extent (x) the Estimated Working Capital is less or greater than, as applicable, the Benchmark Working Capital, and (y) the Estimated Assumed Capital Lease Amount is greater or less than, as applicable, $2,000,000, and (2) decreased to the extent Estimated Transferred Employees Liabilities is greater than $200,000 (as adjusted, the "Estimated Cash Purchase Price").

(b)     Within forty-five (45) days after the Closing Date, Purchaser shall deliver to US Seller (i) an audited balance sheet of the Business as at the Closing Date (the "Closing Balance Sheet") prepared in accordance with GAAP using the same methods, principles, practices and policies as was required to be used in the preparation of the Estimated Closing Balance Sheet pursuant to Section 2.8(a) above, and (ii) a certificate (the "Purchase Price Certificate") setting forth Purchaser's calculation of (A) the Working Capital as of the Closing Date (the "Final Working Capital"), (B) the difference between the Final Working Capital and the Benchmark Working Capital, (C) the Assumed Capital Lease Amount as of the Closing Date (the "Final Assumed Capital Lease Amount"), (D) the Transferred Employees Liabilities as of the Closing Date (the "Final Transferred Employees Liabilities") and (E) the Gross Cash Purchase Price as (1) decreased or increased to the extent (x) the Final Working Capital is less or greater than, as applicable, the Benchmark Working Capital, and (y) the Final Assumed Capital Lease Amount is greater or less than, as applicable, $2,000,000 and (2) to the extent Final Transferred Employees Liabilities is greater than $200,000 (as adjusted, the "Final Cash Purchase Price").

(c)     US Seller shall review the Closing Balance Sheet and Purchase Price Certificate. In conducting such review, US Seller and its independent accountants shall have reasonable access to all records and working papers used or prepared in the preparation of the Closing Balance Sheet and Purchase Price Certificate. If US Seller delivers written notice (the "Disputed Items Notice") to Purchaser within thirty (30) days after receipt by US Seller of the Closing Balance Sheet and Purchase Price Certificate, stating that US Seller objects to any items set forth in the Closing Balance Sheet or Purchase Price Certificate, specifying the reasonable basis for such objection and setting forth Seller's proposed modification to the Closing Balance Sheet or Purchase Price Certificate, US Seller and Purchaser shall attempt in good faith to resolve and finally determine and agree upon the Closing Balance Sheet and Purchase Price Certificate as promptly as practicable.

(d)     If US Seller and Purchaser are unable to agree upon the disputed items set forth in the Disputed Items Notice within thirty (30) days after delivery of the Disputed Items

Notice, US Seller and Purchaser will select an independent accounting firm of national recognition (excluding any accounting firm used by a party hereto) to resolve the disputed items and make a determination of the proposed adjustments in the Disputed Items Notice. Such determination will be made within sixty (60) days after such selection and will be binding upon the parties hereto. The fees, costs and expenses of the accounting firm so selected will be borne by the party whose positions generally did not prevail in such determination, or if the accounting firm determines that neither party could be fairly found to be the prevailing party, then such fees, costs and expenses will be borne 50% by US Seller and 50% by Purchaser.

(e)     If US Seller does not deliver the Disputed Items Notice to Purchaser within thirty (30) days after receipt by US Seller of the Purchase Price Certificate, the calculations set forth in the Closing Balance Sheet and Purchase Price Certificate will be conclusively presumed to be true and correct in all respects and will be binding upon the parties.

(f)     In the event the Final Cash Purchase Price as finally determined hereunder is less than the Estimated Cash Purchase Price, Purchaser shall be entitled to receive a distribution of a portion of the Escrow Amount equal to the amount of such deficiency, and the US Seller shall be entitled to a distribution of the balance, if any, of the Escrow Amount. If the Escrow Amount is not sufficient to cover the amount the US Seller is required to pay to the Purchaser pursuant to the preceding sentence, the US Seller shall promptly pay Purchaser such amount in cash, in readily available funds, equal to such shortfall. In the event the Final Cash Purchase Price as finally determined hereunder is in excess of the Estimated Cash Purchase Price, US Seller shall be entitled to receive a distribution of the Escrow Amount and Purchaser shall promptly pay US Seller an amount in cash, in readily available funds, equal to such excess.

(g)     All distributions and payments pursuant to Section 2.8(f) shall be made within five Business Days following the final determination of the Final Working Capital in accordance with this Section 2.8; provided, that if the Seller delivers a Disputed Items Notice to the Purchaser in accordance with Section 2.8(c) and the aggregate value of the all disputed items is less than the Escrow Amount, the US Seller and Purchaser shall promptly instruct the Escrow Agent in writing to distribute to the US Seller that portion of the Escrow Amount that is not in dispute and to retain the balance of the Escrow Amount pending final resolutions of such disputes in accordance with this Section 2.8.

2.9     Transfer Taxes.   To the extent the transactions contemplated hereby are not exempt under Section 1146 of the Bankruptcy Code, Purchaser and Seller shall, on a fifty-fifty basis, be liable for and pay any sales and transfer Taxes, filing fees, documentary fees or other similar Taxes payable in connection with the purchase, sale or transfer of the Purchased Assets to, and the assumption of the Assumed Liabilities by, Purchaser pursuant to this Agreement. Purchaser and US Seller will use commercially reasonable efforts to minimize the amount of all the foregoing Taxes and shall cooperate in providing each other with any resale exemption certificates, Tax clearance certificates and other similar documentation.

2.10     Allocation of Purchase Price.   Within sixty (60) days after the Closing Date, the Purchaser shall deliver to the US Seller a schedule allocating the purchase price (including any relevant assumed liabilities) among the Purchased Assets in accordance with the applicable provisions of the Code and the Treasury Regulations thereunder (the "Purchase Price Allocation

16

Schedule"). In the event the US Seller does not provide the Purchaser with comments within thirty (30) calendar days from receipt of the Purchase Price Allocation Schedule, such allocation shall be deemed final and agreed to by the parties hereto. In the event that the US Sellers provides comments within such thirty (30) day period, the parties shall work in good faith to resolve their differences, provided if the parties cannot agree on a final allocation schedule within sixty (60) calendar days after the Purchaser has delivered the Purchase Price Allocation Schedule to the US Seller, then the parties hereto shall each prepare their own allocation. To the extent the parties agree as to the Purchaser Price Allocation Schedule, the Purchaser and US Seller shall file all Tax Returns consistently with the Purchase Price Allocation Schedule (as appropriately adjusted), and shall not take any position during the course of any audit or other Proceeding that is inconsistent with the Purchase Price Allocation Schedule, unless required to do so by applicable Law or a final determination of an applicable Governmental Authority. The Purchaser and the US Seller shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect adjustments to the purchase price.

2.11 · Acknowledgement of Payments. It is acknowledged that certain proceeds from the transactions contemplated by this Agreement will be distributed directly at Closing by the terms of this Agreement, or after Closing by the US Seller, to the US Seller's secured lenders, and that no clawback, indemnity, surcharge or similar rights shall attach to the proceeds distributed to such secured lenders in any instance.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF US SELLER

As an inducement to Purchaser to enter into and perform this Agreement, and in consideration of the covenants of Purchaser contained herein, US Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing Date regardless of any examinations, inspections, audits and other investigations Purchaser has heretofore made, or may hereafter make, that (all references to "Seller" herein all be deemed a reference to each of US Seller and Mexico Seller):

3.1     Organization and Good Standing.

(a)     Seller is duly organized, validly existing as a corporation or limited liability company, as applicable, and in good standing under the laws of its jurisdiction of incorporation or organization (as the case may be). Each other Seller Entity is duly organized, validly existing under its jurisdiction of formation or organization and is in good standing under the laws of its formation or organization. Each Seller Entity has full power and authority (corporate, limited liability company and other) to enable it to own or lease its properties and assets and to conduct its business as currently conducted. Each Seller Entity is duly qualified and in good standing to do business in each jurisdiction in which either the ownership or use of the properties owned or used by it or the nature of its activities conducted by it requires such qualification.

(b)     Seller has delivered to Purchaser true and complete copies of the organizational and governing documents of each Seller Entity as amended to date.

17

3.2     No Conflicts.  Subject to the approval of the Bankruptcy Court pursuant to the Sale Order, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (a) conflict with or result in a breach or violation of any term or provision of, or constitute a default under (with or without notice or passage of time, or both), or otherwise give any Person a basis for accelerated or increased rights or termination or nonperformance under, any Assigned Contract, (b) result in the violation of the provisions of the organizational documents of Seller or the organizational or governing documents of any other Seller Entity or any Law applicable to or binding upon any Seller Entity, or (c) result in the creation or imposition of any Encumbrance upon any of the Purchased Assets or the assets of the Mexican Subsidiaries.

3.3     Execution and Delivery.  This Agreement has been duly authorized by all necessary corporate or limited liability company action of Seller.  Subject to approval of the Bankruptcy Court pursuant to the Sale Order, Seller has full right, power, authority and capacity to execute, deliver and perform this Agreement.  This Agreement has been duly executed and delivered by Seller and, subject to Bankruptcy Court approval and the entry of an Order of the Bankruptcy Court approving the terms of this Agreement, constitutes the legal, valid and binding agreement of Seller enforceable against, and binding upon, Seller in accordance with its terms.

3.4     Title to Purchased Assets.  Seller has good and marketable title to all of the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances.  Each Mexican Subsidiary has good and marketable title to all of its assets used in the operation of the Business, free and clear of all Encumbrances other than Permitted Encumbrances.

3.5     Compliance with Laws.  The operation of the Business by the Seller Entities complies in all material respects with all applicable Laws.  No Seller Entity (i) has been alleged in writing to be in violation of any Laws, and (ii) has received any written notice of any alleged violation of, or any citation for noncompliance with, any Laws.

3.6     Contracts.

(a)     Schedule 3.6 sets forth the following Contracts relating to the Business (other than the operations located at the Russellville, Kentucky facility) to which any Seller Entity is a party to or is bound (collectively, the "Material Contract") and true and complete copies of such written Material Contracts have been provided to Purchaser:

(i)     any Contract requiring payments by a Seller Entity in excess of $25,000 during any twelve (12) month period which cannot be cancelled by such Seller Entity upon less than ninety (90) days' notice without penalty;

(ii)     the Real Property Leases;

(iii)     any loan agreement, promissory note, letter of credit or other evidence of Indebtedness of a Seller Entity which will survive the Closing;

(iv)     any guarantee by a Seller Entity of payment or performance by another Person that is not another Seller Entity;

18

（v)    any Contract imposing on the Seller Entities any non-competition obligation;

(vi)    any Contract with any employee, officer, director or Affiliate of the Seller Entities;

(vii)    any Contract that is a collective bargaining agreement;

(viii)    any joint venture Contract or other Contract involving the sharing of profits with any other Person;

(ix)    all licenses (other than "shrink wrap" or other widely available commercial end-user licenses) relating to the use of any material Intellectual Property;

(x)    any Contract that requires any Seller Entity to purchase its total requirements of a good or service from another Person; and

(xi)    any Assigned Contract.

(b)    All Assigned Contracts are valid and in full force and effect and constitute legal, valid and binding obligations of the applicable Seller Entity and, to the Seller Entities' Knowledge, the other parties thereto, and are enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Other than any Cure Amounts with respect thereto or otherwise as set forth on Schedule 3.6, no Seller Entity is in default in complying with any provisions thereof, nor has any Seller Entity received written notice of any such default.

3.7    Equipment Listing; Condition of Purchased Assets.  The tangible Purchased Assets and the tangible assets of each Mexican Subsidiary are in good condition and repair (subject to routine maintenance and repair for similar assets of like age and use) and are usable in the Ordinary Course of Business as currently conducted. Schedule 3.7 hereto sets forth a listing of all Equipment included in the Purchased Assets and all Equipment owned by the Mexican Subsidiaries (including all tooling) as of the date indicated thereon.

3.8    Inventory.  The Inventory included in the Purchased Assets and Inventory owned by any Mexican Subsidiary consists of items of a quality and quantity useable or saleable in the Ordinary Course of Business.  All items included in such Inventory are the property of the applicable Seller Entity.  Other than as set forth in Schedule 3.8, no items included in such Inventory are held on consignment from or bailment for third parties.

3.9    Subsidiaries.  Schedule 3.9 sets forth a complete and accurate list of each Subsidiary of each Seller.

3.10    Licenses and Permits.  Schedule 3.10 lists and describes all qualifications, registrations, filings, privileges, franchises, immunities, licenses, permits, authorizations and approvals of Governmental Authorities which are required in order for Seller or any other Seller

19

Entity to operate the Business (other than the operations located at the Russellville, Kentucky facility) as currently conducted and own the Purchased Assets, including, all certificates of occupancy and certificates, licenses and permits relating to building, safety, environmental laws, fire and health (collectively, the "Permits"). Each such Permit is in good standing, valid and subsisting, and in full force and effect in accordance with its terms. Each Seller Entity and the Leased Real Property are in compliance in all material respects with all such Permits.

3.11    Personnel Identification and Compensation. Schedule 3.11 contains a true and complete list of the names and titles of all current employees of each Seller Entity (other than employees at the Russellville, Kentucky facility) as of the date indicated thereon and their current hourly rate and/or base salary.

3.12    Broker's or Consultant's Fees. Other than with respect to fees owed by US Seller to BlueWater Partners, LLC and as otherwise set forth on Schedule 3.12, Seller has not dealt with any broker, finder or similar consultant in connection with any of the transactions contemplated by this Agreement and no Person is entitled to any commission or finder's fee in connection with the sale of the Purchased Assets to Purchaser.

3.13    Consents. Except (i) for entry of the Sale Order and (ii) as disclosed on Schedule 3.13, the execution and delivery of this Agreement by each Seller and the performance by such Seller of its obligations hereunder does not require any consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or any other Person that has not been obtained or is not deemed to be superseded by applicable provisions of the Bankruptcy Code (collectively, the "Consents").

3.14    Financial Statements.

(a)    Attached hereto as Schedule 3.14(a) are the unaudited consolidated balance sheet and the related unaudited consolidated statement of operations of US Seller as of and for the fiscal period ending December 31, 2015 and the five (5) month period ended May 31, 2016 (collectively, the "Financial Statements").

(b)    The Financial Statements (i) have been prepared in accordance with GAAP applied consistently with historical practice (except for the absence of a statement of cash flows, the absence of footnotes and, in the case of the interim period ending May 31, 2016, subject to year-end adjustments), (ii) present fairly, in all material respects, the consolidated financial position of US Seller for the period or as of the dates set forth therein and the results of its operations for such periods and (iii) are in accordance with the books and records of US Seller which have been maintained in a manner consistent with historical practice.

(c)    As of the date of the Financial Statements, except as set forth in the Financial Statements, no Seller Entity had any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) of the type which are required to be reflected on a balance sheet prepared in accordance with GAAP and, except (i) as set forth on Schedule 3.14(c) and (ii) for liabilities and obligations which have been incurred since such date in the Ordinary Course of Business or in connection with the filing of the Chapter 11 Case, since such date no Seller Entity has incurred any liability or obligation of any nature (whether accrued, absolute,

20

continent or otherwise) of the type which are required to be reflected on a balance sheet prepared in accordance with GAAP. No Mexican Subsidiary has any Indebtedness, except as set forth on Schedule 3.14(a).

3.15    No Material Adverse Change or Subsequent Distributions. Except as set forth on Schedule 3.15 hereto and the filing of the Chapter 11 Case, since May 31, 2016, there has not been any:

(a)    change in the business, operations or financial condition of any Seller Entity, the Business or the Purchased Assets that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    dividend or other distribution of assets or securities whether consisting of money, property or any other item of value, declared, issued or paid by any Seller Entity;

(c)    sale, assignment, transfer, mortgage, pledge or lease of assets which would otherwise constitute Purchased Assets, except for sales transactions or leases in the Ordinary Course of Business;

(d)    any single capital expenditure made or authorized in excess of $25,000 for any Seller Entity;

(e)    material damage, destruction or loss (whether or not covered by insurance) of any Purchased Assets;

(f)    modification, amendment, transfer or waiver of any right under any Assigned Contract or any termination of any Assigned Contract (other than in the Ordinary Course of Business);

(g)    investigation of any Seller Entity by any Governmental Authority nor has any Seller Entity, or any Affiliate of any Seller Entity, received any notice of such investigation;

(h)    change in any accounting method, policy or practice of any Seller Entity;

(i)    cancellation or waiver of any rights in respect of the Purchased Assets, except in the Ordinary Course of Business; or

(j)    except to the extent contemplated by this Agreement, amendment or termination of any Employee Benefit Plan, employment, consulting, severance, termination, retirement or indemnification agreement, Contract, policy, plan, practice or arrangement of any Seller Entity, other than in the Ordinary Course of Business.

3.16    Taxes. Except as set forth in Schedule 3.16:

(a)    US Seller and each other corporation included in any affiliated group, within the meaning of section 1504 of the Code, of which any Seller Entity is or has been a member have timely filed all Tax Returns, reports or estimates for all years and periods (and portions thereof) and for all jurisdictions (whether federal, state, local or foreign) in which any

21

such returns, reports or estimates were due. All such returns were true, correct, and complete in all material respects. All Taxes, whether shown as due and payable in respect of such returns, reports and estimates or that have otherwise become due and payable have been paid. As of the date of the most recently prepared Financial Statements, all Taxes not yet due and payable have been fully accrued on the books of Seller or are being contested in good faith.

(b)    All personal property taxes and assessments which may be due and payable with respect to the Purchased Assets have been paid in full. No Seller Entity has executed or filed with any Governmental Authority any agreement or other document extending or having the effect of extending the period for assessment, reassessment or collection of any Taxes, and no power of attorney granted by any Seller Entity with respect to any Taxes is currently in force.

(c)    No federal, state, local or foreign Tax audits or other administrative proceedings, discussions or court proceedings are presently pending with regard to any Taxes or Tax returns of any Seller Entity and no additional issues are being asserted against any Seller Entity in connection with any existing audits of any Seller Entity.

(d)    No Encumbrances have been filed and no Seller Entity has been notified by the IRS or any other taxing authority that any issues have been raised (and are currently pending) by the IRS or any other taxing authority in connection with any Tax Return of any Seller Entity or any Affiliate thereof.

(e)    There are no outstanding claims made by any tax authority in a jurisdiction in which any Seller Entity does not file Tax Returns that such Seller Entity is or may be subject to taxation in that jurisdiction.

3.17    Real Property.

(a)    Schedule 3.17 contains a complete and accurate list of each parcel of Owned Real Property. Except as set forth in Schedule 3.17, no real property, other than the Real Property, is used in the Business.

(b)    With respect to each of the Real Property Leases, except for Permitted Encumbrances: (i) the applicable Seller Entity has a valid interest or estate in such Real Property Lease, free and clear of all Encumbrances; (ii) such Real Property Lease is in full force and effect, valid and enforceable against the applicable Seller Entity in accordance with its terms; (iii) such Real Property Lease constitutes the entire agreement to which such Seller Entity is a party with respect to the lease of the subject Leased Real Property; (iv) the applicable Seller Entity has not assigned, sublet, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the interest or estate created thereby; (v) all facilities located on or comprising the Leased Real Property have received all Permits required in connection with the operation thereof and have been operated and maintained in all material respects in accordance with all applicable Laws; (vi) all facilities located on or comprising the Leased Real Property are supplied with utilities and other services necessary for the operation of such facilities as such facilities have been operated prior to the date of this Agreement, including electricity, water, telephone, sanitary sewer, storm sewer and natural gas; and has not, during the last two years, experienced any

22

material interruption in the delivery of adequate quantities of any such utilities or services utilized or required in the operation of the Business at the Leased Real Property; (vii) neither the applicable Seller Entity nor any other party thereto is in breach of or default thereunder (and, to the Seller Parties' Knowledge, no event has occurred which with notice or the passage of time or both would constitute a breach or default thereunder); (viii) the Closing will not affect the enforceability against any Person of such Real Property Lease or the rights of the applicable Seller Entity to the continued use and possession of the Leased Real Property for the conduct of the Business as currently conducted; (ix) except as set forth on <u>Schedule 3.17(b)</u>, there are no other parties occupying, or with a right to occupy, the Leased Real Property; and (x) there are no disputes, oral agreements, or forbearance programs with the applicable Seller Entity in effect as to such Real Property Lease.

(c)     Subject to Permitted Encumbrances, all the buildings, fixtures and leasehold improvements used by any Seller Entity in the Business (other than the those located on the leased facilities in Livonia, Michigan and Russellville, Kentucky which are not included in the Purchased Assets) are located on the Real Property and none of such buildings, fixtures or improvements encroach on any adjoining property owned by others or public rights of way. Subject to Permitted Encumbrances, each parcel of Real Property abuts on at least one side of a public street or road in a manner so as to permit reasonable vehicular and pedestrian ingress, egress and access to such parcel, or has adequate easements across intervening property to permit reasonable, customary and adequate vehicular and pedestrian ingress, egress and access to such parcel from a public street or road. Other than Permitted Encumbrances, to the Seller Entities' Knowledge, there are no restrictions on entrance to or exit from the Real Property to adjacent public streets.

(d)     Neither the Real Property nor the use or occupancy thereof violates in any material respect any applicable Laws, Orders, Permits, covenants, conditions or restrictions.

(e)     Subject to Permitted Encumbrances, US Seller has good, valid and marketable fee simple title to the Indiana Owned Property, and the applicable Seller Entity has valid and assignable leasehold interests in the Leased Real Property, free and clear of all Encumbrances. Except for the Real Property Leases and Permitted Encumbrances, there is no unrecorded or undisclosed legal or equitable interest in any Real Property owned or claimed by any Seller Entity to which a Seller Party is a party. Subject to the Real Property Leases, the applicable Seller Entity has enjoyed the continuous and uninterrupted quiet possession, use and operation of the Real Property without any material complaint or objection by any Person. There exists no unfulfilled obligation on the part of any Seller Entity to dedicate or grant an easement or easements over any portion or portions of any of the Real Property to any Governmental Authority.

(f)     With respect to the Indiana Owned Property, except for Permitted Encumbrances: (i) all facilities located on or comprising the Indiana Owned Property have received all Permits required in connection with the operation thereof and have been operated and maintained in all material respects in accordance with all applicable Laws; (ii) all facilities located on or comprising the Indiana Owned Property are supplied with utilities and other services necessary for the operation of such facilities, including electricity, water, telephone, sanitary sewer, storm sewer and natural gas; and has not, during the last two years, experienced

23

any material interruption in the delivery of adequate quantities of any such utilities or services utilized or required in the operation of the Business at the Indiana Owned Property; (iii) there are no other parties occupying, or with a right to occupy, the Indiana Owned Property; (iv) US Seller has not assigned, transferred, conveyed, mortgaged, leased, deeded in trust or encumbered any interest in the Indiana Owned Property; (v) US Seller has not granted any outstanding options, rights of first offer or rights of first refusal to purchase such Indiana Owned Property or any portion thereof or interest therein; and (vi) US Seller has made available to Purchaser copies of all title insurance policies, opinions, abstracts and surveys in Seller's possession or control relating to the Indiana Owned Property.

3.18  Intellectual Property.  (a)  US Seller or another Seller Entity owns, or is licensed or otherwise has the right to use (in each case, free and clear of any Encumbrances other than Permitted Encumbrances), all Intellectual Property used in or necessary for the conduct of the Business as currently conducted, (b) no claims are pending or, to the Seller Entities' Knowledge, threatened in writing that any Seller Entity is infringing on or otherwise violating the rights of any Person with regard to any Intellectual Property and (c) to the Seller Entities' Knowledge no Person is infringing on or otherwise violating any right of any Seller Entity with respect to any Intellectual Property owned by and/or licensed to any Seller Entity.  Schedule 3.18 identifies (a) patents, patent applications, all registered and unregistered trademarks, and all licenses, agreements or other permissions of each Seller Entity, (b) each material license, agreement or other permission which any Seller Entity has granted to any third party with respect to any Intellectual Property used in the Business and (c) each material item of Intellectual Property that any third party owns and that any Seller Entity uses in connection with the Business.  Any exclusive right to use any of the Intellectual Property used in or necessary for the conduct of the Business as currently conducted is valid and enforceable.

3.19  Litigation, etc.  Except (i) in connection with the filing of the Chapter 11 Case and the filing of bankruptcy case for General Products Mexico, LLC and (ii) as otherwise disclosed on Schedule 3.19, there is no Action pending or, to the Seller Entities' Knowledge, threatened against or affecting any Seller Entity, the Business or the Purchased Assets nor is there any Order of any Governmental Authority outstanding or, to the Seller Parties' Knowledge, threatened against any Seller Entity, the Business or the Purchased Assets.

3.20  Employee Benefits; ERISA.

(a)  Schedule 3.20 includes a complete list of all Employee Benefit Plans providing benefits to any employee or former employee of any Seller Entity sponsored or maintained by any Seller Entity or any of its Affiliates or to which any Seller Entity contributes or is obligated to contribute. Without limiting the generality of the foregoing, the term "Employee Benefit Plans" includes all employee welfare benefit plans within the meaning of Section 3(1) of ERISA and all employee pension benefit plans within the meaning of Section 3(2) of ERISA.

(b)  With respect to each Employee Benefit Plan which constitutes a Purchased Asset or which is maintained by a Mexican Subsidiary, Seller has delivered to Purchaser a true, correct and complete copy of: (i) all plan documents, benefit schedules, trust agreements, and insurance contracts and other funding vehicles; (ii) the most recent Annual Report (Form 5500

24

Series) and accompanying schedule, if any; (iii) the current summary plan description, if any; (iv) the most recent annual financial report, if any; (v) the most recent actuarial report, if any; and (vi) the most recent determination letter from the IRS, if any.

(c)     Each Seller Entity has complied, and is now in compliance, in all material respects with all provisions of ERISA, the Code and all Laws applicable to the Employee Benefit Plans which constitute Purchased Assets or which are maintained by any Mexican Subsidiary. With respect to each Employee Benefit Plan which constitutes a Purchased Asset or which is maintained by any Mexican Subsidiary, and that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code, the IRS has issued a favorable determination letter or the remedial amendment period for requesting a favorable determination letter has not yet expired.

(d)     All contributions required to be made by applicable Law or by any plan document or other contractual undertaking to any Employee Benefit Plan which constitutes a Purchased Asset or which is maintained by any Mexican Subsidiary, and all premiums due or payable with respect to insurance policies funding any such Employee Benefit Plan, for any period through the date hereof have been timely made or paid in full or, to the extent not required to be made or paid on or prior to the date hereof, have been fully reflected in the Financial Statements to the extent required under GAAP.

(e)     No Employee Benefit Plan which constitutes a Purchased Asset or which is maintained by any Mexican Subsidiary is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code. To the Seller Entities' Knowledge, there does not now exist, nor do any circumstances exist that would reasonably be expected to result in, any liability or the imposition of a lien on Purchased Assets on or before the Closing Date under (i) Title IV of ERISA, (ii) Sections 302 and 4007 of ERISA and the regulations thereunder or (iii) sections 412, 430 and 4971 of the Code and the regulations thereunder. No "pension plan" (within the meaning of Section 3(2) of ERISA) that is subject to Title IV of ERISA that is sponsored, maintained, or contributed to by the Sellers, the Mexican Subsidiaries or a member of the controlled group of such Persons (within the meaning of Section 414 of the Code or 4001(b)(1) of ERISA), has been terminated and no termination date has been established for such plan as of the Closing Date.

(f)     No Employee Benefit Plan which constitutes a Purchased Asset is or was a "multiple employer plan" within the meaning of section 413 of the Code. No Seller Entity has ever been obligated to contribute to any "multiemployer plan" within the meaning of Section 3(37) of ERISA.

(g)     Since December 31, 2015, Seller has not made nor agreed to make, nor is currently required to make any changes in benefits that would materially increase the cost of maintaining any of the Employee Benefit Plans which constitute Purchased Assets or which is maintained by any Mexican Subsidiary.

(h)     Seller has timely deposited and transmitted all amounts withheld from employees for contributions or premium payments for each Employee Benefit Plan which constitutes a Purchased Asset or which is maintained by any Mexican Subsidiary into the appropriate trusts or accounts.

25

3.21 <u>Labor and Employment Matters</u>. No controversies, disputes or proceedings are pending or, to the Seller Entities' Knowledge, threatened against any Seller Entity with respect to the employees of any Seller Entity. To the Seller Entities' Knowledge, no employee of any Seller Entity has indicated to US Seller his or her intention to terminate his or her respective employment with such Seller Entity or not to accept employment with Purchaser immediately after the Closing. Other than as set forth on <u>Schedule 3.21</u>, no Seller Entity is a party to any collective bargaining agreement, union contract or similar agreement. There is no (a) unfair labor practice complaint pending against any Seller Entity or, to the Seller Entities' Knowledge, threatened in writing against any Seller Entity and (b) no strike, labor dispute, slowdown or stoppage is pending or, to the Seller Entities' Knowledge, threatened against any Seller Entity.

3.22 <u>Environmental Matters</u>.

(a) For the purposes of this <u>Section 3.22</u>: "<u>Environmental Law</u>" means any Law, Order, common law or regulation promulgated or approved by any Governmental Authority, relating to the environment, public health and safety or worker health and safety, including any law relating to Releases or threatened Releases of Hazardous Materials into the environment (including air, surface water, groundwater and land), or relating to the presence, generation, use, storage, treatment, transportation, recycling, disposal or arranging for transportation, treatment or disposal, or handling of Hazardous Materials; "<u>Environmental Permits</u>" means, collectively, all Permits required under Environmental Laws; "<u>Hazardous Materials</u>" means, collectively, any chemicals or other materials or substances which are defined as or included in any definition of or regulated as "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", or words of similar meanings or regulatory effect under any Environmental Law, including but not limited to friable asbestos and petroleum products; "<u>Hazardous Materials Contamination</u>" means the presence of Hazardous Materials in, at, on, under or emanating from any improvement, building, or the environment (including air, surface water, groundwater and land) in such quantity or condition that requires any investigation, monitoring or remediation and gives rise to material Liabilities under any Environmental Laws; "<u>Release</u>" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material into the environment (including air, surface water, groundwater and land).

(b) Except as set forth on <u>Schedule 3.22</u> or in any environmental audit, assessment, investigation report or other environmental documents made available to Purchaser, no Release of Hazardous Materials resulting in Hazardous Materials Contamination has occurred at the Indiana Owned Property or the Leased Real Property.

(c) Except as set forth on <u>Schedule 3.22</u> or in any environmental audit, assessment, investigation report or other environmental documents made available to Purchaser, no Hazardous Materials Contamination exists at the Indiana Owned Property or the Leased Real Property.

(d) There are no pending or, to the Seller Entities' Knowledge, threatened civil, criminal, administrative or private party Actions, suits, summons, citations, complaints,

26

notices, demands, Encumbrances, Orders, investigations, judgments, proceedings or hearings based on or related to Environmental Laws or Hazardous Materials against or involving the Indiana Owned Property or the Leased Real Property, and no Seller Entity has received any written notice of any noncompliance or Liability based on or related to Environmental Laws or Hazardous Materials related thereto.

(e)     Except as set forth on Schedule 3.22 or in any environmental audit, assessment, investigation report or other environmental documents made available to Purchaser, no underground storage tanks, impoundments, pits, or disposal areas for Hazardous Materials are located on or have been removed from, abandoned or closed at the Indiana Owned Property or the Leased Real Property.

(f)     US Seller has delivered to Purchaser true and correct copies of all environmental audit, assessment or investigation reports and other material environmental documents relating to the Indiana Owned Property and the Leased Real Property which are in its possession or under its reasonable control.

3.23    Intentionally Omitted.

3.24    Customers and Suppliers.  Neither FCA LLC (in its capacity as a customer) nor any supplier related to the FCA LLC business (i) has given notice to any Seller Entity that such Person intends to change the terms of the business relationship in an adverse way following the date hereof nor has any such intent been expressed or (ii) has reduced the volume of business or changed any material term in an adverse manner since the date of the Reference Balance Sheet. Schedule 3.24 sets forth the top ten customers (each a "Material Customer") and the top ten suppliers (each a "Material Supplier") of Seller (based on gross sales and purchases, as applicable) for the prior two (2) fiscal years.

3.25    Product Liability.  Except as set forth on Schedule 3.25, to the Seller Entities' Knowledge, all products sold, distributed, installed, used, delivered or held in inventory in connection with the Business (including, without limitation, all documentation furnished in connection therewith) conform in all material respects with all applicable contractual commitments and with all express and implied warranties.  To the Seller Entities' Knowledge, no product sold, distributed, used or delivered by any Seller Entity in connection with the Business is subject to any guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of sale except as may be set forth in a written contract.

3.26    Sufficiency of Purchased Assets.  The Purchased Assets and the tangible assets owned or leased by the Mexican Subsidiaries include all of the assets, goodwill, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, necessary to conduct the Business solely with respect to FCA LLC and Eaton Corporation at the facilities in Angola, Indiana and Mexico as presently conducted by each Seller Entity.

3.27    No Other Representations or Warranties.  Except as expressly set forth in this Article III (as modified by the Schedules hereto), none of Seller or any agent, employee, attorney or other representative of Seller makes any representation or warranties, express or implied, of

27

any kind whatsoever to Purchaser with respect to the Purchased Assets, the Assumed Liabilities, the Business or otherwise. Except for the representations and warranties expressly set forth in this Article III, Seller expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, related to the condition of Purchased Assets, including, without limitation (i) any implied or expressed warranty of merchantability, (ii) any implied or express warranty of fitness for a particular purpose, or (iii) conformity to models or samples of materials. For the avoidance of doubt, except as expressly set forth in this Article III, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement, all of which were produced only for informational purposes. The disclosure of any matter or item in any Schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to, and covenants and agrees with, US Seller that:

4.1     Organization and Good Standing.  Purchaser is duly organized, validly existing as a corporation and in good standing under the laws of the State of Delaware with full corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.

4.2     Execution and Delivery.  This Agreement has been duly authorized by all necessary corporate action on the part of Purchaser, has been duly executed and delivered by Purchaser and constitutes the legal, valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general equitable principles (whether considered at a proceeding at law or in equity.

4.3     No Conflicts; Consents.  The execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby will not (i) conflict with or result in the violation of the provisions of the Certificate of Incorporation or Bylaws of Purchaser, (ii) violate any applicable Law, or (iii) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority or other Person which has not otherwise been obtained or made.

4.4     Financing.  At the Closing, Purchaser will have sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement.

4.5     Brokers and Finders.  Neither Purchaser, any officer, member, director or employee of Purchaser, nor any Affiliate of Purchaser has employed any broker, finder or

investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby.

4.6     Litigation.  There is no Action pending, or the Purchaser's knowledge, threatened against Purchaser, nor is there any Order of any Governmental Authority outstanding or, to Purchaser's knowledge, threatened against Purchaser that would adversely affect Purchaser's ability to consummate the transactions contemplated by this Agreement.

4.7     No Inducement or Reliance; Independent Investigation.  With respect to the Purchased Assets and any other rights to be transferred hereunder, Purchaser acknowledges it has not been induced by and has not relied upon any representations, warranties or statements, whether expressed or implied, made by US Seller or any agent, employee, attorney or other representative of US Seller representing or purporting to represent US Seller that are not expressly set forth in Article III, whether or not any such representations, warranties or statements were made in writing or orally.  For purposes of clarification, this Section 4.7 shall not in any way limit any representation, warranty or statement of US Seller made in this Agreement or in any other document or instrument delivered to Purchaser pursuant to this Agreement.

4.8     Purchaser's Investigation.  Purchaser represents that it is a sophisticated entity that was advised by knowledgeable counsel and other advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets, Assumed Liabilities and the Business. Notwithstanding the foregoing, this Section 4.8 does not limit any representation or warranty made by US Seller in this Agreement or in any document or instrument delivered to Purchaser pursuant to this Agreement.

4.9     No Other Representations or Warranties.  Except as specifically set forth in this Article IV, neither Purchaser nor any agent, employee, attorney or representative of Purchaser makes any representation or warranty, expressed or implied, of any kind whatsoever.

ARTICLE V

COVENANTS AND AGREEMENTS

5.1     Conduct of Business of each Seller.

(a)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 7.4 or the Closing, except (i) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (ii) as required by applicable Law, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), each Seller shall, and shall cause each other Seller Entity to:

(i)     conduct the Business (other than the operations located at the Russellville, Kentucky facility) and operate and maintain the Purchased Assets and the assets of the Mexican Subsidiaries in the Ordinary Course of Business as currently conducted, including maintaining accounting methods;

(ii)     use its commercially reasonable good faith efforts to (x) preserve the goodwill of and relationships with Governmental Authorities, customers, clients, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, agents, employees and others having business dealings with the Business (other than the operations located at the Russellville, Kentucky facility); and (y) comply with all applicable Laws and, to the extent consistent therewith, preserve its assets (tangible and intangible).

(b)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with <u>Section 7.4</u> or the Closing, except (i) for any limitations on operations imposed by, or actions required by, the Bankruptcy Court or the Bankruptcy Code, (ii) as required by applicable Law, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed and, in the event that any Seller requests Purchaser's consent in writing and Purchaser does not provide a response within ten (10) Business Days after such request, Purchaser shall be deemed to have provided their prior written consent to such request), each Seller shall not and shall cause each other Seller Entity not to:

(i)     distribute, sell, transfer, assign, convey, dividend, mortgage, pledge or subject to any Encumbrance (other than Permitted Encumbrances) any of the Purchased Assets or the assets of the Mexican Subsidiaries;

(ii)     cancel or compromise any debt or material claim or waive or release any material right of such Seller Entity that constitutes a Purchased Asset or any asset of the Mexican Subsidiaries;

(iii)     (A) enter into any new Contract or renew any existing Contract relating to the Business (other than the operations located at the Russellville, Kentucky facility) requiring payments by or to such Seller or Seller Entity in excess of $25,000 over the thirty day period immediately following the execution thereof and (B) cancel, reject, terminate, amend, modify, supplement or rescind any customer or vendor contract relating to the Business (other than the operations located at the Russellville, Kentucky facility) or the Real Property Leases or any terms of any such contract, except for the purpose of effecting any changes in applicable Law or implementing regulatory requirements or in response to a breach or default by the other party thereto;

(iv)     breach or abandon any rights under the Real Property Leases or any vendor contract or any customer contract relating to the Business; or

(v)     make or rescind any material Tax election or take any material Tax position (unless required by Law) or file any amended Tax Return or change its fiscal year or financial or Tax accounting methods, policies or practices, or settle any Tax liability, except in each case as would not reasonably be expected to result in Liability to Purchaser or the Business.

Notwithstanding anything else in this Agreement to the contrary, during the period from the Execution Date and continuing until the earlier of the termination of this Agreement or the Closing, the Sellers and any members of the Seller's controlled group (within the meaning of Section 414 of the Code or 4001(b)(1) of ERISA) shall take no action to terminate any "pension

30

plan" (within the meaning of Section 3(2) of ERISA) that is subject to Title IV of ERISA, including the issuance of a notice of intent to terminate to affected parties.

5.2     Access to Information.

(a)     Each Seller agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 7.4, Purchaser shall be entitled, through its officers, employees, counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, employees, accountants, auditors, counsel and operations of each Seller Entity with respect to the Purchased Assets as Purchaser's Representatives may reasonably request.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including such Seller's right to have its Representative accompany Purchaser upon the Real Property at the time of any inspection or examination and shall be subject to restrictions under applicable Law.  Pursuant to this Section 5.2, each Seller shall furnish to Purchaser and their Representatives such financial, operating and property related data and other information relating to the Purchased Assets as such Persons reasonably request.  Each Seller shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall, and use their commercially reasonably efforts to cause their Representatives to, reasonably cooperate with such Seller and its Representatives and shall use their reasonable efforts to minimize any disruption to the Purchased Assets.

(b)     Intentionally Omitted.

(c)     Intentionally Omitted.

(d)     No information received pursuant to an investigation made under this Section 5.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of any Seller set forth in this Agreement or any certificate or other instrument delivered to Purchaser in connection with the transactions contemplated hereby, (ii) amend or otherwise supplement the information set forth in the schedules attached hereto, (iii) limit or restrict the remedies available to the parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity, or (iv) limit or restrict the ability of either party to invoke or rely on the conditions to the obligations of the parties to consummate the transactions contemplated by this Agreement.

(e)     All information provided pursuant to this Section 5.2, shall be considered confidential (the "Confidential Information") and the receiving party agrees that the Confidential Information will be used solely for the purpose of consummating this Agreement and that all of the  Confidential Information will be kept confidential; provided that any such information may be disclosed only to the limited group of the receiving party's officers, directors, employees, agents, and outside advisors, who are actually engaged in and need to know the Confidential Information for the purpose of consummating this Agreement, who have been informed of the confidential nature of the  Confidential Information, and who have been advised by and agree

31

with the receiving party that such information is to be kept confidential and shall not be used for any purpose other than consummating this Agreement. Notwithstanding the foregoing, the receiving party shall be responsible for any violation of the terms of this Section 5.2 by any such officer, director, employee, agent or outside advisor.

5.3     Assignability of Certain Permits. To the extent that the assignment to Purchaser of any Permit pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Permit or any right or interest therein unless and until such consent is obtained; provided, however, that the parties hereto will use their commercially reasonable efforts, before the Closing, to obtain all such consents.

5.4     Rejected Contracts. Neither Seller shall reject any Real Property Lease or any other Contract in any bankruptcy proceeding during the period beginning on the date hereof and ending seventy-five (75) days following the Closing Date without the prior written consent of Purchaser. Within 10 days of the Petition Date, Sellers shall provide a written proposal to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America satisfying the requirements of section 1113(b)(1)(A) of the Bankruptcy Code and thereafter shall comply with the obligations under section 1113(b)(1)(B) and (b)(2) of the Bankruptcy Code.

5.5     Further Agreements. Purchaser authorizes and empowers US Seller from and after the Closing Date to receive and to open all mail received by US Seller relating to the Purchased Assets or the Assumed Liabilities and to deal with the contents of such communications in accordance with the provisions of this Section 5.5. Each Seller shall (i) promptly deliver to Purchaser any mail or other communication received by it after the Closing Date and relating to the Purchased Assets or the Assumed Liabilities, (ii) promptly transfer in immediately available funds to Purchaser any cash, electronic credit or deposit received by such Seller but solely to the extent that such cash, electronic credit or deposit are Purchased Assets and (iii) promptly forward to Purchaser any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Purchased Assets. Purchaser shall (x) promptly deliver to US Seller any mail or other communication received by it after the Closing Date and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to US Seller, any cash, electronic credit or deposit received by Purchaser but solely to the extent that such cash, electronic credit or deposit are Excluded Assets and (z) promptly forward to US Seller any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets. From and after the Closing Date, each Seller shall refer all inquiries with respect to the Purchased Assets to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to US Seller. In the event that action is taken by any third party with respect to the Purchased Assets within six (6) months of the Closing Date, upon reasonable request by US Seller, Purchaser shall take such actions to resolve or otherwise address such action.

5.6     Reasonable Efforts.

(a)     Subject to the terms and conditions of this Agreement and applicable Law, each Seller and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.

(b)     Each Seller shall use its commercially reasonable efforts, and Purchaser shall reasonably cooperate with such Seller, to obtain any Consents required to consummate the transactions contemplated by this Agreement; provided, in no event shall Purchaser be required to pay any fee to obtain such Consents.

(c)     The obligations of each Seller pursuant to this Section 5.6 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Chapter 11 Case), and such Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and such Seller's duty to seek and obtain the highest or otherwise best price for the Business as required by applicable Law or an order of the Bankruptcy Court. Following the Closing, Purchaser shall provide to each Seller, at such Seller's expense, such further assistance as reasonably requested with respect to completion of all returns, filings and documentation and actions necessary or appropriate to administer the bankruptcy estate.

5.7     Preservation of Records.  Each Seller and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Purchased Assets for a period of five (5) years from the Closing Date, in the case of Purchaser, and until the closing of the Chapter 11 Case or the liquidation and winding up of each Seller's estate, in the case of such Seller, and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of each Seller or Purchaser or any of their respective Affiliates or in order to enable each Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event any Seller or Purchaser wishes to destroy such records at the end of such applicable period, such party shall first give sixty (60) days prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of such Seller's estate shall permit.

5.8     Publicity.  Each Seller or Purchaser may issue a press release or public announcement concerning this Agreement or the transactions contemplated hereby only with the prior written approval of the other parties hereto, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the disclosing party, such disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.  Without limiting the generality of the foregoing sentence, the party intending to make such release shall use its commercially reasonable efforts, consistent with such applicable Law or Bankruptcy Court requirement, to consult with the other parties with respect to the text thereof.

33

5.9     Notification of Certain Matters.  Purchaser and each Seller will each give prompt notice to the other party of the occurrence of any event that would reasonably be expected to preclude any condition precedent of such party under Article VI to be satisfied.  Prior to Closing, each Seller will have the right to supplement or amend the Schedules hereto (each a "Schedule Supplement"), and each such Schedule Supplement will be deemed to be incorporated into and to supplement and amend the Schedules; provided, however, that if such event, development or occurrence which is the subject of the Schedule Supplement would have provided Purchaser the right to terminate this Agreement pursuant to Section 7.4(i) (assuming lapse of the cure period), then Purchaser will have the right to terminate this Agreement.

5.10     Amendment.  This Agreement may be amended at any time by a written instrument executed by Purchaser and Sellers.  Any amendment effected pursuant to this Section 5.10 shall be binding upon all parties hereto.

5.11     Waiver.  Any term or provision of this Agreement may be waived in writing at any time by the party or parties entitled to the benefits thereof.  Any waiver affected pursuant to this Section 5.11 shall be binding upon all parties hereto.  No failure to exercise and no delay in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude the exercise of any other right, power or privilege.  No waiver of any breach of any covenant or agreement hereunder shall be deemed a waiver of any preceding or subsequent breach of the same or any other covenant or agreement. The rights and remedies of each party under this Agreement are in addition to all other rights and remedies, at law or in equity that such party may have against the other parties.

5.12     Pro Rations.  Any and all real and personal property Taxes for the year ended December 31, 2016 imposed on, or resulting from, the Purchased Assets (the "Property Taxes") (irrespective of which party such Taxes are imposed on) shall be paid by US Seller, on the one hand, and paid by Purchaser, on the other hand, on a pro rata basis in accordance with the following: (a) US Seller shall pay an amount equal to the aggregate amount of the Property Taxes multiplied by a ratio the numerator of which is the number of days elapsed in the calendar year as of the Closing Date and the denominator of which is 365 (the "Seller Property Taxes") and (b) Purchaser shall pay an amount equal to the aggregate amount of the Property Taxes minus Seller Property Taxes.  If the exact amount of any real or personal property Taxes is not known on the Closing Date, such Taxes will be estimated based upon the best available information at the time of Closing (i.e. that taxable value currently assigned to the real property and the most recent millage rate).  US Seller shall pay all utilities with respect to the Leased Real Property for the periods prior to the Closing.  US Seller shall use commercially reasonable efforts to obtain final billings of such utilities as of the Closing Date, provided, however, if it is not possible to obtain final utility readings prior to the Closing Date, utilities will be prorated between US Seller and Purchaser on the Closing Date based on the most recently available bills. All prorations hereunder shall be final as of Closing.  All amounts owing by US Seller hereunder shall be calculated and paid as of the Closing.

5.13     Offer of Employment.

(a)     Effective as of the Closing Date, Purchaser (or an Affiliate thereof) will offer employment to each current employee of US Seller (not any other Seller Entity) who is

34

identified on Schedule 5.13 hereto (each, a "Potential Employee"). Any Potential Employee who becomes an employee of Purchaser as of the Closing Date shall be referred to in this Agreement as a "Transferred Employee". Purchaser shall have no obligations whatsoever in respect of any employee of any Seller other than a Potential Employee (each, an "Excluded Employee"). Potential Employees who, as of the Closing Date, are on layoff or any leave of absence, including, without limitation, vacation, military leave, disability leave or disability retirement (whether or not any applicable waiting period relating to such disability leave or disability retirement is then satisfied) (each, a "Leave Employee"), shall, except for Leave Employees who have retired with a total and permanent disability benefit retirement under an Employee Benefit Plan, become Transferred Employees on the date that they are capable of performing services and present themselves for active employment with Purchaser, and shall be otherwise subject to the terms and conditions of this Section 5.13. Each such employment offer shall be effective as of the Closing (or, with respect to each Leave Employee, the date such Leave Employee is capable of performing services for Purchaser as an active employee, if later). Any Potential Employee who presents himself or herself for active employment at his or her principal place of employment on the Closing Date or within five (5) Business Days thereafter shall be deemed to have accepted Purchaser's offer of employment described in this Section 5.13(a) effective as of the Closing Date, and any Potential Employee (other than any Leave Employee) who does not present himself or herself for such active employment within such time frame shall be considered an Excluded Employee as of the Closing Date. Any Leave Employee who does not present himself or herself for active employment with Purchaser (or an Affiliate thereof) within five (5) Business Days after becoming capable of performing services shall be considered an Excluded Employee.

(b)     Purchaser shall have no obligations whatsoever in respect of the Excluded Employees. Nothing herein shall be construed to confer upon Potential Employees or Excluded Employees any right to continued employment with Purchaser or to amend or modify any at-will employment policy of Purchaser. No Potential Employee, Transferred Employee or Excluded Employee or any other Person not a party to this Agreement will have any rights with respect to any obligation of any party under this Agreement, and nothing contained herein, express or implied, is intended to confer on any such Person any rights or remedies.

5.14    Title Commitments; Surveys; Zoning Reports.

(a)     No later than ten (10) Business Days prior to Closing, US Seller shall obtain and deliver, or cause to be delivered, to Purchaser or Purchaser shall obtain the following:

(i)     with respect to the Indiana Owned Property, US Seller shall obtain an owner's preliminary report on title (a "Title Commitment") covering a date subsequent to the date hereof, issued by the Title Company, which preliminary report shall contain a commitment of the Title Company to issue an owner's title insurance policy on the most current form of ALTA fee owner's title insurance policy, with extended coverage (a "Title Policy"), insuring the good and marketable fee simple title of Purchaser or its nominee in such Indiana Owned Property, with liability in the amount of the approximated fair market value of the Indiana Owned Property as reasonably agreed to between US Seller and Purchaser, together with legible and complete copies of all exceptions and matters referred to therein, and Purchaser may include, at its cost and expense, with such affirmative coverages and endorsements as Purchaser shall

require, including, without limitation, the following endorsements: (i) ALTA 3.1 zoning (plus parking and loading docks), (ii) owner's comprehensive, (iii) land "same as" survey, (iv) subdivision compliance, (v) tax parcel identification, (vi) contiguity, (vii) location, (viii) waiver of arbitration, (ix) utilities availability, and (x) access;

        (ii)     Purchaser shall obtain an up-to-date ALTA Land Title Survey (a "Survey") for the Indiana Owned Property, acceptable to Purchaser in form and substance, certified within sixty (60) days of the Closing, prepared by a surveyor licensed in the jurisdiction where such Indiana Owned Property is located, completed in accordance with the most current "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," including items 1-4, 6, 7(a), 7(b)(1), 7(b)(2), 8-10, 11(a), 13, 14 and 16-18 of "Table A" thereof, and certified to Purchaser, the Title Company, Purchaser's lender, if any, Winston & Strawn LLP and any other parties designated by Purchaser;

        (iii)    Purchaser shall obtain a current zoning report from a nationally-recognized zoning information services provider containing a certificate from the applicable governmental authority indicating the zoning classification of each parcel of the Real Property and certifying that each such parcel is in compliance with all Laws regarding zoning (each, a "Zoning Report"), together with a copy of all pertinent regulations, variances, special use permits and certificates of occupancy and/or completion

        (b)    US Seller shall pay the costs and expenses of the Title Commitments and Title Policies (excluding endorsements), whether or not the transactions contemplated under this Agreement are consummated; Purchaser shall pay the costs and expenses of the endorsements to the Title Policies, Surveys and Zoning Reports; and US Seller and Purchaser shall split any and all escrow and closing fees charged by the Title Company in connection with the Closing.

## ARTICLE VI

## CONDITIONS TO CLOSING

    6.1    <u>Conditions Precedent to the Obligations of Purchaser and each Seller</u>.  The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by US Seller and Purchaser in whole or in part to the extent permitted by applicable Law):

        (a)    there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

    6.2    <u>Conditions Precedent to the Obligations of each Seller</u>.  The obligations of each Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of

36

which may be waived in writing by US Seller in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of Purchaser set forth in <u>Article IV</u> hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby, and US Seller shall have received a certificate, signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date and US Seller shall have received a certificate, signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c) The Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order; and

(d) Purchaser shall have delivered, or caused to be delivered, to US Seller all of the items set forth in <u>Section 7.3</u>.

6.3 <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser in whole or in part to the extent permitted by applicable Law):

(a) The Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and, as of the Closing Date the Bid Procedures Order and Sale Order shall be in full force and effect and shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified in any respect that materially affects the terms and conditions of this Agreement without the prior written consent of the Purchaser;

(b) The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari, unless the Sale Order provides that the Purchaser is a "good faith purchaser" pursuant to Section 363(m) of the Bankruptcy Code and is entitled to all the protections afforded to such purchaser by such section;

(c) the representations and warranties set forth in <u>Article 3</u> hereof shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) (without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect" set forth in such representations and warranties), and Purchaser shall have received a certificate (in form

37

and substance satisfactory to Purchaser), signed by an authorized officer of US Seller, dated the Closing Date, to the foregoing effect;

(d)     Each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date, and Purchaser shall have received a certificate, (in form and substance satisfactory to Purchaser), signed by an authorized officer of such Seller, to the forgoing effect;

(e)     Each Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 7.2;

(f)     There shall have occurred no Material Adverse Effect since the date hereof;

(g)     Any material Encumbrances (other than Permitted Encumbrances) on the assets of any Mexican Subsidiary shall have been released in full;

(h)     The Bankruptcy Court shall have entered an order acceptable to Purchaser granting a motion filed by the US Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Sellers to reject all collective bargaining agreements to which any Seller is a party;

(i)     (i) The Bankruptcy Court shall have determined that Purchaser is not a successor to Sellers under the UAW Collective Bargaining Agreement(s) or (ii) the Bankruptcy Court shall have granted a motion acceptable to Purchaser filed by the applicable Sellers pursuant to section 1113(c) of the Bankruptcy Code authorizing the applicable Sellers to reject the UAW Collective Bargaining Agreement(s);

(j)     That certain Real Property Lease between Deutsche Bank Mexico, S.A., Institucion de Banca Multiple Division Fiduciaria, as Trustee of Trust F/1638 and GP Innovative Machining & Assembly de Mexico, S. de R.L. de C.V. shall be amended to extend the expiration date of such Real Property Lease to no earlier than December 31, 2018;

(k)     The Mexican Working Capital as agreed to pursuant to Section 2.8(a) hereof shall not be less than zero; and

(l)     As of the Closing, Purchaser, or an affiliate thereof, and Eaton Corporation shall have executed and delivered a "Contract" (as defined in that certain Letter of Intent dated June 17, 20016 by and between AAA Sales & Engineering Company, Inc. and Eaton Corporation) which is satisfactory to Purchaser in its sole discretion.

Notwithstanding the foregoing or anything else in this Agreement to the contrary, solely in the event all of the conditions set forth in Section 6.3 are satisfied in full other than the condition set forth in subsections (j), (k) or (l) above, in the event such condition in subsection (j), (k) or (l), as applicable, is not satisfied (or waived in writing by Purchaser) within five (5) business days of satisfaction of all such other conditions, the condition set forth in subsections (j), (k) and (l) shall be deemed waived by Purchaser and Purchaser will be required to

38

consummate the transactions set forth herein in accordance with the terms hereof; provided, in such an event, at the Closing and without any further action of the parties hereto, (i) the definition of "Purchased Assets" hereunder shall be deemed amended and modified to delete the reference therein to "Mexican Subsidiary Interests" (set forth in clause (a) thereof) and the reference therein to the assets set forth on Schedule 1.2(E) (as referenced in clause (n) thereof), (ii) the reference to Mexican Subsidiary Interests in Section 2.3(m) shall be deemed deleted, (iii) the references to the Mexican Subsidiaries set forth in Article III shall be deemed deleted, (iv) any reference to "Seller Entity" set forth herein shall be deemed to refer only to the Sellers and exclude the Mexican Subsidiaries, (v) the closing deliveries in Section 7.2 related to the Mexican Subsidiaries shall be deemed deleted; (vi) Schedule 1.2(B) hereto shall be deemed amended and modified to delete and remove the Contracts set forth therein identified with an asterisk, and (vii) the Gross Cash Purchase Price shall be deemed reduced and adjusted by $2,900,000. The parties will work in good faith to identify any other required modifications to the Transaction to accommodate this intent in form and substance of the foregoing.

6.4    Deemed Consents and Cures.  US Seller shall be deemed to have obtained all required consents in respect of the assignment of any of the Assigned Contracts, and all defaults thereunder shall be deemed to have been cured if, and to the extent that, pursuant to the Sale Order or any other Order of the Bankruptcy Court, US Seller is authorized to assume and assign any such Assigned Contracts to the Purchaser pursuant to Section 365 of the Bankruptcy Code.

6.5    Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Sections 6.1, 6.2 or 6.3, as the case may be, if such failure was caused directly by such party's failure to comply with any provision of this Agreement.

6.6    Survival of Representations and Warranties.  None of the representations or warranties of any party hereto in this Agreement or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations or warranties shall survive the Closing Date; provided, the representations and warranties set in Sections 3.1, 3.2, 3.3, 3.4, 4.1, 4.2 and 4.3 shall survive without limitation; provided, further, that nothing in this Section 6.6 shall limit the remedies of Purchaser after the Closing for breaches of representations or warranties resulting from fraud by any Seller.

ARTICLE VII

CLOSING AND TERMINATION

7.1    Closing.  Subject to the satisfaction of the conditions set forth in Sections 6.1, 6.2 and 6.3 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the purchase and sale of the Purchased Assets and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Winston & Strawn, 35 W. Wacker Drive, Chicago, Illinois 60601 (or at such other place as the parties may designate in writing) on the later of (a) July 31, 2016 or (b) five (5) Business Days after the entry of the Sale Order, unless another time or date, or both, are agreed to in writing by the parties.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of the applicable Seller in the Purchased Assets to be

CHI:2996054.16

acquired by Purchaser hereunder shall be considered to have passed to Purchaser shall be considered to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

7.2     <u>Closing Deliveries by each Seller</u>.  At the Closing, US Seller shall deliver to Purchaser:

(a)     all such certificates, assignments and other documents and instruments of sale, assignment, conveyance and transfer, as Purchaser or its counsel may deem reasonably necessary or desirable to effect the transfer of the Purchased Assets to Purchaser including, without limitation, a properly executed Ownership Interest Assignment Agreement in accordance with Mexican Law effectuating the transfer of the ownership interests (*partes sociales*) of GP Innovative Machining & Assembly de Mexico, S. de R. L. de C.V. ("<u>GPM</u>") and SLP Resource Solutions, S. de R. L. de C.V. ("<u>SLP</u>") from each Seller to Purchaser and or Purchaser's designees in form acceptable to Purchaser;

(b)     a duly executed Bill of Sale with respect to the Purchased Assets;

(c)     a duly executed Assignment and Assumption Agreement with respect to the Assumed Contracts and Assumed Liabilities;

(d)     a true and correct copy of the Sale Order;

(e)     a duly executed Escrow Agreement;

(f)     a duly executed non foreign person affidavit of each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(g)     the officer's certificates required to be delivered pursuant to <u>Sections 6.3(c)</u> and <u>6.3(d)</u>;

(h)     the consents set forth on <u>Schedule 7.2(h)</u> in form and substance satisfactory to Purchaser;

(i)     the books and records included in the Purchased Assets including the Partners' Registry Book and the Partners' Meeting Minutes Book (*Libro de Actas de Asambleas de Socios*) of GPM and SLP;

(j)     the written resignations of the current members of the Board of Managers of SLP and GPM (*Consejo de Gerentes*);

(k)     a general warranty deed conveying to Purchaser or its nominee the Indiana Owned Property, duly executed by each Seller and in form and substance satisfactory to Purchaser and subject to Permitted Encumbrances;

(l)     a pro forma Title Policy or "marked-up" Title Commitment, signed by the Title Company, insuring Purchaser's or its nominee's good and marketable fee simple title to the

Indiana Owned Property and title to all recorded easements, if any, appurtenant to the Indiana Owned Property, free and clear of all Encumbrances other than Permitted Encumbrances (including, without limitation, any and all of the Title Company's standard exceptions), together with payment of the premiums therefor and all of the Title Company title search, escrow and closing fees payable by US Seller hereunder;

      (m)     all real property transfer tax declarations and all affidavits and other documents required by the Title Company in connection with the issuance of the Title Policies;

      (n)     an access agreement, in form and substance reasonably satisfactory to Purchaser, with respect to the US Seller's facility in Livonia, Michigan providing Purchaser access to such facility during normal business hours during the 45-day period following Closing to facilitate the transition of the Purchased Assets located therein or related thereto; and

      (o)     any other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by any Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement.

    7.3    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) US Seller:

      (a)     the Closing Date Consideration in accordance with <u>Section 2.8</u>;

      (b)     a duly executed Assignment and Assumption Agreement;

      (c)     a duly executed Escrow Agreement;

      (d)     the officer's certificates required to be delivered pursuant to <u>Sections 6.2(a)</u> and <u>6.2(b)</u>;

      (e)     an access agreement, in form and substance reasonably satisfactory to US Seller, providing Sellers and their bankruptcy estate (or any of its successors or representatives) with access to the computer systems and financial and other records of the Business included in the Purchased Assets during normal business hours until a final decree is entered in the Chapter 11 Case or any subsequent Chapter 7 bankruptcy case to which the Chapter 11 Case may be converted; and

      (f)     any other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

    7.4    <u>Termination of Agreement</u>. This Agreement may be terminated as follows:

      (a)     by the mutual written consent of US Seller and Purchaser at any time prior to the Closing;

      (b)     by either Purchaser or US Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there

shall be in effect a final non-appealable order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(c) by Purchaser, if the Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner to operate or manage the financial affairs, the business or the reorganization of Seller is appointed in the Chapter 11 Case and such trustee or examiner takes action to reject this Agreement;

(d) by either Purchaser or US Seller, if (A) the Sale Order shall not have been approved by the Bankruptcy Court by the close of business on August 22, 2016 or (B) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Purchaser and US Seller; provided that the right to terminate this Agreement under this Section 7.4(d) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of such order to meet these requirements on or before such date;

(e) by either Purchaser or US Seller, if either Seller has entered into an Alternative Transaction;

(f) automatically upon consummation of an Alternative Transaction;

(g) by Purchaser, if (i) there has been a Material Adverse Effect prior to the Closing Date, unless such Material Adverse Effect was caused by Purchaser's failure to fulfill any material obligations under this Agreement or (ii) the Estimated Assumed Capital Lease Amount pursuant to Section 2.8(a) exceeds $3,000,000;

(h) by US Seller, if Purchaser has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 6.2 and Section 6.3 hereof, as the case may be, would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by Purchaser within ten (10) days through the exercise of its reasonable best efforts, then for so long as Purchaser continues to exercise such reasonable best efforts US Seller may not terminate this Agreement under this Section 7.4(h) unless such breach is not cured within ten (10) days from written notice to Purchaser of such breach; provided, further, that US Seller is not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured;

(i) by Purchaser, if either Seller has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 6.2 and Section 6.3 hereof, as the case may be, would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by such Seller within ten (10) days through the exercise of its reasonable best efforts, then for so long as such Seller continues to exercise such reasonable best efforts Purchaser may not terminate this Agreement under this Section 7.4(i) unless such breach is not cured within ten (10) days from written notice

42

to such Seller of such breach; provided, further, that Purchaser is not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured; or

(j) by US Seller, if all of the conditions set forth in Sections 6.1 and 6.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and Purchaser fails to deliver the Purchase Price at the Closing.

(k) By either Purchaser or US Seller, if the Closing has not occurred on or before September 10, 2016; provided that the right to terminate this Agreement under this Section 7.4(k) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

7.5     Procedure Upon Termination.  In the event of a termination of this Agreement by Purchaser or US Seller, or both, pursuant to Section 7.4, (a) written notice thereof shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) except as contemplated by Section 7.6 or Section 8.1 with respect to the obligations of Purchaser to serve as a Back-up Bidder hereunder, this Agreement shall thereupon terminate and become void and of no further force and effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.

7.6     Effect of Termination.  (a) In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Purchaser or either Seller other than as set forth in this Section 7.6, Section 5.2(e), Article IX, and in the Bidding Procedures Order.  Subject to the Bidding Procedures Order, in the event this Agreement is terminated (i) pursuant to Sections 7.4(e) or (f) and Seller consummates such Alternative Transaction within one (1) year of the date of termination of this Agreement or (ii) by Purchaser pursuant to Sections 7.4(c),(d), (i) or (k), then US Seller shall pay the Termination Fee to Purchaser as promptly as reasonably practicable after such termination (or the day the Alternative Transaction is consummated).  The Termination Fee shall be paid by US Seller by wire transfer of immediately available funds to the account designated in writing by Purchaser.

(b) If this Agreement is terminated for any reason (other than as set forth in Sections 7.4(h) or (j) above, the Deposit shall be promptly returned to Purchaser and, in any event, within two (2) Business Days of such termination.  In the event the US Seller terminates this Agreement pursuant to Sections 7.4(h) or (j) above, US Seller shall retain the Deposit and Purchaser shall thereafter have no rights thereto.

(c) Each Seller and Purchaser acknowledges that the agreements contained in this Section 7.6 are an integral part of the transactions contemplated by this Agreement.  In the event that US Seller shall fail to pay the Termination Fee (or any portion thereof) when due, US Seller shall reimburse Purchaser for all reasonable costs and expenses actually incurred by Purchaser (including reasonable expenses of counsel) in connection with the enforcement of this

43

Section 7.6, together with interest on the Termination Fee (or unpaid portion thereof), as applicable, at the prime rate then in effect (as published in the Wall Street Journal) from the date payment was required to be made through the date of payment. Each of Purchaser and each Seller further acknowledges that, without the Termination Fee and the other provisions of this Section 7.6, Purchaser would not have entered into this Agreement; and that the Termination Fee is not a penalty, but rather is liquidated damages in a reasonable amount that will appropriately compensate Purchaser under the circumstances with respect to any claims that Purchaser may have against any Seller in connection with such Seller's failure to close the sale of the Purchased Assets to the Purchaser as contemplated by this Agreement. The payment of the Termination Fee, to the extent applicable, shall be Purchaser's sole and exclusive remedy in the event of any such termination of this Agreement by Purchaser as set forth in this Section 7.6.

In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any willful pre-termination breach of this Agreement by such Party.

ARTICLE VIII

BANKRUPTCY COURT MATTERS

8.1    Competing Bid and Other Matters.

(a)    This Agreement and the transactions contemplated hereby are subject to US Seller's right, ability and obligation to consider higher or better competing bids with respect to the Business and a material portion of the Purchased Assets pursuant to the Bidding Procedures Order (each a "Competing Bid").

(b)    Until the conclusion of the Sale Hearing, US Seller shall have the responsibility and obligation to actively market the Business and the Purchased Assets to other parties for Competing Bids, respond to any reasonable inquiries or offers to purchase all or any part of the Business, and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including, without limitation, supplying information relating to the Business and the assets of each Seller to prospective purchasers, and conduct an Auction, subject only to the provisions of the Bidding Procedures Order.

(c)    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of the Auction (such prevailing party, the "Prevailing Bidder" and the prevailing transaction, the "Alternative Transaction"), Purchaser shall be required to serve as a back-up bidder (the "Back-up Bidder"), but only to the extent Purchaser was determined to be the second highest bid, and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is thirty (30) days after the date of the Sale Hearing (the "Outside Back-up Date"); or (ii) the date of closing of an Alternative Transaction with the Prevailing Bidder. Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder (if the Back-up Bidder is the next highest bidder at the Auction) will be deemed to have the new

prevailing bid, and US Seller will use reasonable best efforts to ensure that the Sale Order provides that each Seller be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder.

8.2     Sale Order.  If the Purchaser is the Successful Bidder, the Sale Order shall be entered by the Bankruptcy Court in form and substance acceptable to Purchaser.  The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code: (A) the execution, delivery and performance by each Seller of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances and (C) the performance by each Seller of its respective obligations under this Agreement; and (ii) find that Purchaser is a "good faith" Purchaser within the meaning of section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Purchaser the protections of section 363(m) of the Bankruptcy Code.  Purchaser agrees that it will promptly take such actions as are reasonably requested by US Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Purchaser is a "good faith" Purchaser under section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.  In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, US Seller shall use reasonable efforts to defend such appeal.

ARTICLE IX

GENERAL PROVISIONS

9.1     Notices.  All notices and other communications under or in connection with this Agreement shall be in writing and shall be deemed given (a) if delivered personally (including by overnight express or messenger), upon delivery, (b) if delivered by registered or certified mail (return receipt requested), upon the earlier of actual delivery or three days after being mailed, or (c) if given by telecopy or electronic mail, on the day of transmission upon confirmation of transmission (or the next Business Day if not sent on a Business Day), in each case to the parties at the following addresses:

(a)     If to Purchaser, addressed to:

AAA-GPC Holdings LLC
c/o Industrial Opportunity Partners LLC
1603 Orrington Avenue, Suite 700
Evanston, IL 60201
Attention: Robert M. Vedra
Telephone: (847) 556-3464
Facsimile:  (847) 556-4764
Email:  bvedra@iopfund.com

With a copy to:

45

Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601
Attention: Gregory J. Bynan
Telephone: (312) 558-7342
Facsimile: (312) 558-5700
Email: gbynan@winston.com

 (b)  If to any Seller, addressed to:

General Products Corporation
14137 Farmington Road
Livonia, Michigan 48154
Attn: Andrew Masullo
Telephone: (734) 793-9235
Email: amasullo@general-products.com

With a copy to:

BlueWater Partners, LLC
146 Monroe Center NW
Suite 701
Grand Rapids, MI 49503
Attention: Ronald Miller
Telephone: (616) 988-9444
Email: ron@bluewaterpartners.com

With a copy to:

Miller Johnson
250 Monroe Avenue NW
Suite 900
P.O. Box 306
Grand Rapids, MI 49501-0306
Attention: Robert D. Wolford
Telephone: (616) 831-1726
Facsimile: (616) 988-1726
Email: wolfordr@millerjohnson.com

 9.2 Severability. If any term or provision of this Agreement or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable such term or provision in any other jurisdiction, the remaining terms and provisions of this Agreement or the application of such terms and provisions to circumstances other than those as to which it is held invalid or enforceable.

46

9.3    Entire Agreement. This Agreement, including the annexes and schedules attached hereto and other documents referred to herein, contains the entire understanding of the parties hereto in respect of its subject matter and supersedes all prior and contemporaneous agreements and understandings, oral and written, between the parties with respect to such subject matter.

9.4    Successors and Assigns. This Agreement shall be binding upon Seller and Purchaser and, subject to entry of the Sale Order, and inure to the benefit of the parties and their respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, except to the extent assigned pursuant to a debtor-in-possession financing order filed in the Chapter 11 case; provided, however, Purchaser may assign this Agreement and all of its rights and obligations hereunder to any Affiliate of Purchaser and to any lender providing financing to Purchaser and/or its Affiliates in connection herewith, which assignment will not relieve Purchaser of any of its obligations under this Agreement. This Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their permitted successors and assigns.

9.5    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same Agreement.

9.6    Recitals, Schedules and Annexes. The recitals, schedules and annexes to this Agreement are incorporated herein and, by this reference, made a part hereof as if fully set forth at length herein.

9.7    Construction.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

47

(iv) The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(v) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi) Any reference in this Agreement to $ shall mean U.S. dollars.

(vii) Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii) The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b) The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

9.8 Governing Law. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

9.9 Jurisdiction, Waiver of Jury Trial.

(a) THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF ILLINOIS AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN ILLINOIS WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b) EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.10 <u>Injunctive Relief</u>. The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by any party, and, accordingly, each party shall be entitled to injunctive relief with respect to any such breach, including without limitation, specific performance of such covenants, promises or agreements or an order enjoining any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by the other party. The rights set forth in this <u>Section 9.10</u> shall be in addition to any other rights which the parties may have at Law or in equity pursuant to this Agreement.

9.11 <u>Expenses</u>

(a) Except as otherwise set forth in this Agreement, each of Seller and Purchaser shall each bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

(b) If any Party seeks to enforce the terms and provisions of this Agreement, then the prevailing party in such action shall be entitled to recover from the non-prevailing Party, in addition to the remedies provided hereunder, all costs incurred in connection with such action, including reasonable legal fees, expenses and costs incurred.

9.12 <u>Time of the Essence</u>. Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

9.13 <u>Limitation on Damages</u>. NO PARTY (OR ANY OF ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PARTY OR ITS AFFILIATES OR REPRESENTATIVE) FOR ANY SPECIAL OR PUNITIVE DAMAGES CLAIMS BY SUCH PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC.

[signature page follows]

IN WITNESS WHEREOF, each of the parties hereto has executed this Asset Purchase Agreement as of the date first above set forth.

**SELLER**

**GENERAL PRODUCTS CORPORATION**

By: _____
    _PRESIDENT/CEO_

**GENERAL PRODUCTS MEXICO, LLC**

By: _____
    _PRESIDENT/CEO_

**PURCHASER**

**AAA-GPC HOLDINGS LLC**

By: _____
    _____

IN WITNESS WHEREOF, each of the parties hereto has executed this Asset Purchase Agreement as of the date first above set forth.

**SELLER**

**GENERAL PRODUCTS CORPORATION**

By: _____

**GENERAL PRODUCTS MEXICO, LLC**

By: _____

**PURCHASER**

**AAA-GPC HOLDINGS LLC**

By: _____

**EXHIBIT A**

**BILL OF SALE AND ASSIGNMENT**

        **THIS BILL OF SALE AND ASSIGNMENT** (this "Bill of Sale") is entered into as of _____, 2016 by General Products Corporation, a Delaware corporation as Debtor-in-Possession in Case No. _____, pending in the United States Bankruptcy Court for the Eastern District of Michigan ("Seller"), in favor of AAA-GPC Holdings LLC, a Delaware limited liability company ("Purchaser").

        **WHEREAS**, the parties hereto have entered into an Asset Purchase Agreement dated as of _____, 2016 (as amended, the "Purchase Agreement") providing for the purchase by Purchaser of certain assets of Seller, and the parties now desire to carry out such transaction by Seller's execution and delivery to Purchaser of this instrument evidencing the vesting in Purchaser of all of the assets and rights of Seller hereinafter described. Capitalized terms used but not defined herein have the meanings given them in the Purchase Agreement.

        **NOW, THEREFORE**, in consideration of the premises and of other valuable consideration to Seller in hand paid by Purchaser, at or before the execution and delivery hereof, the receipt and sufficiency of which by Seller are hereby acknowledged and pursuant to the terms of the Order authorizing sale of assets entered by the United States Bankruptcy Court for the Eastern District of Michigan in Case No. _____, Seller hereby conveys, grants, bargains, sells, transfers, sets over, assigns, remises, releases, delivers and confirms unto Purchaser, its successors and assigns forever, effective as of 12:01 a.m. EDT on the date hereof (the "Effective Time"), all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

        Seller hereby covenants that, from time to time after the delivery of this instrument, at Purchaser's request and without further consideration, Seller will do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged and delivered, all and every such further acts, deeds, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required to more effectively convey, transfer to and vest in Purchaser, and to put Purchaser in possession of, any of the Purchased Assets.

        Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any person, firm or corporation other than Purchaser and its successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or condition hereof, and all of the terms, covenants and conditions, promises and agreements in this instrument contained shall be for the sole and exclusive benefit of Purchaser and its successors and assigns.

        This instrument is executed by, and shall be binding upon, Seller and its successors and assigns for the uses and purposes above set forth and referred to, effective as of the Effective Time.

This instrument shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the Delaware, without regard to its conflict of law principle provisions.

To the extent this Bill of Sale is inconsistent with any terms or conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

This instrument may be executed in counterpart signature pages, all of which when so executed and attached hereto shall constitute one and the same original.

**IN WITNESS WHEREOF**, Seller has executed this Bill of Sale and Assignment by a duly authorized officer of Seller as of_____, 2016.

**SELLER:**

**GENERAL PRODUCTS CORPORATION**
By: _____
    Name:
    Title:

2

# Exhibit B

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION (DETROIT)

————————————————

IN RE: GENERAL PRODUCTS CORPORATION,      Case No.: 16-49267
a Delaware corporation, *et al.*,      (Chapter 11)
     Hon. Thomas J. Tucker

        Debtors.

————————————————————————————————— /

## ORDER (1) APPROVING BIDDING PROCEDURES, A TERMINATION FEE, BID PROTECTIONS AND OTHER MATTERS RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S OPERATING ASSETS; (2) FORM OF ASSET PURCHASE AGREEMENT; AND (3) SCHEDULING A SALE HEARING

Upon preliminary consideration of the motion (the "Sale Motion") of General Products Corporation and General Products Mexico, LLC, debtors and debtors-in-possession in these Chapter 11 cases (collectively, the "Debtors"), for the entry of an order authorizing and approving (i) bidding procedures, a termination fee, bid protections, form of asset purchase agreement, and certain other matters relating to the Debtor's intended sale of the Purchased Assets (as defined in Section 1.2 to the APA) to AAA-GP Holdings, LLC, or its nominee ("AAA-GP Holdings") pursuant to the Asset Purchase Agreement dated June 26, 2016 between the Debtor and GP Holdings (the "APA"), which is attached to the Sale Motion as **Exhibit A**; (ii) the sale (the "Sale") of the Purchased Assets free and clear of liens, claims, and encumbrances; and (iii) the assumption and assignment of certain executory contracts and unexpired nonresidential property leases in connection with the Sale; this Court having determined that granting the preliminary relief requested in the Sale Motion, as it pertains to the preliminary relief approved in this Order, is in the best interests of the Debtor, the estate and the Debtor's creditors; that proper and adequate notice of the Sale Motion has been given and that the Court has jurisdiction over this matter pursuant to 27 U.S.C. §§1334 and 157; the Court having found that good and sufficient cause appears for granting the preliminary relief requested

upon the record herein; all objections to the preliminary relief approved in this Order having been withdrawn by the objecting party; and after conducting a hearing in open court on [_____], 2016, regarding the relief provided herein, it is therefore,

ORDERED, ADJUDGED AND DECREED that:

1.      The Sale Motion is granted to the extent set forth in this Order solely to the extent related to the relief set forth in this Order;

2.      The proposed Bidding Procedures, the Termination Fee, Bid Protections, the form of the APA, and the form of notice of the Sale, all as defined and described in the Sale Motion and, with respect to the Bidding Procedures, as amended and as set forth in **Exhibit A** to this Order, are approved in all respects, and the Debtor is authorized to comply with them.  If required to do so under Article VII of the APA, the Debtor shall pay the Termination Fee of $500,000 and such obligation to pay the Break-Up fee shall be (a) treated as a superpriority administrative expense claim under §§ 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, and (b) superior to the rights of any successor trustee or any creditor, in the Chapter 11 case, or any subsequent proceedings under the Bankruptcy Code, and (c) shall be paid ahead of MB Financial in the event of the closing of an Alternative Transaction by the Debtor.

3.      The proposed procedures related to the assumption and assignment of certain executory contracts and unexpired nonresidential property leases in connection with the Sale, including the treatment of cure payments, all as more fully set forth in the Sale Motion and

the Bidding Procedures, as amended and as attached to this Order as **Exhibit A**, are hereby authorized and approved.

4.     The Auction for the Purchased Assets shall take place on August 5, 2016, at 10:00 a.m. Eastern Time at the offices of Miller Johnson, 45 Ottawa Avenue, S.W., Suite 1100, Grand Rapids, Michigan  49503, or such later time or other place of which the Debtor shall give notice to all Qualified Bidders who have submitted Qualified Bids.

5.     The Sale Hearing to approve the Successful Bid for the Purchased Assets and to consider the remaining relief requested in the Sale Motion shall be held before this Court on August 8, 2016 at 9:00 a.m. Eastern Time, or as soon thereafter as counsel may be heard, at the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (Detroit) located at 211 West Fort Street, Detroit, Michigan, in the courtroom usually occupied by the Hon. Thomas J. Tucker, at which time the Court shall consider the entry of an order with respect to the Successful Bid in a form similar to **Exhibit E** to the Sale Motion.  Anyone having an objection to the Sale or to the entry of an order approving the Successful Bid must be present.

6.     The Notice of Sale, as amended, is hereby approved.  The Notice of Sale shall be served by first class United States mail, postage prepaid, upon all known creditors of the Debtor and other parties in interest.  Receipt of such Notice of Sale shall constitute notice of the Auction and the Sale Hearing for all purposes.

**[Remainder of this page intentionally left blank.]**

Approved for entry by:

**Miller Johnson**
*Counsel to the Debtor*

By:_____
     John T. Piggins

**OFFICER OF THE UNITED STATES TRUSTEE**

By:_____

*Counsel to MB Financial Bank, f/k/a Cole Taylor Bank*

By:_____

# Exhibit C

**EXHIBIT C**

**EXHIBIT A**

**TO PROPOSED ORDER APPROVING BID PROCEDURES ETC.**

**GENERAL PRODUCTS CORPORATION**

**CASE NO 16-[      ]**

## Bid Procedures

Set forth below are the bid procedures (the "Bid Procedures" or "Bidding Process") to be used with respect to the prospective sale (the "Sale") of substantially all of the operating assets of General Products Corporation and General Products Mexico, LLC, as debtors and debtors-in-possession (collectively, the "Debtors"). The Debtors will seek entry of an order from the Bankruptcy Court authorizing and approving the Sale of substantially all of its operating assets to the Qualified Bidder (as hereinafter defined) that the Debtors determine to have made the highest or otherwise best offer to purchase the assets (the "Successful Bidder") in the exercise of their business judgment, and after consultation with their legal and financial advisors, MB Financial Bank, N.A., the Debtors' pre-petition senior secured lender ("MB Financial"), those customers of the Debtors who are parties to an Accommodation Agreement with the Debtors (collectively, the "Customers") and an Official Committee of Unsecured Creditors (the "Creditors' Committee"), if any.

## Assets to be Sold

The Debtors are offering for sale as a group all of the assets identified in Section 1.2 (collectively, the "Purchased Assets") of the Asset Purchase Agreement dated June 26, 2016 (the "APA") with AAA-GP Holdings, LLC (the "Stalking Horse").

## Excluded Assets

The Debtors' remaining assets, which include (a) all rights under the APA, the Escrow Agreement contemplated by the APA and any other agreement executed and delivered by any Seller pursuant hereto; (b) all minute books, organizational documents, stock registers and such other books and records of each Seller pertaining to ownership, organization or existence of such Seller; (c) all Tax Returns and records (including work papers) related thereto of each Seller; (d) all claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom; (e) each Seller's books and records not related to the Purchased Assets, the Transferred Employees or FCA LLC or that such Seller is required by law to retain in its possession (including confidential personnel and medical records of employees); (f) any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment not related to the Purchased Assets or Assumed Liabilities; (g) any claims and causes of action under Section 544 through 550 of the Bankruptcy Code; (h) any other claims or causes of action under any other provision of the Bankruptcy Code except any claims or causes of action relating to the Purchased Assets; (i) all Contracts (including all Real Property Leases) other than the Assigned Contracts, (j) all cash and cash equivalents (excluding pre-paids and deposits referenced in the definition of Purchased Assets), (k) all Employee Benefit Plans and insurance policies of Sellers, (l) all assets relating exclusively to the operations of the Debtors located at the Russellville, Kentucky facility (including the owned real property located in Russellville, Kentucky), other than those assets specifically identified on Schedule 1.2(E) to the APA, (m) the outstanding equity interests of any Person other than the Mexican Subsidiary Interests, (n) all Accounts Receivable and (o) all Inventory located at the Russellville, Kentucky facility or otherwise related to a specific customer other than FCA LLC (collectively

with other remaining assets of the Debtors, the "Excluded Assets"), will remain part of the bankruptcy estate and in all likelihood be liquidated in accordance with the Bankruptcy Code and Rules, any approved Plan of Reorganization or Liquidation of the Debtors, and the further orders of the Court.

## The Bidding Process

## Participation Requirements

To participate in the Bidding Process, each person (a "Potential Bidder") must deliver to (a) the Debtors, (b) MB Financial, and (c) counsel for the Creditors' Committee, if any, no later than July 19, 2016:

> (i) current audited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtors and demonstrating such Potential Bidder's ability to close a proposed transaction regarding the Purchased Assets;

> (ii) a preliminary (non-binding) proposal regarding the purchase price range of the bid and the financing of the transaction; and

> (iii) an executed Confidentiality and Non-Disclosure Agreement in form and substance reasonably acceptable to the Debtors, which such Confidentiality and Non-Disclosure Agreement shall be the same as the Confidentiality Agreement (as defined in the APA) in all material respects  (collectively, the "Potential Bid Package").

A Qualified Bidder is a Potential Bidder that delivers the documents described in subparagraphs (i) and (ii) above (collectively, the "Potential Bid Package"), whose financial information demonstrates the financial capability of the Potential Bidder to consummate the Sale, and that the Debtors, in consultation with MB Financial, the Customers, and the Creditors' Committee, if any, determine is reasonably likely (based on availability of financing, experience and other considerations) to submit a bona fide offer and to be able to consummate the Sale if selected as the Successful Bidder.  The Stalking Horse shall automatically be considered as a Qualified Bidder by reason of its willingness to act as a stalking horse bidder in connection with the Bidding Process.

After reviewing all of the materials required by subparagraphs (i) and (ii) above, the Debtors, in consultation with MB Financial, the Customers, and the Creditors' Committee, if any, shall determine, and shall notify the Potential Bidder whether it is a Qualified Bidder.  The Debtors shall notify a Potential Bidder if it is a Qualified Bidder by the earlier of (a) two (2) business days of the Debtors', MB Financial's, and the Creditors' Committee's, if any, receipt of a complete Potential Bid Package or (b) July 21, 2016.  At the same time that the Debtors notify the Potential Bidder that it is a Qualified Bidder, the Debtors shall allow the Qualified Bidder to

conduct due diligence with respect to the Purchased Assets sought to be acquired as hereinafter provided.

## Due Diligence

The Debtors shall afford each Qualified Bidder due diligence access to the Purchased Assets. The Debtors will designate a representative to coordinate all reasonable requests for due diligence from such bidders. Qualified Bidders will have the opportunity to review such due diligence at a location designated by the Debtors. The Debtors shall not be obligated to furnish any due diligence information after 5:00 p.m. on August 4, 2016. Neither the Debtors nor any of its representatives are obligated to furnish any information relating to the Purchased Assets to any person except to a Qualified Bidder. Bidders are advised to exercise their own discretion before relying on any information regarding the Purchased Assets provided by anyone other than the Debtors or their representatives.

## Executory Contracts and Unexpired Leases

The Stalking Horse or any other Qualified Bidder shall have until July 22, 2016 to designate the executory contracts and unexpired nonresidential real property leases to which either Debtor is a party (the "Assumed Contracts and Leases") that it intends for such Debtor to assume and assign to it pursuant to Section 365 of the Bankruptcy Code; however, Qualified Bidders, including the Stalking Horse, shall be entitled to remove Assumed Contracts and Leases from the designated list through the Bid Deadline. The Debtors shall pay all amounts necessary to cure any monetary defaults under the Assumed Contracts and Leases, as required by Section 365 of the Bankruptcy Code.

## Bid Deadline

A Qualified Bidder that desires to make a bid shall deliver a written copy of its bid to Debtors and Debtors' counsel, not later than August 3, 2016, at 4:00 p.m. Eastern Time (the "Bid Deadline"). Debtors' counsel shall then distribute copies of the bids to (i) counsel for the MB Financial, (ii) the United States Trustee, (iii) counsel to the Customers, (iv) counsel to the Creditors' Committee, if any; and (v) counsel for the Stalking Horse. The Stalking Horse, having already submitted a bid in the form of its entry into the APA, shall not be required to submit a bid, but may submit an additional bid in response to the bid of any other Qualified Bidder on or before the Bid Deadline. To the extent the Stalking Horse submits an additional bid in response to the bid of any other Qualified Bidder, the Debtors shall share the terms of such additional bid of the Stalking Horse with other Qualified Bidders. The Debtors may extend the Bid Deadline once or successively, but is not obligated to do so.

## Bid Requirements

All bids must include the following documents (the "Required Bid Documents"):

- A letter stating that the bidder's offer is irrevocable until 30 days after the Sale Hearing, currently scheduled for August 8, 2016, and that the Bidder agrees to be bound by such offer if its bid is the Back Up Bid, as defined herein, until such 30 day period has passed;

- An executed copy of an asset purchase agreement in a form substantially the same as the APA. Any changes to the APA must be (a) non-material, (b) made to and marked on such form of agreement, and (c) agreed to by the Debtors. The asset purchase agreement must set forth a cash bid at least $800,000 in excess of the Purchase Price, as defined in the APA, cannot contain any consideration other than cash and assumption of liabilities of the Debtors, and shall not be subject to any financing or other conditions not set forth in the APA.

- A good faith deposit (the "Deposit") in the form of a certified check (or other form acceptable to the Debtors in their sole discretion) payable to the order of the Debtors (or such other party as the Debtors may designate) in the amount of $500,000.

- Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to the Debtors.

- Written acknowledgment that the bid is not subject to due diligence review, board approval, obtaining financing, or the receipt of any non-governmental consents

The Debtors will consider a bid only if the bid is on terms acceptable to the Debtors, in consultation with MB Financial, the Customers, and the Creditors' Committee, if any, and not conditioned on other conditions unacceptable to the Debtors, in consultation with MB Financial, the Customers, and the Creditors' Committee, if any. A bid received from a Qualified Bidder that includes all of the Required Bid Documents and meets all of the above requirements is a "Qualified Bid."

### Bid Protection and Break-Up Fee

To induce the Stalking Horse to act as a so-called "stalking horse" bidder and thereby set a floor price for the Purchased Assets, the Debtors have agreed to provide the Stalking Horse certain bid protections (the "Bid Protections"). The Bid Protections consist of a requirement that any alternative Acquisition Proposal be a cash bid of $800,000 in excess of the Purchase Price, as defined in the APA, with subsequent bidding in increments of $100,000. Any alternative bid must also be on no less favorable terms to the Debtors than those offered by the Stalking Horse in the APA. Any Potential Bidder should consider the Bid Protections in making any proposal relating to the Purchased Assets.

The Debtor has also agreed to pay to the Stalking Horse a Break-Up Fee of $500,000 (the "Break-Up Fee") in the event it is not the Successful Bidder. The Stalking Horse has expended, and likely will continue to expend, considerable time, money and attention in pursuit of this sale and has engaged in arm's length, good faith negotiations with the Debtors. The APA is a product of those negotiations and benefits the Debtors' estates by providing a floor price for the Purchased Assets and a form of agreement to be used.

### The Auction and Sale Hearing

After all Qualified Bids have been received, the Debtors intend to conduct an auction (the "Auction") with respect to the Purchased Assets if a Qualified Bid other than that of Stalking Horse has been received. The Auction shall take place August 5, 2016 at 10:00 a.m. at the offices of Miller Johnson, 250 Monroe Avenue, N.W., Suite 800, Grand Rapids, Michigan 49503, or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids. The Auction shall be conducted in the presence of a certified court reporter, who shall transcribe the proceedings for purposes of creating and preserving a record of the Auction. Only the Stalking Horse and any other Qualified Bidders who have submitted the Required Bid Documents in form and substance satisfactory to the Debtors by the Bid Deadline will be eligible to participate in the Auction as bidders. However, MB Financial, the Creditors' Committee, if any, the Customers, and the Office of the United States Trustee, or counsel for any of the aforementioned parties are authorized to attend the Auction and participate in the process, if desired.

Based upon the terms of the Qualified Bids received, the level of interest expressed as to the Purchased Assets, and such other information as the Debtors determine is relevant, the Debtors, in consultation with MB Financial, the Customers, and the Creditors' Committee, if any, and if no Creditors' Committee exists, with the Office of the United States Trustee (the "UST"), will conduct the Auction in the manner they determine will result in the highest or otherwise best offer for the Purchased Assets. If there is not a timely Qualified Bidder other than the Stalking Horse, the Stalking Horse shall be deemed the Successful Bidder.

All bids at the Auction must satisfy the requirements for a Qualified Bid. In evaluating any bids by the Stalking Horse at the Auction, the Debtors shall treat the Break-Up Fee that would be payable to the Stalking Horse in the event the Stalking Horse is not the winning bidder as cash consideration in comparing the consideration offered by the Stalking Horse with that offered by any other Qualified Bidder.

Upon the Auction's conclusion, the Debtors, in consultation with its advisors, MB Financial, the Customers, and representatives of the Creditors' Committee, if any, and if no Creditors' Committee exists, with the UST, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest and otherwise best offer (the "Successful Bid"). At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

## Post Sale Hearing Procedures

Unsuccessful bidders shall be entitled to return of their earnest money deposit within 30 days of the Sale Hearing. If the Successful Bidder fails to consummate the transactions by the Closing Date, as defined in the APA, the Debtors shall (i) retain such bidder's earnest money deposit; and (ii) be free to consummate the proposed sale of the Purchased Assets with the next highest and best bidder (the "Back Up Bidder") at the final price bid by the Back Up Bidder at the Auction (the "Back Up Bid") (or, if that competing bidder is unable to consummate the purchase of the Purchased Assets at that price, the Debtors may consummate the transaction with the next highest and best competing bidder, and so forth) without the need for an additional hearing or order of the Court; provided, the Debtors must have the consent of the MB

Financial. The Debtors shall, upon conclusion of the Auction and in consultation with MB Financial, the Customers, and the Creditors' Committee, if any, and, if no Creditors' Committee exists, with the UST, rank the Qualified Bids in order of its determination of the highest and best Qualified Bids. The Successful Bid shall be ranked first, the Back Up Bid shall be ranked second, and any other Qualified Bids shall be ranked in order of preference by the Debtors as the next highest and best Qualified Bids. Additionally, Qualified Bidders shall be required to keep their offer open until 30 days after the Sale Hearing in the event they are the Back Up Bidder. Notwithstanding any of the foregoing, unless the Stalking Horse shall choose to make an additional bid after the making of an initial bid by a Qualified Bidder which complies with the Bid Protections and is in excess of the "stalking horse bid" of the Stalking Horse, the Stalking Horse shall not be considered as a Back Up Bidder hereunder.

### Summary Timeline of Critical Events

| Event | Date | Action Required |
|---|---|---|
| Sale Procedures | 7/11/16 | Court enters Sale Procedures Order |
| Sale Notice Service Deadline | 7/12/16 | Deadline for Debtor to provide notice of sale |
| Potential Bid Package Deadline | 07/19/16 | Deadline to submit materials required to qualify as bidder |
| Assumed Contract Designation Date | 7/22/16 | Deadline for Stalking Horse and Potential Bidders to designate the Assumed Contracts and Leases for the Debtor to assume and assign |
| Cure Amount Deadline | 7/27/16 | Deadline for Debtor to file Cure Amount Schedule |
| Competing Bid Deadline | 8/3/16 | Deadline to submit Required Bid Documents/Deposit |
| Assumed Contract/ Leases and Cure Objection Deadline | 8/3/16 | Deadline for a party to executory contract to file objection to either Cure Amount or assumption of contract/lease |
| Auction Date | 8/5/16 | Auction Sale held at offices of Debtor's counsel |
| Sale Hearing | 8/8/16 | Court Approves Sale |
| Closing Date | 8/15/16 | Sale Closes |

# Exhibit D

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

IN RE:    **GENERAL PRODUCTS CORPORATION,**      Case No.: 16-49267
          *et al.,*[1]                                   (Chapter 11)
                                                  Hon. Thomas J. Tucker
_____Debtors._____ /

## NOTICE OF DEBTOR'S PROPOSED SALE OF BUSINESS ASSETS

**PLEASE TAKE NOTICE**, that on August 8, 2016 at 9:00 a.m., a hearing (the "Sale Hearing") will be held before the Honorable [_____], Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (Detroit), located at 211 West Ford Street, Suite 2100, Detroit, Michigan 49226 to consider the motion of General Products Corporation and General Products Mexico, LLC, the debtors and debtors-in-possession (collectively, the "Debtors") in the above-referenced proceedings, to sell certain assets used by the Debtors in the operation of its business (the "Purchased Assets") on a "going concern basis", free and clear of all liens, claims, interests and encumbrances, to **AAA-GP Holdings, LLC** ("AAA-**GP Holdings**") pursuant to the terms of an Asset Purchase Agreement dated **June 26, 2016** (the "APA"). A copy of the Debtors' motion, including a copy of the APA, is on file with the Clerk of the Bankruptcy Court and is available upon request from the attorneys for the Debtors.

          **PLEASE BE ADVISED** that the Debtor is authorized to solicit competitive bids for the Purchased Assets. **AAA-GP Holdings** has been granted certain bid protections, so that any competitive bid must be at least the Purchase Price as defined in the APA plus $**800,000**. Thereafter, the Debtor will accept overbids in increments of at least $100,000.00

          **PLEASE BE FURTHER ADVISED** that in order to participate in the Sale Hearing, a party must first be determined to be a "Qualified Bidder". Only "Qualified Bidders" will be entitled to participate in the auction and Sale Hearing. Interested parties must deliver to the Debtor, and to counsel to MB Financial Bank, f/k/a Cole Taylor Bank, the Debtor's prepetition secured lender ("MB Financial"), and to counsel to the Official Committee of Unsecured Creditors, if any, not later than 4:00 p.m. Eastern Time on **July 19**, 2016 the following: (i) current audited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidders, or such other form of financial disclosure acceptable to the Debtor and demonstrating such Potential Bidder's ability to close a proposed transaction regarding the Purchased Assets; (ii) a preliminary (non-binding) proposal regarding the purchase price range of the bid and the financing of the transaction; and (iii) an executed Confidentiality and Non-Disclosure Agreement in form and substance reasonably acceptable to the Debtor, which such Confidentiality and Non-Disclosure Agreement shall be the same as the Confidentiality Agreement (as that term is defined in the APA) in all material respects (collectively, the "Potential Bid Package"). In addition, the interested party

_____

[1] General Products Corporation's case is jointly administered with the case of General Products Mexico LLC, Case No. 16 _____.

must comply with the Bid Procedures approved by the Court in this matter. A copy of the Bid Procedures will be made available upon request to the Debtor's counsel.

**PLEASE BE FURTHER ADVISED** that any objections to the proposed sale of the Purchased Assets shall be filed with the Clerk of the Bankruptcy Court, 211 West Fort Street, Detroit, Michigan 48226 and served on the attorneys for the Debtor, for MB Financial, for the Official Committee of Unsecured Creditors, if any, and for **AAA-GP Holdings** and to the Office of the United States Trustee, all at the addresses set forth below, on or before **August 2**, 2016 and any objector must appear at the Sale Hearing to present the objection. If you mail your objection to counsel, you must mail it early enough so counsel will receive it on or before the date set forth above.

To obtain further information regarding this matter, please contact the attorneys for the Debtor.

Grand Rapids, Michigan

Miller Johnson
Proposed Attorneys for Debtor

Dated: June ___, 2016          By _____
John T. Piggins (P34495)
pigginsj@millerjohnson.com
Robert D. Wolford (P62595)
wolfordr@millerjohnson.com
Rachel L. Hillegonds (P67684)
hillegondsr@millerjohnson.com
Business Address:
45 Ottawa Avenue, S.W., Suite 1100
PO Box 306
Grand Rapids, Michigan  49501-0306
Telephone:  (616) 831-1700

2

## ADDRESSES OF COUNSEL OF RECORD

*MILLER JOHNSON*
*Attn:  John T. Piggins*
*45 Ottawa Ave., SW, Suite 1100*
*P.O. Box 306*
*Grand Rapids, Michigan  49501-0306*
*Telephone:  (616) 831-1700*
*Facsimile:  (616) 988-1748*
*Email:  [pigginsj@millerjohnson.com](mailto:pigginsj@millerjohnson.com)*
*Attorneys for Debtor and Debtor-in-Possession*


*GOLDBERG KOHN LTD.*
*Attn:  Jeremy M. Downs*
*55 East Monroe, Suite 3300*
*Chicago, Illinois  60603*
*Facsimile:  (312) 863-7893*
*Email:  jeremy.downs@goldbergkohn.com*
*Attorneys for MB Financial Bank, f/k/a Cole Taylor Bank*


*OFFICE OF THE UNITED STATES TRUSTEE*
*Attn:  _____*
*211 West Fort Street, Suite 700*
*Detroit, MI 48226*
*Telephone: (313) 226-7999*
*Facsimile:*

3

# Exhibit E

_____

IN RE:

**GENERAL PRODUCTS CORPORATION,**
**a Delaware corporation,**

Case No.: 16-49267
(Chapter 11)
Hon. Thomas J. Tucker

_____ **Debtor.** _____ /

**ORDER: (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S OPERATING ASSETS PURSUANT TO § 363 OF THE BANKRUPTCY CODE, FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES TO AAA-GP HOLDINGS, LLC; (II) AUTHORIZING AND APPROVING THE TERMS OF THE DEBTOR'S ASSET PURCHASE AGREEMENT AND RELATED AGREEMENTS WITH AAA-GP HOLDINGS AND AUTHORIZING CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREIN INCLUDING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN SPECIFIED EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND THE ASSUMPTION OF CERTAIN SPECIFIED LIABILITIES; AND (III) GRANTING RELATED RELIEF**

General Products Corporation and General Products Mexico, LLC (the "Debtor"),

having filed on June 28, 2016 its *Motion to Approve (1) Bidding Procedures, a Termination Fee,*

*Bid Protections, Form of Asset Purchase Agreement and Other Matters Relating to Sale of*

*Substantially All of the Debtor's Operating Assets; (2) Sale of Substantially All of the Debtor's*

*Operating Assets Free and Clear of Liens, Claims, and Encumbrances Pursuant to 11 U.S.C.*

*§§ 105(a) and 363, and (3) The Assumption and Assignment of Certain Executory Contracts and*

*Unexpired NonresidentialReal Property Leases Under 11 U.S.C. § 365 in Connection With the*

*Sale Of Substantially All of Debtor's Assets* (the "Sale Motion")[1], seeking, pursuant to §§ 105(a),

_____

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Asset Purchase Agreement (the "Purchase Agreement") by and between the Debtor and AAA-GP Holdings (the "Purchaser"), dated as of June 26, 2016 (a copy of which is attached hereto as Exhibit A), the Sale Motion, or the Bidding Procedures Order, as the case may be, in that order of priority, unless the context clearly requires otherwise.

363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorization to sell substantially all its operating assets and assign certain executory contracts and unexpired leases (the "Transaction" or "Transactions"); and this Court having entered on [_____], 2016, its *Order (1) Approving Bidding Procedures, a Termination Fee, Bid Protections and Other Matters Relating to the Sale of Substantially All of the Debtor's Operating Assets: (2) Form of Asset Purchase Agreement; and (3) Scheduling a Sale Hearing* (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures with respect to, and notice of, the Transaction; and the Auction having been conducted in all material respects in accordance with the Bidding Procedures Order on [_____], 2016; and Debtor, having determined that AAA-GP Holdings ("Purchaser") has submitted the highest or otherwise best bid for the Purchased Assets and Assumed Liabilities and has been designated as the Successful Bidder pursuant to the Bidding Procedures Order; and a hearing having been held on [_____], 2016 (the "Sale Hearing") to consider approval of the sale of the Purchased Assets to Purchaser (as well as the assumption by Purchaser of the Assigned Contracts and Assumed Liabilities) pursuant to the terms and conditions of the Purchase Agreement, and adequate and sufficient notice of the Bidding Procedures, the Purchase Agreement, and the Transaction having been given to parties in interest in these cases; and such parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief requested therein; and the Court having reviewed and considered: (i) the Sale Motion; (ii) the objections to the Sale Motion; and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing, after due deliberation thereon; and good and sufficient cause appearing therefor, and it appearing that the relief requested in the Sale Motion, insofar as it pertains to this

Order, is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and the Court being fully advised in the premises;

**IT HEREBY IS FOUND AND DETERMINED THAT:**[2]

 A. This Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

 B. The statutory bases for the relief sought in the Sale Motion are §§ 105(a), 363, and 365 of the Bankruptcy Code, together with Bankruptcy Rules 2002, 6004, 9007, and 9014.

 C. As evidenced by the proofs of service on file with this Court: (i) due, proper, timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, the Sale Hearing, the Transaction, and the Auction, have been provided in accordance with §§ 102(1), 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, and 9014, and in compliance with the Bidding Procedures and the Purchase Agreement, to interested persons and entities, including, but not limited to: (1) the Office of the United States Trustee; (2) Purchaser and its counsel; (3) all entities, including MB Financial Bank, f/k/a Cole Taylor Bank ("MB Financial"), known to Debtor that assert any Liens against or other interests in the Purchased Assets (or any portion thereof); (4) all parties known to the Debtor who expressed in writing to Debtor an interest in purchasing all or a portion of the Purchased Assets; (5) all non-Debtor parties to any Purchased Contracts; (6) all relevant taxing and regulatory authorities; and (7) all

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

entities required to receive notice pursuant to Bankruptcy Rule 2002, including, without limitation, those entities that have filed a notice of appearance and request for service of papers in these cases; (ii) such notice was good, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion, the Sale Hearing, the Transaction, the Bidding Procedures, the Sale Notice, or the Auction is or shall be required.

D.      As demonstrated by the testimony and other evidence, if any, proffered or adduced at the Sale Hearing, the Debtor has marketed the Purchased Assets and conducted the sale process in compliance, in all material respects, with the Bidding Procedures Order.

E.      No consents or approvals are required for the Debtor to consummate the Transaction other than the consent and approval of this Court and those set forth in the Purchase Agreement. Neither the execution of the Purchase Agreement nor the consummation of the Transaction in accordance with its terms will constitute a violation of any provision of the Debtor's organizational documents or any other instrument, law, regulation, or ordinance by which the Debtor is bound.

F.      The bidding and related procedures established by the Bidding Procedures Order have been complied with in all material respects by the Debtor and Purchaser. The Debtor received a Qualifying Bid from [_____], an Auction for the Purchased Assets was held in material compliance with the Bid Procedures Order, and Debtor has selected Purchaser as the Successful Bidder.

G.      The Debtor is the legal and equitable owner of the Purchased Assets and, upon entry of this Sale Order, the Debtor shall have full authority to consummate the Transaction contemplated by the Purchase Agreement in accordance with this Order. The Purchase

Agreement and the Transaction have been duly and validly authorized by all necessary corporate action, as the case may be, of the Debtor.

H.    Approval of the Purchase Agreement and consummation of the Transaction is in the best interests of the Debtor, its estate, creditors, and other parties in interest, and the Debtor has demonstrated (i) good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Sale pursuant to § 363(b) of the Bankruptcy Code prior to, in contemplation of, and outside of, a plan of reorganization.

I.    The Debtor, with the assistance of its professionals, diligently and in good faith marketed the Purchased Assets to secure the highest and best offer therefor by, among other things, making its books and records and the Purchased Assets available to potential buyers for due diligence and providing potential buyers with access to management. In addition, the Debtor served the Bidding Procedures Order, the Sale Motion, and the Debtor's draft of the Purchase Agreement on each of the entities that had previously expressed an interest in some or all of the Purchased Assets.

J.    The procedures set forth in the Bidding Procedures Order, including the Auction, were designed to and achieved a fair and reasonable purchase price constituting the highest and best offer obtainable for the Purchased Assets.

K.    A sale of the Purchased Assets at this time pursuant to § 363(b) of the Bankruptcy Code will preserve the existing value of the Purchased Assets and maximize the Debtor's estate for the benefit of all constituencies.

L.    The Purchase Agreement was negotiated, proposed, and entered into by Debtor and Purchaser without collusion, in good faith, and from arm's length bargaining positions. Purchaser is not an "insider" of Debtor, as that term is defined in § 101 of the

5

Bankruptcy Code. Any relevant connections or relationships between the Debtor, the Purchaser, and any parties that have, to the Debtor's knowledge, considered participating in the Auction or otherwise expressed interest in acquiring the assets of the Debtor have been disclosed, and the Debtor and Purchaser have not engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under § 363(n) Bankruptcy Code.

M.      Purchaser is in all respects a good faith purchaser under § 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Purchaser will be acting in good faith within the meaning of Bankruptcy Code section 363(m) in consummating the Transaction.

N.      The consideration to be provided by Purchaser pursuant to the Purchase Agreement: (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Purchased Assets; (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative; and (iv)  constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

O.      The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

P.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and, except as expressly provided in the Purchase Agreement, will vest the Purchaser with all right, title, and interest of the Debtor to the Purchased Assets free and clear of all Liens, claims, encumbrances, and interests of any kind (collectively from time to time herein "Interests"), including, without limitation, the following:

6

(i) interests that purport to give to any party or entity a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the Purchaser's interest in the Purchased Assets, or any similar rights; (ii)interests relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date; and (iii) interests relating to Liens, claims, and encumbrances on the Purchased Assets or against the Debtor; provided, however, that all such Interests shall attach to the proceeds of the Sale, in order of priority as set forth herein.

Q.     The Purchaser would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, and its creditors, if the sale of the Purchased Assets to the Purchaser and the assignment of the Purchased Contracts to the Purchaser were not free and clear of all Liens and Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Liens or Interests not expressly assumed by the Purchaser.

R.     Subject to the provisions of this Order, the Debtor may sell the Purchased Assets free and clear of all Liens and other Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in §§ 363(f)(1) through (5) of the Bankruptcy Code has been satisfied. Those (i) holders of Interests and (ii) non-debtor parties to Purchased Contracts who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.  Those (i) holders of Interests and (ii) non-debtor parties to Purchased Contracts who did object fall within one or more of the other subsections of § 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale attributable to the property against or in which they claim Interests.

S.     The (i) transfer of the Purchased Assets to the Purchaser and (ii) assumption and assignment to the Purchaser of the Assigned Contracts will not deem the Purchaser to be a "successor", or subject the Purchaser to any liability whatsoever with respect to, or on account of, the operation of the Business prior to the Closing Date or by reason of such transfer under any applicable laws, whether based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of implied assumption of any liabilities other than the Assumed Liabilities, any theory of constructive consolidation or merger of the Purchaser and the Debtor, any theory that Purchaser's acquisition is a mere continuation or reincarnation of the Debtor's business, any theory that the Transaction is fraudulent or lacks good faith, or any other theory of antitrust, vicarious, successor, or transferee liability.

T.     The Debtor has demonstrated that it is an exercise of its sound business judgment to enter into the Transaction, consummate the Sale, and assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Purchased Contracts is in the best interests of the Debtor, its estate, and its creditors. The Assigned Contracts being assumed and assigned to the Purchaser are an integral part of the assets being purchased by the Purchaser and, accordingly, such assumption and assignment of the Assigned Contracts are reasonable, enhance the value of the Debtor's estate, and do not constitute unfair discrimination.

U.     The consummation of the Transaction (the "Closing") pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets to Purchaser, and will vest Purchaser with all right, title, and interest in and to the Purchased Assets and the Assigned Contracts, free and clear of all Liens and Interests, other than Permitted

Encumbrances (as such term is defined in the Purchase Agreement) in accordance with § 363(f) of the Bankruptcy Code.

V.     The Purchase Agreement is a valid and binding contract between the Debtor and Purchaser, which is and shall be enforceable according to its terms.

W.     All of the provisions of the Purchase Agreement are non-severable and mutually dependent.

X.     Notice of the Sale Motion has been provided to each non-debtor party to an Assigned Contract, together with a statement from the Debtor with respect to the amount, if any, to be paid by the Debtor to such non-debtor party to cure any defaults under, and to otherwise comply with the requirements of § 365(b) of the Bankruptcy Code with respect to the Assigned Contract to which such non-debtor is party (the "Cure Amounts"). As to each Assigned Contract, payment of the Cure Amount as determined in accordance with the procedures provided in the Bidding Procedures Order will be sufficient for the Debtor to comply fully with the requirements of § 365(b) of the Bankruptcy Code.

Y.     Purchaser has provided adequate assurance of its ability to perform its obligations under each of the Assigned Contracts within the meaning of § 365(f) of the Bankruptcy Code.

NOW, THEREFORE IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The Sale Motion is **GRANTED** and approved in all respects (other than with respect to matters already addressed by the Bidding Procedures Order) on the terms set forth herein.

2.     Any objections to the entry of this Sale Order or the relief granted herein and requested in the Sale Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are **DENIED and OVERRULED.**

## Approval Of The Purchase Agreement, Transaction And Ancillary Agreements

3.      Purchaser's final bid of $[_____], the Purchase Agreement, and all of the terms and conditions thereof and the Transactions contemplated thereby, are hereby approved.

4.      Pursuant to §§ 363(b) and (f) and 365(b) of the Bankruptcy Code, and subject to the terms of this Order, the Debtor is authorized, empowered, and, subject to the terms of the Purchase Agreement and this Sale Order, directed to execute, deliver, and perform under, consummate, and implement the Purchase Agreement together with all additional instruments and documents that are requested by Purchaser and may be reasonably necessary or desirable to implement the Purchase Agreement, and to take any and all actions as it deems necessary, appropriate, or advisable for the purpose of assigning, transferring, granting, conveying, and conferring to Purchaser or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement, including, without limitation, any and all actions reasonably requested by Purchaser which are consistent with the Purchase Agreement.

5.      Pursuant to §§ 105(a), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing: (i) the transfer of the Purchased Assets to Purchaser pursuant to the Purchase Agreement shall constitute a legal, valid, and effective transfer of the Purchased Assets and shall vest Purchaser with all right, title, and interest in and to the Purchased Assets; (ii) the Purchased Assets shall be transferred to Purchaser free and clear of all Liens and Interests (other than the Permitted Encumbrances) against such assets, in accordance with §§ 363(f) of the Bankruptcy Code, with any such Liens or Interests (other than the Permitted Encumbrances) to attach to the proceeds of the Transaction, in the order of their priority, with the same validity, force, and effect

which they had against the Purchased Assets prior to the entry of this Sale Order, subject to any rights, claims, and defenses the Debtor and all interested parties may possess with respect thereto (if any); and (iii) each of the Assigned Contracts shall be deemed assumed by the Debtor and assigned to Purchaser on the Closing Date as provided in and contemplated, and required by, the Purchase Agreement. Without limiting the generality of the preceding sentence, the transfer of the Purchased Assets shall be free and clear of all Liens and Interests of any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbiter (public or private).

6. This Sale Order is and shall be effective as a determination that all Liens and Interests shall be and are, without further action by any person or entity, released with respect to the Purchased Assets as of Closing.

7. Except as expressly permitted or otherwise specifically provided by the Purchase Agreement or this Sale Order, to the greatest extent possible with the requirements of due process, and provided further that the Closing shall have occurred, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, customers, users, warranty claimants, and trade and other creditors, holding Liens or Interests of any kind or nature whatsoever in the Debtor or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its parents, affiliates, or subsidiaries, its successors or assigns, its

property, or the Purchased Assets, such persons' or entities' Liens, claims, or Interests, pursuant to any legal or equitable theory whatsoever, including, without limitation that (a) the Purchaser is deemed to be a "successor" to the Debtor for any purpose, (b) the Purchaser is deemed to have, de facto or otherwise, merged with or into the Debtor; or (c) that the Purchaser is deemed to be a continuation of the Debtor. Nothing in this Order or any agreement entered into under this Order, however, releases, nullifies, precludes, or enjoins the enforcement of any liability to a governmental unit under police or regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order

8. To the greatest extent allowed by applicable law, except as expressly provided in the Purchase Agreement, Purchaser is not assuming nor shall it, in any way whatsoever, be or be deemed to be liable or responsible, as successor or otherwise, for any Liabilities of the Debtor, or any Liabilities in any way whatsoever relating to or arising from the Debtor's assets, business, or operations, or by virtue of the conveyance of the Purchased Assets to Purchaser.

## Distribution of Sale Proceeds

9. At Closing, the proceeds of the sale shall be remitted directly by the Purchaser to MB Financial to be applied and otherwise administered pursuant to the **[Final Agreed Order Authorizing the Use of Cash Collateral and Post-Petition Debt]**.

## Assumption And Assignment Of Assigned Contracts

10. The Debtor shall be responsible for curing all allowed pre-petition monetary and non-monetary defaults relating to the Assigned Contracts. Pursuant to Section 365 of the Bankruptcy Code, the Debtor is authorized to assume the Assigned Contracts designated in the Purchase Agreement, cure the same (in the Cure Amounts set forth in the notice relating to such contracts or by further order of the Court) and assign the same to Purchaser.

11.     The Assigned Contracts, consistent with the provisions contained herein, shall be transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Purchaser.

12.     All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured, subject to the satisfaction of the provisions of Paragraph 10 (relating to payment of the applicable Cure Amounts), above, and Purchaser shall have no liability or obligation arising or accruing under the Assigned Contracts prior to the Closing Date, except as otherwise expressly provided in the Purchase Agreement.

13.     Provided that the Debtor pays the applicable Cure Amount, each non-debtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from asserting against Purchaser or the Purchased Assets, any default existing as of the Closing Date or any counterclaim, defense, setoff, or any other claim asserted or assertable against the Debtor as of the Closing Date.

14.     The failure of the Debtor or Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtor's and Purchaser's rights to enforce every term and condition of the Assigned Contracts.

## **Additional Provisions**

15.     The consideration, including the final bid of $[_____], provided by Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under § 363(n) of the Bankruptcy Code.

16.     The Transaction has been, and is undertaken by the Debtor and Purchaser in good faith, as that term is used in § 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the sale of the Purchased Assets to Purchaser, unless such authorization is duly stayed pending such appeal. Purchaser is in all respects a good-faith purchaser of the Purchased Assets and is entitled to all of the benefits and protections afforded by § 363(m) of the Bankruptcy Code. In the event of any stay, modification, reversal or vacation of this Order, then notwithstanding any such stay, modification, reversal or vacation, all obligations incurred by the Debtor under this Order and the Purchase Agreement prior to the effective date of such stay, modification, reversal or vacation will be governed in all respects by the original provisions of this Order, and Purchaser shall be entitled to the rights, privileges and benefits granted in this Order with respect to all such obligations.

17.     This Court retains jurisdiction to:

(a)     Interpret, implement, and enforce the terms and provisions of this Order and the terms of the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, and of each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to Purchaser;

(b)     Protect Purchaser or any of the Assigned Contracts or Purchased Assets against any of the Liens or Interests (other than the Permitted Exceptions),

as provided herein, and to enforce the injunctions provided herein with respect to the commencement or continuation of any action seeking to impose successor or other liability upon the Purchaser;

(c)        Enter orders in aid or furtherance of the Sale and the Transaction;

(d)        Compel delivery of all Purchased Assets to Purchaser;

(e)        Adjudicate any and all remaining issues concerning the Debtor's right and authority to assume and assign the Assigned Contracts and the rights and obligations of Purchaser with respect to such assignment and the existence of any default (including any Cure Amounts) under any such Assigned Contract;

(f)        Adjudicate all issues concerning any actual or alleged Liens or Interests in and to the Purchased Assets, including the extent, validity, enforceability, priority, and nature of all such actual or alleged Liens or Interests; and

(g)        Except as expressly provided for herein, adjudicate any and all issues and/or disputes relating to the Debtor and title or interest in the Purchased Assets and the proceeds of the Sale, the Sale Motion, and/or the Purchase Agreement.

18.    This Sale Order: (a) shall be effective as a determination that, on the Closing Date, all Liens and interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated, against or otherwise with respect to the Purchased Assets (but not the proceeds thereof), with such Liens and Interests to attach to the proceeds of such Sale, and that the conveyances described herein have been effected; and (b) shall be binding upon and shall govern

the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registers of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record, or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

18.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

19.     All persons who or entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to Purchaser on the Closing Date.

20.     Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Purchased Assets or the Excluded Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Purchase Agreement, Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, except as expressly set forth in the Purchase Agreement as an Assumed Liability, and Purchaser shall have no successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or, in any way, relating to the operation or transfer of the Debtor's business or assets prior to the

Closing Date, or obligations in any way relating to collective bargaining agreements between the Debtor and any party, or any other obligations relating to current or former employees, or retirees of the Debtor. The sale of the Purchased Assets pursuant to the Purchase Agreement and this Order shall not give rise to any claims for severance against, or trigger any other employee benefit not otherwise payable in the ordinary course by the Debtor to any employee of the Debtor whose employment is continued by Purchaser after the Closing Date.

21.     If any person or entity that has financing statements, mortgages, mechanics' liens, *lis pendens,* or other documents or agreements evidencing Liens or Interests against the Purchased Assets shall not have delivered to the Debtor and Purchaser, prior to Closing, in proper form for filing and executed by the appropriate parties, releases of all such Liens or Interests which the person or entity has with respect to the Purchased Assets, then: (i) the Debtor or Purchaser hereby is authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Purchased Assets; and (ii) Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens or other Interests in the Purchased Assets as of Closing, of any kind or nature whatsoever.

22.     The terms and provisions of the Purchase Agreement, the ancillary agreements, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor and Purchaser and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code or conversion of this case to a case under chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding. The Purchase Agreement and the Transaction may be specifically enforced against, and shall not be subject to rejection or avoidance by, the Debtor or any Chapter 7 or Chapter 11 Trustee of Debtor.

23. The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor or the Debtor's estate.

24. The failure specifically to include any particular provisions of the Purchase Agreement or the ancillary agreements in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement and the ancillary agreements be authorized and approved in their entirety.

25. To the extent of any inconsistency between the provisions of this Sale Order, the Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order and the Purchase Agreement and any documents executed or delivered in connection therewith shall govern, in that order.

26. Nothing contained in any chapter 11 plan confirmed in this chapter 11 case or any Order of this Court confirming such plan or any other order entered in this chapter 11 case (or any converted chapter 7 case) shall conflict with or derogate from the provisions of the Purchase Agreement, to the extent modified by this Order, or the terms of this Order.

27. In the event that this chapter 11 case is dismissed or converted to a chapter 7 case, or a trustee is appointed (whether under chapter 11 or 7), neither the dismissal or conversion of this case, nor the appointment of such a trustee, shall affect, in any manner the rights of Purchaser under the Purchase Agreement or this Sale Order, or any other agreements executed by the Debtor in conjunction with the Sale and the Transaction, and all of the rights and remedies of Purchaser under this Sale Order, and such agreements shall remain in full force and effect as if the case had not been dismissed or converted or a trustee had not been appointed.

28.     The provisions of this Sale Order are non-severable and mutually dependent.

29.     This Order shall take immediate effect and the 10-day appeal period provided by Bankruptcy Rules 6004(h) and 6006(d) shall not apply so that the sale may close immediately.